| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-cr-00327 |
| v. | ) | |
| | ) | |
| | ) | Hon. Aleta Trauger |
| [1] CHESTER GALLAGHER | ) | |
| [2] HEATHER IDONI | ) | |
| [3] CALVIN ZASTROW | ) | |
| [4] COLEMAN BOYD | ) | |
| [6] PAUL VAUGHN | ) | |
| [7] DENNIS GREEN | ) | |

## UNITED STATES' TRIAL BRIEF

The United States of America, by and through undersigned counsel, respectfully submits this trial brief of evidentiary and legal issues which may be raised at trial.

## I. Statement of the Case

This case arises out of the defendants' blockade of a reproductive health services clinic in Mt. Juliet, Tennessee on March 5, 2021. This blockade was planned over the month of February, both in person and over Facebook messages by the defendants and other unindicted co-conspirators. The week prior to the blockade, defendant Calvin Zastrow traveled to Tennessee, telling his co-conspirators that he was going to "nail down plans for next week's big deal." The planning resulted in multiple individuals, including the defendants, traveling to the Middle District of Tennessee.

On March 4, 2021, the co-conspirators held a final planning meeting at which they divvied out roles. Some people were tasked with blocking doors; some were tasked with "blowfishing," meaning that they remained in the hallway and tried to appear to law enforcement that they were willing to be arrested but in fact intended to leave before arrests were made; some were tasked

with interacting with police to make the blockade last as long as possible; and some were designated as drivers.

The next morning, the clinic was set to open at 8:00 am. The co-conspirators came prepared for a blockade with a pre-printed flyer that was titled "what really happened today in Mount Juliet? Police arrested peaceful, obedient Christians!" The flyer concluded with an email "wearerescuers@gmail.com," an email created by and registered to defendant Chester Gallagher. The co-conspirators entered the building and took positions up and down the hallway. The co-conspirators included children of some of the defendants.

The clinic had two access points: the main entrance for patients, and a second entrance that could only be accessed by employees. Some of the co-defendants positioned themselves directly in front of the main entrance to the clinic and others positioned themselves in front of the employee entrance. The remaining co-defendants occupied the hallway. Gallagher instructed the blockaders as to what to do, Boyd had his children interact with Patient A when she arrived, and Vaughn stalled local law enforcement. The defendants' blockade went on for more than two hours before police finally arrested some of the co-conspirators.

During the course of the morning, at least three of the defendants filmed the blockade.[1] Coleman Boyd was one of the first on the scene. He positioned himself at the end of the hallway opposite the clinic and in front of the elevator. His children were positioned opposite of him, near to the clinic. When Patient A exited the elevator, Boyd was the first to interact with her, asking her if she was coming "to the abortion mill." When Patient A declined to speak with him and left to find a restroom, Boyd sent his minor daughter to follow Patient A. Patient A and her partner then

---

[1] On the recordings, there is also a videographer with a video camera, and defendant Heather Idoni is wearing a Go-Pro, but the United States has not obtained footage from either recording.

tried to proceed to the clinic entrance, stopping outside a bathroom in the hallway. Patient A's partner went inside the bathroom, leaving Patient A in the hallway. Multiple women approached Patient A and began talking at her. Boyd provided commentary, explaining, "See, what you got here is a mom who's coming to kill her baby. Got one mom here, right now, right here." Patient A and her partner ultimately left the building because of the blockade. After they left, Boyd called another individual to tell them that Patient A and her partner were coming.

As the morning wore on, additional blockaders arrived, along with law enforcement. Law enforcement directed the blockaders to leave over and over again, but the blockaders did not comply. Instead, Vaughn drew out the negotiations to ensure that the blockade lasted as long as possible which, as Gallagher explained, was a "tactic" the defendants used to "buy[] more time."

The bulk of the scheduled patients avoided the clinic as the blockade wore on, but a few still tried to access the clinic. One arrived after law enforcement, and they tried to escort her down the hallway, yelling "part the seas!" None of the blockaders moved, so the police officer had to physically move them to make his way down the hallway. The patient ultimately left, saying that the blockade was "too much" and made her "uncomfortable."

