# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 3:22-cr-00327** |
| | ) | **Judge Trauger** |
| **[1] CHESTER GALLAGHER** | ) | |
| **[2] HEATHER IDONI** | ) | |
| **[3] CALVIN ZASTROW** | ) | |
| **[4] COLEMAN BOYD** | ) | |
| **[6] PAUL VAUGHN** | ) | |
| **[7] DENNIS GREEN** | ) | |

## <u>MEMORANDUM and ORDER</u>

Before the court is the Motion for a Protective Order filed on behalf of three "Jane Doe" witnesses who have been subpoenaed by the government to testify in the upcoming trial of this matter. (Doc. No. 453.) The motion asks the court to protect the witnesses from harassment and other unlawful conduct by permitting them to testify under pseudonyms. This motion follows on the heals of the court's denial of the government's related Motion to Protect Witnesses (Doc. No. 353), which likewise sought the court's permission for the same witnesses, among several others, to testify pseudonymously. [1] (*See* Order, Doc. No. 413.) The court denied the motion, but without

---

[1] Counsel for the Doe Witnesses state, in a footnote, that they were not retained to represent any of the other witnesses addressed in the government's motion, specifically including an as-yet "unidentified and unrepresented patient" whom the government expects to call to testify. (Doc. No. 453, at 1 n.1.) Counsel posit in the same footnote that, if the court is inclined to grant the Doe Witnesses' motion, "it should also grant the same relief to the unrepresented patient witness for the same reasons and for consistency." (*Id.*)

The court rejects that proposition for several reasons. First, no motion pertaining to the unrepresented and unidentified patient witness is before the court, and no additional facts regarding her situation have been presented to the court. Second, a former patient who sought unspecified reproductive health services in 2021 is in a wholly different situation than the three former employees of the abortion clinic, such that the rationale for granting the Doe Witnesses' Motion

prejudice. The Doe Witnesses now bring additional factual support for the motion and expressly "adopt[] the Government's motion in whole." (Doc. No. 453, at 1 n.1.)

For the reasons set forth herein, the Motion for a Protective Order will be granted, with conditions in place to protect the defendants' interest in a comprehensive cross-examination of the witnesses.

## I.    BACKGROUND

The court denied the government's motion to allow the Doe Witnesses to testify pseudonymously, largely because it was not supported by affidavits or actual facts to substantiate the government's contention that the witnesses were subject to threats to their safety if they were not permitted to testify anonymously. The denial of the motion was expressly "without prejudice to the government's ability to renew the motion in the event it becomes aware of actual—rather than conjectural—danger or threatened violence to any of these witnesses." (Doc. No. 413, at 7.)

The present motion is supported by sworn Declarations from three Jane Doe witnesses, who, as noted, have retained counsel to represent them. (*See* Doc. Nos. 453-1, 435-2, 453-3 (redacted Declarations); Doc. Nos. 451-1, 451-2, 451-3 (unredacted Declarations filed under seal).) Each of the Declarations sets forth the declarants' articulable and well-grounded fears that they will be targeted by the defendants' supporters and associates if they are publicly identified as testifying witnesses. Jane Doe "A" states that she was the clinic manager for carafem[2] in Mount

_____

for a Protective Order would not necessarily justify permitting the patient witness to testify under a pseudonym. The court, therefore, addresses only the motion before it, and the holding herein pertains only to the three Doe Witnesses on behalf of whom the Motion for a Protective Order was filed.

[2] FemHealth USA, Inc. is a reproductive health organization that does business under the name carafem. It operates a network of reproductive health centers, including, at least as of July 2022, one located in a medical office building in Mount Juliet, Tennessee. *See* https://carafem.org/.

Juliet, Tennessee in March 2021, when "dozens of Operation Save America ('OSA') members entered the clinic and blocked the doors," chanting and shouting, preventing patients from entering the building and trapping employees inside. (Doc. No. 453-1 ¶¶ 2–3.) She was also at the carafem clinic on July 26 and July 28, 2022, when OSA members and affiliates attempted to get inside the clinic and caused the clinic to go on lockdown. In a Memorandum opinion granting a motion for preliminary injunction against OSA and several individual members, Judge Campbell of this court found that the July 26 event was captured on video and posted on the Facebook account of one participant. The video shows members of the group telling Mount Juliet Police Officers:

> It really doesn't matter what men say . . . our position is that there is babies being murdered in there . . . it doesn't matter what the D.A. says or anybody else, it's not going to change what's really going on behind there—murders, homicide. We got men out here who are willing to do what needs to be done. . . . We have to obey God rather than men. It doesn't matter what a man in an air-conditioned office says—you have a duty to God to protect life at every level.

*FemHealth USA, Inc. v. Williams*, 3:22-cv-00565, 2022 WL 4241269, at *2 (M.D. Tenn. Sept. 14, 2022), *appeal dismissed*, 83 F.4th 551 (6th Cir. 2023).