After police finally made arrests, defendant Vaughn participated in an interview with the news in which he explained that "we came into the building, and we sat down at the door peacefully and non-violently." He also explained that many of the blockaders were not local and had travelled far distances to participate in the blockade of the clinic. Defendant Boyd, meanwhile, expressed in a private message that he and others had "[b]locked the door to an abortion mill," and called for the recipient to "look at" his Facebook, on which he had live recorded the blockade. He later went on to essentially proffer on that same platform that:

> On March 5, 2021, [we] went into a building in Mt Juliet, TN . . . [and w]e sat down
> in front of the door . . . . Our intention was not to protest but rather to interpose

ourselves between the baby and the person hired to kill them. After about three hours . . . , we were arrested and taken to jail.

## II. Witnesses

The United States anticipates that it will call ten witnesses, including three employees of the clinic, a patient, the patient's partner, a cooperating defendant, three law enforcement officers who responded to the blockade, and an FBI analyst who will discuss defendants' communications leading up to the blockade. The parties have also agreed to four stipulations, covering the authenticity of records received from Facebook and Google, and the authenticity of videos preserved from Facebook and a local news outlet.

The cooperator, Caroline Davis, will identify the defendants and testify about her prior experience with some of the defendants, along with how she learned of the potential blockade in Tennessee. She will explain her decision-making in deciding to participate in the blockade, and her communications regarding the plans with her co-defendants leading up to the blockade. She will explain terms of art used by the co-conspirators, including "blowfish," and will explain that the co-conspirators' ultimate goal was to make the blockade take as long as possible. She will describe the planning of the blockade, why the particular clinic was chosen, and several meetings before the blockade at which roles were designated. She also will narrate the various defendants' recordings, explaining what was happening as the blockade progressed.

The United States anticipates that the employees will explain that they felt trapped within the clinic after the blockade started. One employee exited to assist Patient A and was unable to reenter the clinic because defendant Calvin Zastrow was blocking the employee entrance.

The United States anticipates that the law enforcement officers will describe the blockade and explain that the defendants and their co-conspirators were blocking the doors of the clinic and

- 4 -

refused to move. They will explain that the blockaders created an intimidating situation for any potential patient, and how law enforcement action was necessary in order to reopen the clinic.

The United States also anticipates that Patient A and her partner will describe their experience with the blockade on March 5, 2021. Patient A will explain that her anxiety skyrocketed after seeing the blockaders and she felt that she could not physically get down the hallway because of the blockaders' presence, both physically blocking the hallway and creating intimidation in numbers and conduct.

### III.   **Potential Trial Issues**

The United States wishes to flag for the Court four evidentiary issues that may arise during trial.

#### A.  *Physical Security Policy*

In its initial discovery production, subject to a protective order, the United States produced to the defendants the national physical security policy for the organization that operated the reproductive health clinic blockaded in this case. Although the specific health clinic at issue in this case is now closed, the organization continues to operate reproductive health clinics across the country that continue to be subject to this policy. This fourteen-page security document includes detailed steps for identifying and responding to, *inter alia*, potential mail bombs and safety evacuations in the event of certain threats. Accordingly, the document presents a readily exploited roadmap for a an individual or group to bypass security procedures, engage in criminal conduct, and even deliver a mail bomb or otherwise trigger a mass casualty incident.

The United States foresees the possibility that defense counsel may be able to cross-examine employees about their compliance with some basic provisions of the physical security policy on March 5, 2021. However, the United States anticipates objecting to any attempt to introduce the security policy into evidence as irrelevant, as inadmissible hearsay, as otherwise

- 5 -

lacking an adequate evidentiary foundation, as improper impeachment, and/or as barred under the collateral issue rule.[2] In the event that portions of the physical security policy become admissible evidence, the Court should admit only those specific portions and, depending on the specific content of those portions, seal the exhibit to protect it from public disclosure.