According to the Doe Witnesses, three days later, three anti-abortion extremists attempted to gain entry to the carafem clinic by falsely representing that they had an appointment. After being denied access to the clinic itself, one of the individuals recorded herself and the two others "stomping through the hallways of the building, screaming, 'Murderers!' and threatening to 'take this whole building down' and 'terrorize this whole building.'" (Doc. No. 453, at 4–5 (quoting Doc. No. 453-5, *FemHealth USA, Inc. v. Williams*, No. 3:22-cv-00565, Mem. Supp. M. Prelim. Inj. (M.D. Tenn. Aug. 9, 2022).) These threats again forced the carafem clinic into a lockdown until the extremists were escorted from the building by security. (*Id.* at 5.) One of these individuals was found to be armed with a concealed handgun when he was arrested. (*Id.*)

Jane Doe "A" states that she was extremely anxious and afraid for her safety on all of these occasions. (*Id.* ¶¶ 4–5.) She continues to work in the field of reproductive healthcare and is afraid of "antiabortion extremists discovering where [she] work[s]" and harassing her at work or following her home. (*Id.* ¶ 6.) She and her family have increased security equipment and measures at their home following the OSA event at carafem in July 2022. (*Id.* ¶ 7.) She continues to fear for her safety and that of her family if protesters learn where she lives.

Jane Doe "B" was also employed by carafem in March 2021 and July 2022 and present at the demonstrations. She feared for her safety during the incidents and has subsequently sought medical treatment due to these events. Following the July incidents, she began altering her routes home and paying close attention to cars around her, due to fear that OSA members would follow her home. (Doc. No. 453-2 ¶¶ 2–5.) She is terrified by the prospect of anti-abortion extremists learning her identity or other personal information. (*Id.* ¶ 6.) In addition, she was "doxed" on LiveAction, an anti-abortion website, in early 2021, meaning that she was identified as an individual who had previously worked at another reproductive health organization. (*Id.* ¶ 7.) Her name and links to her Facebook and LinkedIn profiles were posted publicly. She remains fearful that disclosing her identity in connection with testifying at this trial will permit anti-abortion extremists to use personally identifying information to harass and threaten her, and she fears for her personal safety. (*Id.* ¶¶ 7–8.)

Jane Doe "C" is a Board Certified and practicing obstetrician/gynecologist who was working at the carafem clinic when the defendants and others blocked the entrances in March 2021, which caused her to fear for her safety. (Doc. No. 453-3 ¶¶ 2–4.) She currently works at a public institution, where her records are subject to public records requests. She has already been the target of requests by anti-abortion extremists seeking access to her HR file and emails through

the state's public records laws. She is concerned that, if she is not permitted to testify under a pseudonym, supporters of the defendants will harass and harm her at home and work. (*Id.* ¶¶ 5–6.) The fact that she previously worked at carafem, however, is not subject to public disclosure or part of her HR records with her current employer. The Doe Witnesses argue that, if the doctor is disclosed as a testifying witness, extremists will be able to identify her as a target and use her publicly available information to harass or attack her. (Doc. No. 453, at 6.)

The court also takes notice that OSA has organized a rally to surround the courthouse beginning at 7:30 a.m. on the first scheduled day of trial, January 16, 2024. *See* https://www.operationsaveamerica.org/event/rally-for-rescuers; *see also* Rusty Thomas & Jason Storms, I Stand with the 10 Rally, https://www.facebook.com/events/638724271333633 /?ref=newsfeed.

The Doe Witnesses further show that two of the defendants are members of OSA, and they point to a Facebook post on OSA's website showing an individual describing when he and defendant Gallagher went with a group of "about 600 saints" to demonstrate at the residence of a different abortion doctor. (Doc. No. 453, at 5–6 (citing https://www.facebook.com/reel/ 948914899927193).) They also assert that a "well known anti-abortion extremist" who participated in the OSA events at carafem in July 2022 and is affiliated with the group LiveAction has previously been charged with stalking and harassing a doctor in San Francisco, including at the doctor's home. (*Id.* at 6 (citing Gregory Yee, "L.A. antiabortion activist charged with harassing San Francisco doctor, defacing statue," *Los Angeles Times* (May 19, 2022), https://www.latimes.com/california/story/2022-05-19/los-angeles-antiabortion-activist-harassing-stalking-doctor).)

The Doe Witnesses state that they have faced threat to their personal safety from anti-abortion activists and that there is increasing national violence against abortion providers. They argue that disclosing their names, places of work, and domiciles publicly during this trial would jeopardize their safety and subject them to harassment, threats of violence, and potentially actual violence. Despite the closure of the carafem facility where they previously worked, they still fear that public disclosure of their identities would subject them to harassment, intimidation, and threats. They argue that (1) providing their real names to the defendants under seal, as the government's motion proposed, would protect them from these threats while not inhibiting the defendants' ability to conduct a "fulsome" investigation and cross-examination; (2) the defendants have not articulated how disclosing their real names and other identifying information would help the jury assess the Doe Witnesses' credibility; and (3) the defendants' concerns about the logistics of conducting voir dire without revealing the Doe Witnesses' real names can readily be addressed by displaying photographs of the witnesses during voir dire, as suggested by the government.