### B. The Defendants' Handbill

At trial, the United States expects to elicit testimony about a printed handbill the defendants began distributing prior to any arrests being made. Specifically, the United States may elicit testimony that the handbill was captioned "What really happened today in Mount Juliet," that the handbill declared that the police had arrested people (prior to the police arresting anyone), that the handbill admitted that those arrested were blocking access to a reproductive health facility, and that the handbill listed an email address that is registered with Google to Defendant Chester Gallagher. In addition, the handbill appears to be in the hands of Defendants Vaughn and Green in video clips that the United States will introduce at trial through cooperating defendant Caroline Davis. The bulk of the handbill alleged that those blocking the health clinic were acting in accordance with God's law, declared that they were "[a]cting Biblically" and "rescuing the innocent," and referred to potential penalties. None of this additional language is admissible under the rule of completeness.

The preponderance of the evidence establishes that the language in the handbill is admissible against the defendants under Fed. R. Evid. 801(d)(2)(e). It is well-established however, that the defendants may not elicit their own hearsay under this same rule. *See, e.g., United States*

---

[2] The collateral issue rule "provides that evidence is inadmissible if it is offered solely for the purpose of contradiction and no other." *United States v. Schwyhart*, 123 F. App'x 62, 65 (3d Cir. 2005).

- 6 -

*v. Oakes*, 2018 WL 4051869, at *2 (M.D.T.N., Aug. 24, 2018). Further, statements or testimony that the defendants and others were "acting Biblically," "rescuing the innocent," "obeying God's law" over local and national laws, or that reference to potential penalties, are not admissible as evidence or argument, do not constitute a legal defense to the charges, and would plainly seek to elicit nullification. *See* United States's Motion to Preclude Improper Arguments and Irrelevant Evidence, D.E. 359 at 2-12; United States's Reply in Support of Motion to Preclude, D.E. 412 at 1-4; *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991) ("It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict.").

### C. Fed. R. Evid. 610

Federal Rule of Evidence 610 states, "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." This prohibition concerns all types of theological belief systems, including belief systems that do not involve a deity. *See McCormick On Evid.* § 46 (8th ed. 2022 update) ("Today, there is an insufficient basis for believing that the lack of faith in God's avenging wrath is an indication of greater than average untruthfulness. Without that basis, the evidence of atheism is irrelevant to the question of credibility."). Rule 610 is short, straightforward, and rarely implicated, referenced in only 117 federal court decisions available in Westlaw. However, the United States anticipates that it may invoke the rule to object to improper questioning and/or argument in this trial.

### D. Cross-Examination of the Defendants

Finally, as the Sixth Circuit has held, "a defendant [who] voluntarily takes the stand in his own behalf . . . waives the protected afforded him by his privilege against self-incrimination," and must respond to all inquiries pertinent to the issue on trial." *United States v. Doremus*, 414 F.2d 252, 253 (6th Cir. 1969) (citing *Brown v. United States*, 356 U.S. 148, 154-156 (1958)). The scope

- 7 -

of this inquiry is not "limit[ed] to . . . express questions posed on direct-examination," but rather includes "the subject matter of direct examination," "issues of witness credibility," and "*all* inferences and implications arising from . . . or reasonably related to*" any testimony. *United States v. Arnott*, 704 F.2d 322, 324 (6th Cir. 1983) (emphasis added). Thus, a defendant who on direct is asked even "a series of [basic] questions about his whereabouts" on certain dates, including the date of the alleged incident, has waived Fifth Amendment protection from questions on cross about his involvement in an offense on that date. *Aldridge v. Marshall*, 765 F.2d 63, 66 (6th Cir. 1985) (explaining that the fact that the direct "focuse[d] the court's attention on [the] time period" rendered the questions by the United States not only "reasonabl[y] relat[ed] [to] petitioner's testimony on direct," but "direct[ly]" so); *see also United States v. Moore*, 917 F.2d 215, 222 (6th Cir. 1990) (finding "elicited testimony inculpating [the defendants] was reasonably related to the inferences drawn" from the questions on direct about a defendant's whereabouts on the date of an offense, and "hence, permissible"). So too here: any defendant who takes the stand and is questioned about any date or time period—their whereabouts, their actions, or their intentions—has waived Fifth Amendment protection from questions on cross about his or her involvement in any offense on that date, including the date of the incident that is charged in the Indictment. This remains true even if a defendant's examination is subject to objections based on the lines of permissible testimony drawn by the Court's rulings.