## II.     ANALYSIS

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. The Supreme Court has held that a defendant has the right under the Confrontation Clause to cross examine a witness regarding the witness's full name and place of residence. *See Smith v. Illinois*, 390 U.S. 129, 131–32 (1968) ("To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself."). This right, however, is not unqualified. Trial judges have "wide latitude . . . to impose reasonable limits . . . on cross examination based on concerns about, among other things, harassment, prejudice, . . . or the witness' safety." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also United States v. Rangel*, 534 F.2d 147 (9th Cir. 1976) ("*Smith v. Illinois* . . . 'does

not establish a rigid rule of disclosure, but rather discusses disclosure against a background of factors weighing conversely, such as personal safety of the witness.'" (quoting *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir. 1974))).

While the Sixth Circuit has not directly addressed the question of permitting witnesses in a criminal case to testify using pseudonyms, those circuits that have confronted the question have held that, "[w]hen the government seeks to withhold a witness's true name, address, or place of employment, it bears the burden of demonstrating that 'the threat to the witness [is] actual and not a result of conjecture.'" *United States v. Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012) (quoting *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969)). Thus, for example, a "generalized statement" to the effect that "*anyone* who testifies against [a gang member] faces danger from [the gang]" would not be sufficiently particularized. *Id.* at 501. But, once the government makes the requisite showing of an actual, particularized threat, then the district court "has discretion to review relevant information and determine whether disclosure of the witness's identifying information is necessary to allow effective cross-examination." *Id.*; *see also United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1144 (10th Cir. 2014) ("[C]ourts evaluate Confrontation Clause claims based on anonymous testimony by asking (i) whether the government has demonstrated a threat and if so, (ii) whether anonymous testimony deprived the defendant of an opportunity for effective cross-examination.").

The Sixth Circuit, addressing limitations to cross-examination in other contexts, has recognized that the Confrontation Clause "guarantees a defendant the opportunity to impeach the credibility of a witness against him" and that a "criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and

thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." *United States v. Callahan*, 801 F.3d 606, 623–24 (6th Cir. 2015) (quoting *United States v. Holden*, 557 F.3d 698, 704 (6th Cir. 2009), and then *Van Arsdall*, 475 U.S. at 680)). However, the right to cross-examination is not unlimited. *Id.* at 623. To determine whether court-imposed limitations on the scope of cross-examination are constitutionally permissible, "[t]he key issue is whether the jury had enough information to assess the defense's theory of the case" despite those limitations. *Id.* at 624 (quoting *Holden*, 557 F.3d at 704). "So long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." *Id.* (quoting *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998)); *see also United States v. Fields*, 763 F.3d 443, 464 (6th Cir.2014) ("In determining a trial court's limitation of cross-examination for motive, bias, or prejudice, a reviewing court must decide 'whether the jury was otherwise in possession of sufficient information concerning formative events to make a discriminating appraisal of a witness' motives and bias.'" (quoting *Stevens v. Bordenkircher*, 746 F.2d 342, 346–47 (6th Cir. 1984)).

The court finds that the Doe Witnesses, through their Declarations, have carried their burden of establishing the existence of an actual threat to their personal safety and well-being, in the form of the strong likelihood of harassment and intimidation, if their true names, domiciles, and places of employment are disclosed during the trial. The Doe Witnesses' fears are only partially mitigated by their having found employment elsewhere after the complete ban on abortions took effect in Tennessee and the carafem clinic closed.

The court also finds that the measures proposed by the government to protect the witnesses would nonetheless permit the defendants to conduct a complete and effective cross-examination

and will not prejudice them or adversely impact their ability to defend against the charges against them. Specifically, the government will be required to identify the Doe Witnesses to defense counsel, under seal, thus enabling the defendants to investigate the witnesses out of court and to effectively cross-examine them at trial. The defendants will not be permitted to elicit the Doe Witnesses' real names, current places of employment, and home addresses during cross-examination. These details are not relevant to their testimony, their credibility, or the charges against the defendants.

To address the defendants' concerns about ensuring that no jurors are familiar with the witnesses, the parties may use enlarged images of the witnesses' driver's license (or other appropriate) photographs to substitute for the witnesses' names during voir dire.

## III. CONCLUSION AND ORDER

As set forth herein, the Doe Witnesses' Motion for a Protective Order (Doc. No. 453) is **GRANTED**. These witnesses will be permitted to testify under a pseudonym, and the defendants will not be allowed to cross examine them about (1) their true names; (2) home addresses; or (3) places of employment. The government must, as proposed, provide the Doe Witnesses' names and identifying information to defense counsel under seal. The parties may use enlarged photographs of the witnesses during voir dire to ensure that no potential jurors are familiar with the witnesses.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
U.S. District Judge