## IV.    Conclusion

The defendants in this case planned and executed a joint effort to block the doors of a reproductive health and to do so for as long as possible. They did so in order to prevent patients from receiving reproductive healthcare and to prevent the facility from providing medical services to its patients. The United States' evidence will prove their guilt beyond a reasonable doubt.

- 8 -

Respectfully submitted,


HENRY C. LEVENTIS
United States Attorney
Middle District of Tennessee

*s/Amanda J. Klopf*
AMANDA J. KLOPF
Assistant United States Attorney
791 Church St, Suite 3300
Nashville, Tennessee 37203
Phone: 615-736-5151

KRISTEN M. CLARKE
Assistant Attorney General
Civil Rights Division

*s/Kyle Boynton*
KYLE BOYNTON
Trial Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530
Phone: 202-598-0449
Kyle.Boynton@usdoj.gov

*s/Wilfred T. Beaye, Jr.*
WILFRED T. BEAYE, JR.
Trial Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530
Phone: 771-333-1681
Wilfred.Beaye@usdoj.gov

- 9 -

<u>**CERTIFICATE OF THE SERVICE**</u>

I certify that a true and correct copy of the foregoing was filed electronically and served electronically, via the CM/ECF electronically filing system on this 9th day of January, 2024, upon the following:

**JODIE A. BELL**
Law Office of Jodie A. Bell
Washington Square Building 214 Second
Avenue North Suite 208
Nashville, TN 37201
USA
jodie@attorneyjodiebell.com
(615) 953-4977

*Attorney for Defendant Chester Gallagher*

**WILLIAM J. CONWAY**
William J. Conway, Esq. P.C.
214 Second Avenue North, Suite 208
Nashville, TN 37201
wjconway@gmail.com
(615) 260-5364

*Attorney for Defendant Heather Idoni*

**LARRY LAMONT CRAIN**
5214 Maryland Way
Suite 402
Brentwood, TN 37207
(615) 376-2600
larry@crainlaw.legal

**STEPHEN M. CRAMPTON**
Thomas More Society
P.O. Box 4506
Tupelo, MS 38803
scrampton@thomasmoresociety.org
662-255-9439

*Attorneys for Defendant Paul Vaughn*

**G. KERRY HAYMAKER**
Haymaker & Heroux, P.C.
545 Mainstream Drive
Suite 420
Nashville, TN 37228
haymaker@tennesseedefense.com
(615) 250-0050

**STEVE C. THORNTON, I**
Steve Thornton Attorney Law Office
P.O. Box 16465
Jackson, MS 39236
USA
mail@lawlives.com
(601) 982-0313

*Attorneys for Defendant Coleman Boyd*

**MANUEL B. RUSS**
340 21st Avenue North
Nashville, TN 37203
(615) 329-1919
russben@gmail.com

**JOHN R. MANSON**
3112 Carrington Court
Nashville, TN 37218
USA
jmanson@lewisthomason.com
615-259-1366

*Attorneys for Defendant Dennis Green*

- 10 -

**ROBERT LYNN PARRIS**
208 3rd Avenue North Ste 300
Nashville, TN 37201
rlp@robertparrisattorney.com
(901) 490-8026

**DAVID I. KOMISAR**
Law Office of David I. Komisar
208 Third Avenue North, Suite 300
Nashville, TN 327201
david@komisarlaw.net
615-256-3330

*Attorneys for Defendant Calvin Zastrow*


s/ *Wilfred T. Beaye, Jr.*
Wilfred T. Beaye, Jr.
Trial Attorney

- 11 -