UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


UNITED STATES OF AMERICA )
)
VS ) No. 3:22-cr-327
)
CHESTER GALLAGHER [1] )
HEATHER IDONI [2] )
CALVIN ZASTROW [3] )
COLEMAN BOYD [4] )
PAUL VAUGHN [6] )
DENNIS GREEN [7] )
_____



BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS

January 26, 2024

(Volume 4-A)

_____








_____

**Roxann Harkins, RPR, CRR**
Official Court Reporter
719 Church Street, Ste 2300
Nashville, TN 37203
615.403.8314
roxann_harkins@tnmd.uscourts.gov

1    **APPEARANCES:**

2    For the Government:      AMANDA J. KLOPF
                              US Attorney's Office
3                            719 Church Street, Suite 3300
                              Nashville, TN 37203
4

5                            KYLE RANDOLPH BOYNTON
                              WILFRED T. BEAYE , JR.
6                            U.S. Department of Justice
                              150 M St. NE
7                            Washington, DC 20530

8

9    For the Defendant Gallagher:

10                           JODIE A. BELL
                              Law Office of Jodie Bell
11                           214 Second Avenue North
                              Suite 208
12                           Nashville, TN 37201

13

14   For the Defendant Idoni:

15                           WILLIAM J. CONWAY
                              214 Second Avenue North
16                           Suite 208
                              Nashville, TN 37201

17

18   For the Defendant Zastrow:

19                           ROBERT LYNN PARRIS
                              200 Jefferson Avenue
20                           Suite 1500
                              Memphis, TN 38103
21
                              DAVID I. KOMISAR
22                           800 Broadway
                              Third Floor
23                           Nashville, TN 37203

24

25

1   For the Defendant Boyd:

2                           G. KERRY HAYMAKER
                            Haymaker & Heroux
3                           300 James Robertson Parkway
                            Suite 306
4                           Nashville, TN 37201

5                           STEVEN C. THORNTON
                            PO Box 16465
6                           Jackson, MS 39236

7

8   For the Defendant Vaughn:

9                           STEPHEN CRAMPTON
                            Thomas More Society
10                          PO Box 4506
                            Tupelo, MS 38803
11

12  For the Defendant Green:

13                          MANUEL B. RUSS
                            340 21st Avenue North
14                          Nashville, TN 37203

15

16

17

18

19

20

21

22

23

24

25

1

2 **I N D E X**

3 <u>Government witnesses cont'd</u>

4 **CAROLINE DAVIS**

5 Continued Cross-Examination By Mr. Thornton ........16
Cross-Examination By Mr. Russ ......................31
6 Cross-Examination By Mr. Crampton ..................35
Cross-Examination By Mr. Conway ....................45
7 Redirect Examination By Ms. Klopf ..................51
Recross-Examination By Ms. Bell ....................67
8 Recross-Examination By Mr. Crampton ................72
Redirect Examination By Ms. Klopf ..................75

9

10 **MELISSA ASHBY**

Direct Examination By Ms. Klopf ....................81
11 Cross-Examination By Mr. Haymaker ..................93
Cross-Examination By Ms. Bell .....................108
12 Redirect Examination By Ms. Klopf .................110

13 **ANN MARIE WOOD**

14 Direct Examination By Mr. Beaye ...................120
Cross-Examination By Ms. Bell .....................150
15 Cross-Examination By Mr. Parris ...................154
Cross-Examination By Mr. Haymaker .................156
16 Cross-Examination By Mr. Crampton .................161
Redirect Examination By Mr. Beaye .................162

17

18 **NICHOLAS ASHBY**

19 Direct Examination By Ms. Klopf ...................163
Cross-Examination By Mr. Haymaker .................175
20 Cross-Examination By Ms. Bell .....................180

21 <u>Defense witness</u>

22 **TRAVIS WATKINS**

23 Direct Examination By Mr. Crampton ................187
Cross-Examination By Mr. Boynton ..................217
24 Cross-Examination By Ms. Bell .....................240

25

1 **E X H I B I T S**

2   Government No. 7....2/18/2021 web history of .....125
       Google account registered to Chester
3        Gallagher
  Government No. 8....xSearch history from .........125
4        2/18/2021 of Google account registered to
       Chester Gallagher
5   Government No. 9....Web history from 2/25/2021 of 125
       Google account registered to Chester
6        Gallagher
  Government No. 10....Search history from .........125
7        2/25/2021 of Google account registered to
       Chester Gallagher
8   Government No. 11....Facebook excerpt – messenger 125
       from account registered to Coleman Boyd
9   Government No. 12....Facebook excerpt –status ....125
       update from account registered to Coleman
10        Boyd
  Government No. 13....Facebook excerpt – messenger 125
11        from account registered to Chester
       Gallagher
12   Government No. 14B....Demonstrative Exhibit – ....129
       communication timeline
13   Government No. 18....Facebook post ................54
  Government No. 21....Stipulation re: portions of .119
14        Coleman Boyd's and Chester Gallagher's
       Facebook account
15   Government No. 23....Stipulation re: portions of .120
       the Google account web history and search
16        history of Chester Gallagher

17 Government rests ..................................182

18 Defense rests ....................................244

19

20

21

22

23

24

25

1

2          The above-styled cause came to be heard on

3    January 26, 2024, before the Hon. Aleta A. Trauger,

4    District Judge, when the following proceedings were had

5    at 9:10 a.m., to-wit:

6

7          THE COURT:  Good morning.  I want to thank

8    my court reporter, Roxann Harkins, for getting to all of

9    us the rough transcript from yesterday.

10          THE COURT REPORTER:  Very rough.

11          THE COURT:  Very rough.  It had some very

12   interesting things in it.

13          At any rate, the government has something

14   preliminary.  I've just received your new motion.  I

15   don't know if the defendant has received your new motion.

16   I think it was just filed this morning.  Another motion

17   to reconsider the admissibility of Exhibit 15.  It was

18   just filed; right?

19          MR. BOYNTON:  Yes, Your Honor.

20          THE COURT:  So we won't discuss that until

21   you have a chance to look at it.

22          So where are we from yesterday?

23          MR. BOYNTON:  Your Honor, just -- well,

24   would you like to talk about where we left things

25   yesterday afternoon?

1          THE COURT:  I think I would first and then
2    you can raise something else.
3          MR. BOYNTON:  Yes, Your Honor.  Thank you.
4          THE COURT:  And I realize you-all have lots
5    of prior statements by the witness, which the Court, of
6    course, is not privy to, but it looks as though her only
7    testimony about the DC situation was that she
8    participated -- that she was involved in the blockade of
9    a clinic in DC and she was not charged.  And I don't --
10   did she say something else about DC?
11         MS. KLOPF:  She did, and you probably were
12   searching for the word Washington, and you have to search
13   the word DC.  So page 129 I asked her:  When you were
14   involved in DC, when you kind of said you were doing the
15   five-second sermons, were you aware that other people
16   were blocking doors?
17              I was fully aware.
18              Were you encouraging others to commit the
19   crime?
20              Yes, I was.
21              Did you intend to help them commit the
22   crime?
23              Yes.
24              Did you get arrested that day?
25              No.

1          But you'd helped commit the crime of a

2   blockade?

3          Yes.

4          And in terms of planning that day, had you

5   reached an agreement with those people to engage and to

6   help them with that blockade?

7          Yes, I did.

8          But, again, you weren't arrested that day?

9          Yes.

10          Do you agree that you still committed a

11   crime?

12          Yes.

13          THE COURT:  Okay.  Well, here the government

14   is eliciting what it doesn't want the defense to elicit.

15   You are eliciting her conclusion that she committed a

16   crime.  The defense also wants to talk with her about

17   what was legal and what was illegal, and you're objecting

18   to it.

19          MS. KLOPF:  Yes, because they're cabining it

20   as -- she's agreeing that broadly she didn't commit a

21   particular crime.  We didn't identify what crime she has

22   committed.  They are cabining it in to trespass.  And she

23   does not understand, I think, the bounds of what she has

24   done.  And, in fact, because the question was phrased in

25   terms of they -- if they didn't ask you to leave, then

1    you had not committed a crime, which is actually an

2    inaccurate statement of law because even if you are not

3    asked to leave, you could be committing a number of

4    crimes.

5            So it's -- yes, the United States did elicit

6    that she has culpability here, which we discussed

7    yesterday, that she's saying that she did have exposure

8    for what she did, but it's not saying what crime did you

9    commit.  And it's the inverse, where they're asking her

10   whether or not she committed the crime of trespass and

11   she has agreed.

12           But in a way that leaves the jury with the

13   understanding that if somehow someone doesn't ask you to

14   leave or that you comply with that leaving, that you have

15   not committed a crime, which is an inaccurate statement

16   of law.

17           THE COURT:  Which is what I said you could

18   clear up on redirect.

19           MS. KLOPF:  Yes, Your Honor.  But I -- if we

20   continue on that path this morning, I will continue to

21   object because it's a misstatement of law.

22           THE COURT:  I will not allow her to come to

23   legal conclusions, but I will allow a certain amount of

24   testimony about what she intended.  She doesn't know what

25   anybody else intended.  And I'll just have to make the

1  calls as we go along.

2              So what is the other matter?

3              MR. BOYNTON:  Yes, Your Honor.  In the

4  indictment Patient A identified in the indictment and

5  Employee A identified in the indictment, they're both

6  under those names.  Sarah Flowers is Employee A.  That's

7  made clear from the description of what happened that

8  day.  She has now testified.

9              Melissa Mendez will be testifying today --

10  I'm sorry, Melissa Ashby will be testifying today and she

11  is Patient A identified in the indictment.  And just for

12  unmasking purposes for the jury, we wanted to flag that

13  for the Court.

14              THE COURT:  Okay, I think we've -- I think

15  we agreed at the pretrial conference, the indictment

16  wasn't going back.

17              MR. BOYNTON:  Yes, Your Honor.  Okay.

18              So the second thing we wanted to raise --

19  and I understand Your Honor may have been working on jury

20  instructions at the moment, but over the last couple of

21  days a couple of things have come up in the course of

22  trial that have raised some questions for the government

23  about additional instructions that may be appropriate.

24              Four of the defendant openings invoked some

25  of the language from the second element of Count One, the

1  241 conspiracy.  There is not a definition in the

2  instruction packet as it -- well, what we've received so

3  far for that language, that injure, oppress, intimidate.

4  And I handed up a slip copy of an opinion from

5  *United States v Handy*.  I've also handed that to defense

6  counsel.  That -- the definition was also absent from the

7  instructions in the first trial in the DC.  I think

8  Mr. Crampton can speak more to this because he was

9  counsel of record in that case.  But the jury came back

10  with a question about what do these words mean.

11           THE COURT:  Yeah.

12           MR. BOYNTON:  And the District Court at the

13  top of the right side of page 1 instructed that the words

14  are not used in any technical sense but cover a variety

15  of conduct intended to harm, frighten, punish, prevent,

16  or obstruct a person's exercise or enjoyment of a legal

17  right.  That comes from one of the earliest Supreme Court

18  decisions deciding 241 and is consistent with the Eighth

19  Circuit pattern instruction.

20           THE COURT:  Yeah, I've read this, and I

21  suspect we would get a question.  So we will consider

22  adding this.

23           MR. BOYNTON:  Yes, Your Honor.

24           THE COURT:  And, of course, I'll hear from

25  the defense about it.

1          MR. BOYNTON:  Absolutely, Your Honor.  We

2     wanted to flag that.  The charge conference may be a

3     little bit more lengthy.

4          THE COURT:  Oh, I think the charge

5     conference will be substantial, yes.

6          MR. BOYNTON:  We also wanted to flag based

7     on Mr. Haymaker's opening about leaving, I think the end

8     of that, that opening statement asked the question of the

9     jury, what did he do?  And that raises I think the

10    question of whether the Pinkerton instruction, Pattern

11    Instruction 3.10 would be appropriate in the case.

12          And then we're also concerned about some

13    discussion yesterday with Caroline Davis that may give

14    rise to a need for a Pattern Instruction 2.09, which I

15    believe is titled the Deliberate Ignorance instruction.

16          THE COURT:  All right.  I'm going to -- tell

17    me those numbers again that you're proposing.

18          MR. BOYNTON:  Certainly, Your Honor.  3.10

19    of the Sixth Circuit pattern instructions.  Pinkerton

20    liability.

21          THE COURT:  Okay.  And what's the other one?

22          MR. BOYNTON:  And 2.09 of the Sixth Circuit

23    pattern instruction, Deliberate Ignorance.

24          THE COURT:  Okay.  I have completed a first

25    draft of all the instructions that includes the

1    introductory ones and the concluding ones, and we'll hand

2    those out during our first break so you can start looking

3    at them.

4              So we are ready for the witness, are we?

5    Defense -- okay, go ahead.

6              MR. HAYMAKER:  I have one issue to raise to

7    the Court real briefly.

8              THE COURT:  Yes.

9              MR. HAYMAKER:  I didn't catch it yesterday,

10   my client pointed it out to me.  Ms. Davis, when she was

11   testifying, referred to one of the children of my client

12   by his full name, and we would ask that the witness not

13   refer to --

14             THE COURT:  Yeah, I think you've tried to

15   always --

16             MR. HAYMAKER:  And I don't think it was

17   anything deliberate.

18             THE COURT:  No.

19             MR. HAYMAKER:  Matter of fact, I didn't even

20   catch it.  But I looked back at the transcript and, sure

21   enough, that's what was done.

22             THE COURT:  Would you like to have that

23   deleted from the transcript?

24             MR. HAYMAKER:  Yes, Judge.

25             MS. KLOPF:  No objection.  And we've been

1  trying very hard to avoid that.

2              THE COURT:  Give her the page of the

3  transcript.

4              MR. HAYMAKER:  I'll have to look later and

5  I'll let her know.

6              THE COURT:  Just give it to her at some

7  point.

8              MR. HAYMAKER:  Yes, Judge.

9              THE COURT:  That's fine.  Any other

10 preliminary matters?  All right.  Let's get the witness

11 back on the stand.  Where is she?

12             Good morning, Ms. Davis.  We're going to get

13 you back on the stand and then we'll get the jury in

14 here.

15             THE WITNESS:  Good morning.

16             COURTROOM DEPUTY:  I don't have to reswear

17 her, right?

18             THE COURT:  No, I'll just remind her.

19             MR. HAYMAKER:  Your Honor, it's page 232.

20             THE COURT:  That's where the name appears?

21             MR. HAYMAKER:  Yes, Your Honor.

22             THE COURT:  Page 232, okay.

23             I want to remind everybody in the audience,

24 your cell phone is not to be out.  If any of the court

25 security officers see it out at all, you will be asked to

leave for the day.  And in the other room as well.  No
one may record any of the proceedings or take pictures.

                    (Whereupon, at 9:21 a.m. the jury returned
to open court.)

          THE COURT:  Good morning.  I hope you are
refreshed.  Has everyone followed my instructions to not
talk about this case amongst yourselves or with anyone
else?

                    Has everyone followed my instructions to not
do any research about anyone or anything connected to
this case?

                    Has everyone followed my instructions to
ignore any news coverage?  And I have learned we do have
reporters in the courtroom, there is news coverage, so
you must be very diligent about that.

                    All right.  We're ready to continue the
examination of Caroline Davis.  Ms. Davis, you're still
under oath.

                            **CAROLINE DAVIS**
called as a witness, duly sworn yesterday, returned to
the stand today and testified as follows:

          THE COURT:  Okay, Mr. Thornton.

          Mr. Thornton, Ms. Klopf needs you.  She has
a question.

**CONTINUED CROSS-EXAMINATION**

BY MR. THORNTON:

Q.   Good morning, Ms. Davis.

A.   Good morning.

Q.   When we left off yesterday, I was asking you questions about your involvement in a rescue in Washington, DC.  Do you remember that?

A.   I do remember that.

Q.   Let me get us back into that by asking you questions about your testimony when Ms. Klopf was asking you questions.  You remember you were asked when you were involved in DC when you kind of said you were doing the five-second sermons, were you aware that other people were blocking the doors.  Remember that question?

A.   I remember that question.

Q.   And you said:  I was fully aware.  Remember that?

A.   Yes.

Q.   Okay.  And you were asked again:  Did you intend to help them commit the crime.  Remember that question?

A.   I do.

Q.   And you said yes?

A.   Yes.

Q.   And you were asked, did you get arrested

1  that day.  Remember that question?

2       A.    I do.

3       Q.    And your answer was no?

4       A.    Yes.

5       Q.    And you were asked:  And in terms of

6  planning of that day, had you reached an agreement with

7  those people to engage and to help them with that

8  blockade.  Your answer was:  Yes, I did.  Remember that?

9       A.    I do.

10      Q.    Okay.  Now, that's not actually correct, is

11  it?

12      A.    I believe that it is correct.

13      Q.    Do you remember giving testimony in

14  Washington, DC case involving the Washington, DC rescue?

15      A.    I do.

16      Q.    And in that testimony you were asked:  Did

17  you plan and was it part of your agreement with those

18  other people to block access to the clinic.  You were

19  asked that question.  Do you remember your answer being:

20  I did not plan to block access to the clinic?

21      A.    Yes.

22      Q.    Okay.  And you were asked:  That was not

23  part of your agreement, was it?  You were asked that

24  question.

25      A.    That's correct.

1      Q.    And your answer was:  I personally never

2   made an agreement to block at the DC abortion clinic.

3            Remember that answer?

4      A.    Yup.

5      Q.    So the question goes on:  So your agreement

6   wasn't to block access.  Remember that question?

7      A.    Yes.

8      Q.    And your answer was:  I was on the fence

9   initially, but then I decided for sure not to?

10      A.    Yes, I remember that.

11      Q.    And in another case in Washington, DC

12   involving the same rescue, you were asked about your

13   blocking or your agreement to block, and you said you did

14   not agree.  Do you remember?

15      A.    I remember.

16      Q.    And you said you were not charged.  Remember

17   that?

18      A.    I do remember that.

19      Q.    Okay.  Now, you weren't the only one who did

20   not agree to block in the meetings the day before, were

21   you?

22      A.    Could you ask that one more time?  Sorry.

23      Q.    Okay.  I'm taking you back to the meetings

24   on the day before the Washington, DC rescue.  You

25   attended a meeting where people were -- I think you said

```
1    they were planning.  Remember that meeting?
2          A.    I remember the meeting.
3          Q.    And you remember you being not the only
4    person who did not agree to block in that meeting.
5          A.    Yes, I remember.
6          Q.    In fact, your friend Caroline Davis and you
7    had a discussion about whether --
8                THE COURT:  Wait.  She is Caroline Davis.
9                MR. THORNTON:  Sorry, I misspoke.
10               MS. KLOPF:  Objection.  Given our
11   conversation yesterday, I just want to make sure that
12   we're not treading into what we discussed yesterday
13   evening.
14               THE COURT:  Let's have a bench conference.
15               (Whereupon, the following proceedings were
16   had at the bench outside the hearing of the jury:)
17               THE COURT:  Okay.  Mr. Thornton, what's your
18   next question?
19               MR. THORNTON:  I believe I understood your
20   instruction to be that I could ask her about Eva Zastrow.
21   I will not mention any of the defendants in this case,
22   but she had conversations with Eva Zastrow about not
23   agreeing.
24               THE COURT:  Okay.  Is that -- you're not
25   going to talk about any of these defendants?
```

1          MR. THORNTON:  Correct.

2          MS. KLOPF:  I guess I'll sit down, I'm

3    sorry.  I also would note this is misstating the prior

4    testimony.  I mean, I can clean it up on redirect, but --

5          THE COURT:  What was the prior agreement?

6          MS. KLOPF:  I initially never made an

7    agreement to block at the abortion clinic, but the others

8    did.  They raised their hands boldly that they were going

9    to do it for sure and they showed up to do it for sure.

10          MR. THORNTON:  I didn't elicit any testimony

11    about any particular individual yesterday, but just --

12    I'm going to get to that some did not agree.  Whether

13    some did agree, I'm not going to ask her about those

14    people.

15          THE COURT:  You're not going to ask her

16    about specific individuals.

17          MR. THORNTON:  I'm going to ask her about

18    her conversations with Eva Zastrow.

19          MR. PARRIS:  And that's my problem

20    because -- this is Robert Parris for Mr. Zastrow.  Again,

21    if you'll remember yesterday, also in her testimony I

22    believe in DC she testified that my client told Eva and

23    Ms. Davis about the --

24          THE COURT:  Yeah.

25          MR. PARRIS:  About the Catholic and the

1    transsexual.  As long as we don't go there.

2              MR. THORNTON:  I certainly won't go into it.

3    But if we are concerned about it at this level of detail,

4    I just won't use Eva's name there.

5              THE COURT:  Just say some agreed to --

6              MR. THORNTON:  Yeah.

7              THE COURT:  -- and some did not.

8              MR. THORNTON:  Yeah.

9              THE COURT:  That's fine.

10             Okay.  We're done.

11             (End of bench conference.  Whereupon, the

12   following proceedings were had in the hearing and

13   presence of the jury:)

14             MR. THORNTON:  Thank you.

15   BY MR. THORNTON:

16        Q.    Now, Ms. Davis, you know that there was at

17   least one other person with you in DC who did not

18   agree -- and I'm talking about the evening before, who

19   did not agree to plan to block the next day?

20        A.    Yes, I did know.

21        Q.    And that person -- I won't use her name, but

22   that person was a friend of yours?

23        A.    Yes, she was.

24        Q.    Now, we talked a little bit about your

25   interviews with the FBI and meetings with counsel; right?

1    A.    Yes.

2    Q.    Did you not tell -- let me ask it this way.

3 Have you said that you left the meeting the night before

4 thinking to yourself you were not going to do anything

5 the next day except stand on the sidewalk?

6    A.    No, I was very honest with them during my

7 proffer sessions, at least I believe I was.  I explained

8 I think very clearly that I was on the fence and I

9 overheard my friend speaking to her father.

10          MR. PARRIS:  Objection, Your Honor, that's

11 exactly where --

12          THE COURT:  Yeah, we don't need to go any

13 further with this, do we, Mr. Thornton?

14          MR. THORNTON:  I don't need that.

15          THE COURT:  Okay.

16 BY MR. THORNTON:

17    Q.    I apologize for my smart computer who is not

18 as smart as I wish.

19          I am going to refer to a statement that you

20 made to the FBI on August the 1st, 2023.  And this

21 statement that was provided to us says that you said you

22 left the planning meeting the night before thinking she

23 was not going to do anything that day except stand on the

24 sidewalk.  Is that correct?

25          A.    I believe there's more to that.  Did you

1  read everything that I talked about?  There is more.  I

2  said that I wasn't fully sure, but I was leaving with the

3  intention of not doing it, but I was still on the fence

4  and I prayed with my friend about it.  And then I heard

5  her father give instructions --

6            THE COURT:  No, do not talk about anything

7  her father said.

8            THE WITNESS:  Oh, okay.

9  BY MR. THORNTON:

10       Q.    We don't need all of the other details about

11  that, only to determine that you left the meeting the

12  night before thinking that you were not going to do

13  anything the next day except stand on the sidewalk.  Just

14  yes or no.

15       A.    It's not a yes-or-no answer, unfortunately.

16       Q.    Is that what you told the FBI?

17       A.    That fragment I did say, but I said some

18  more too.

19       Q.    Yeah, you said quite a bit more.

20       A.    I did.

21       Q.    But I'm focusing on your intention at the

22  time you left the meeting the night before, what your

23  plan was.

24       A.    My plan was --

25       Q.    I'm not asking you, I'm telling you this is

1  the nature of my question.  My question is putting this

2  in context, and I'm trying to get that from you.  You

3  with me?

4          A.    I think I'm with you.

5          Q.    Now, you also told the FBI, did you not,

6  tell me, that you told others that they -- you and your

7  friend were not going to participate to risk arrest.

8  Yes, you did or you did not?

9          A.    Oh, you're asking did I say that?

10         Q.    Yes.

11         A.    Yes, I did say that.

12         Q.    Now, on the day of the rescue you started

13  out, the morning, standing on the sidewalk and doing what

14  you call sidewalk counseling; correct?

15         A.    Yes.

16         Q.    And this is what I wanted to confirm.  You

17  cannot, as you sit here today, testify as to what any of

18  those other participants intended to do or agreed to do

19  with the exception of some you may have seen raise their

20  hand?

21              THE COURT:  Are we still talking about DC?

22              MR. THORNTON:  Yes, Your Honor.  Thank you

23  for that.

24  BY MR. THORNTON:

25         Q.    Yes, I am still asking you questions about

1  the night before, the DC event/rescue.  You can't testify

2  as to what those individuals agreed to or planned to do

3  except for a small number who raised their hand; correct?

4         A.    The exact number of people that blockaded

5  and went through the trial were all the people that I saw

6  raise their hand, and I can say I did see them say I'm

7  going to blockade by raising their hand.  I saw that.

8         Q.    Yeah.

9         A.    Okay.

10        Q.    I'm not talking about those folks who did

11 sit and did raise their hand.  I'm talking about those

12 who didn't raise their hand.

13        A.    What about them?

14        Q.    You can't testify what they agreed to, can

15 you?

16        A.    I can testify about what I saw.  I don't

17 know what you're asking even.  I don't understand the

18 question, I'm sorry.

19        Q.    Bear with me one second.

20        A.    Okay.

21        Q.    Now I want to ask you about the Nashville

22 rescue, a few questions about that.  You testified

23 whenever Ms. Klopf was asking you questions about

24 meetings that occurred a day or two before the Nashville

25 rescue; correct?

1     A.    Yes.

2     Q.    And you knew that there were some people who

3 came into town to attend those meetings who did not

4 intend to sit or block the next day; correct?

5     A.    Yes.

6     Q.    All right.  Now, you have said, have you

7 not, that my client, Coleman Boyd, never risked arrest?

8     A.    My belief is that his intention was to never

9 put himself in a position where he thought he would get

10 arrested, yes.

11     Q.    Now, you had testified that he was

12 encouraging his children; correct?

13     A.    Yes.

14     Q.    Now, you have no reason to believe he wasn't

15 encouraging his children to do the same thing he does, do

16 you?

17     A.    Wait, what?  I'm sorry, I don't understand

18 what you're asking.

19     Q.    You can't testify here today that Coleman

20 Boyd was encouraging his children to do anything other

21 than follow his example, can you?

22     A.    Yes, I can, because I heard him praying with

23 them whether or not that they would want -- if they felt

24 called that God would bless them to do the rescue.  Like,

25 he prayed that God would show them what to do.  And he

1  was definitely encouraging them not just to follow his

2  example because, like we discussed, Coleman isn't willing

3  to go put himself in a position of blocking the doors so

4  that he wouldn't get arrested.  But he absolutely was

5  encouraging, and we saw that played out when his children

6  had his blessing to go do that.

7      Q.    That requires a lot of speculation, but I

8  won't go into that.  Let me ask you this way.  You saw

9  him on the other end of the hall filming, livestreaming

10  the event; right?

11      A.    Yes.

12      Q.    When you heard him pray with others that to

13  lay down their lives, that's what he said he was doing,

14  wasn't it?

15      A.    I believe that Coleman Boyd believes that he

16  was laying down his life, yes.

17      Q.    And so to interpret his words to say

18  anything different, you're not in a position to do that,

19  are you?

20      A.    I think that the fact that his children

21  did --

22      Q.    Can you just answer my question yes or no?

23      A.    It's not really a yes-or-no answer.

24      Q.    Well, are you in a position to tell us what

25  he meant?

1        A.    I think the evidence of what happened plays

2   out.  I think that shows what he meant.

3        Q.    You don't think the children -- their

4   children are about 15 years old; correct?

5        A.    I don't know how old his children are.  I

6   can guess, but I'm not a hundred percent sure how old

7   they are.

8        Q.    They were older teenagers, weren't they?

9        A.    I don't remember how old one of his children

10  was, but I knew that his daughter was around, I believed,

11  like 14 at the time, I think, but I'm just guessing.  I'm

12  not a hundred percent sure how old she was.

13       Q.    And you know that he was encouraging them to

14  make their own independent decision, don't you?

15       A.    Sorry.  Ask that one more time, I'm sorry.

16       Q.    You know that he was encouraging his

17  children to make their own independent decision as to

18  what to do?

19       A.    I believe that he was encouraging them --

20       Q.    Just answer my question yes or no.

21       A.    -- in an appropriate way to do something

22  that maybe -- I don't know how to answer this --

23            THE COURT:  Can we just stick to what he

24  said rather than what you think he was doing?  Just talk

25  about what he said to whom.

1              THE WITNESS:  Okay.

2      BY MR. THORNTON:

3          Q.    Let me ask this.  When you were a youngster

4      and you were going with your mom to rescues in Georgia or

5      in other places, did she encourage you to follow her

6      example?

7          A.    When you say rescues, you mean sidewalk

8      counseling?

9          Q.    That's the definition that you gave us.

10         A.    There could be lots of different ways to use

11     that word, so I just wanted to clarify.  When my mom took

12     me out to the abortion clinics as a child, she definitely

13     encouraged me to follow her example and she told me what

14     to do and I did obey and comply.

15         Q.    When you moved to Michigan, you then engaged

16     in behavior that followed her example in Michigan.  I'm

17     not talking specifics, but you told us that you were out

18     on the sidewalks regularly.  You did some research to

19     find out where there were clinics and you went out there.

20             When you were doing those things, some by

21     yourself, some with others, you were following your

22     mother's example?

23         A.    I believe, yes.  And my convictions, yeah.

24         Q.    Thank you.

25             MR. THORNTON:  One moment, may I confer.

BY MR. THORNTON:

    Q.    Just one or two more.  You'll remember in the Nashville event there was a lady in the wheelchair?

    A.    Yes.

    Q.    You don't know how old she is?

    A.    She's in her 80s, I know that.

    Q.    You don't know what her physical condition is, do you?

    A.    I did at the time because we talked about it.

    Q.    You did know what her physical condition was?

    A.    I knew she didn't need the wheelchair because we talked about it.

           MR. THORNTON:  Nothing further, Your Honor.

           THE COURT:  All right.  Who's next?

           MR. CRAMPTON:  May we go out of order, Your Honor?

           THE COURT:  Sure.

           MS. BELL:  Your Honor, may I switch with Mr. Komisar to run the computer for Mr. Russ?

           THE COURT:  Sure.

           MS. BELL:  Thank you.

**CROSS—EXAMINATION**

BY MR. RUSS:

Q.    We may or may not need that, but if we do.

Ms. Davis, I'm Ben Russ again, and I represent Mr. Green.  I have one area that I want to ask you about in particular.  So I don't know if it was March the 3rd or March the 4th it's a little unclear, but there was this meeting that took place that you described before the rescue on the 5th?

THE COURT:  What meeting?  She's talked about three.

MR. RUSS:  I was going to get to that.  Yes, Your Honor.

BY MR. RUSS:

Q.    The one at the motel.  You mentioned there was a larger group meeting first; right?

A.    Yes.

Q.    And then there was sort of a meeting —— I think you said pavilion or some sort of covered space in the outside.  That's the one in particular that I was talking about.  So you were saying that that meeting there were, I guess, roles that people had for the next day or whichever day, whenever the actual rescue was taking place; is that right?

A.    Yeah, things were —— roles were discussed.

1      Q.   Okay.  Now, at least three times that I
2   counted yesterday, could have been more though, you were
3   describing when people engage in a rescue, it's up to the
4   individual person; that they'll pray and they'll seek
5   guidance from the Holy Spirit.  And I don't want to be
6   rude or misquote you or something, but basically like
7   that; right?
8      A.   Yes.
9      Q.   So even though there have been roles
10  assigned, you're saying people were still praying or
11  determining up until the point whether they were going to
12  risk arrest or be arrested that day; is that right?
13     A.   I believe that really is the case every
14  single time, but that their intention is to do so.  Like
15  for me, I'll speak for me.  My intention was -- if I was
16  going to do a rescue, was to do it, but I would be
17  praying about it all the way up to the point, seeing if
18  God was going to give me a sign not to do it or something
19  like that.
20     Q.   Okay.  And you said that you're -- what you
21  just described is common amongst people that do rescues.
22  So people may not know until the last minute, so to
23  speak, what they're going to do?
24     A.   That is a fair assumption to make.
25     Q.   Okay.  So I want to jump forward to the day

1   of and talk about two of the clips.  If you need me to

2   play them, I can, but I imagine that you won't.  They're

3   at the very end of the process.

4           You said that probably somewhere between

5   two, two and a half hours the group had been in the

6   clinic up to that point -- or outside the clinic; right?

7       A.   Yes.

8       Q.   And the police had come in and they had

9   started taking people's names of who -- this was the time

10  when people were actually going to get arrested; right?

11      A.   Yes.

12      Q.   And the two clips we saw -- and I do think

13  chronologically the way we viewed them as well as when

14  they happened, these were the last couple of clips we

15  watched -- Mr. Gallagher is on there and he's going

16  around to the various people that are still in the

17  hallway and saying, you know, who is not willing to be

18  arrested; right?

19      A.   Yes.

20      Q.   And in both of those two different clips,

21  you know, one of them you say, okay, well, the blowfish

22  are leaving; right?

23      A.   Uh-huh (affirmative), yes.

24      Q.   And then the other one, there's still some

25  people in the hallway that ultimately aren't arrested, so

1  I guess more of the blowfish left after that; right?

2       A.    Yes.

3       Q.    So two and a half hours into this rescue,

4  after the meeting in the pavilion the day before and

5  after everyone has thought about it, up until that point,

6  you still don't know who's going to actually be arrested;

7  right?

8       A.    Well, we had a good idea because people said

9  that they were going to do it.  And then, you know, but

10 if you asked them, like, are you for sure going to do it,

11 it would be, I'm prayerfully considering.  That's why I'm

12 saying, it's hard to give an answer to that because, like

13 we discussed, most people in this position who performed

14 blockades to abortion clinics will give you that answer

15 of I'm being led by the Holy Spirit.  But when the leader

16 of the rescue needed a head count --

17      Q.    Right, that's my point.

18      A.    -- he got a head count.

19      Q.    Have a head count, right.  At the very end

20 when actual arrests are being made, that's when they

21 start talking about who's actually going to get arrested?

22      A.    That same discussion was had before the day

23 of the rescue as well of, like, let's get an idea of how

24 many people are going to be participating.  That's how

25 these rescues get organized.

1      Q.   Okay.  So then what does Mr. Gallagher need

2  a head count for if it was predetermined?  Why is he

3  doing it at the end there?

4      A.   Because at the last minute you might still

5  have people that want to change their mind or chicken

6  out, right.  And he was trying to be gracious, I assume,

7  in letting people know that they had a choice to make,

8  that they didn't have to go with the group.  I'm sure.

9  I'm sure he was trying to lead well in his endeavors.

10  I'm sure.

11      Q.   Right.

12      A.   But I have to speculate there.  I can't know

13  his thoughts.

14      Q.   My point is, up until the last minute when

15  people are getting arrested, Mr. Gallagher and everyone

16  else didn't know exactly who was going to get arrested;

17  right?

18      A.   They had a good idea, but they couldn't know

19  for sure.  I agree with that.

20      MR. RUSS:  Those are all the questions I

21  have, Your Honor.

22      THE COURT:  All right.

23                **CROSS-EXAMINATION**

24  BY MR. CRAMPTON:

25      Q.   Good morning, Ms. Davis.  How you doing?

1      A.    I'm better than I deserve.  How are you

2  doing?

3      Q.    That's good to hear.  It's nice to be back

4  another day, isn't it?

5            By the way, having stayed over after a long

6  day yesterday, you didn't speak with the government again

7  about your testimony, did you?

8      A.    I wasn't able to do so because it's not

9  allowed.

10      Q.    Okay.  Now, as I recall your testimony,

11  please correct me if I'm wrong, you indicated yesterday

12  that you didn't think Mr. Vaughn ever asked you to leave?

13      A.    I think he never -- oh, I know he never came

14  up to me personally and said, would you like to leave, so

15  yeah.

16      Q.    Okay.  But do you recall, in fact, I think

17  it's in the same video clip that my colleague just

18  referenced, near the end he came in and he announced,

19  they are going to make arrests after this next

20  announcement.  And then Mr. Gallagher turned to you and

21  everyone else and said, okay, anybody that's not risking

22  arrest, go to the stairway, you need to leave now.  You

23  remember that?

24      A.    Yeah, that was Mr. Gallagher that turned to

25  me and said that.

1      Q.    Okay.  But you didn't hear Mr. Vaughn tell

2   Mr. Gallagher and others that were standing right there

3   at the time?

4      A.    I didn't.  And if you look in the video,

5   you'll see that I'm sitting there praying and singing

6   when the camera pans over.  I wasn't paying attention to

7   Mr. Vaughn, but I did hear Mr. Gallagher say that, yes.

8      Q.    Very good.  And then you also testified

9   there was a little snippet in that clip, if I may call it

10  that, where you were holding the camera, in fact, and it

11  looks back up over the hallway, right over

12  Mr. Gallagher's shoulder, and the government asked you to

13  identify Mr. Vaughn along the wall.  Remember that?

14     A.    I do remember that.

15     Q.    And you said, there he is blocking the door.

16  Recall that?

17     A.    I think I said he's standing in front of

18  that door.

19     Q.    Standing in front of that door?

20     A.    Yes.

21     Q.    That door, as we're looking back up that

22  hallway, is actually not the clinic entrance, is it?

23     A.    I'm very aware of that.  I didn't say that

24  it was.

25     Q.    Now, you also testified, as I recall

1  repeatedly, that before some of these events and maybe

2  even in between you were reminded or kind of warned

3  regarding laws that you might be risking arrest for.

4  Remember that?

5        A.    Yes.

6        Q.    And you mentioned several times the FACE

7  Act; right?

8        A.    Yes.

9        Q.    And you mentioned criminal trespass; right?

10       A.    Yes.

11       Q.    I did not hear you, but help me if I missed

12 it, say that you were ever warned that you might receive

13 a felony conspiracy charge.

14             MS. KLOPF:  Objection, Your Honor.

15             THE COURT:  Overruled.

16 BY MR. CRAMPTON:

17       Q.    Were you ever warned about that?

18       A.    About conspiracy charges?

19       Q.    Yes, ma'am.

20       A.    I don't believe I ever was warned about

21 conspiracy charges.  In fact, that was a huge surprise to

22 me when I got indicted by the FBI.

23       Q.    Okay.  And if I follow, there was a series

24 of questions regarding your plea agreements and your

25 cooperation agreement and so forth; right?  Did I

1    understand correctly that you still haven't been

2    sentenced under any of those; correct?

3         A.    That is correct.

4         Q.    Okay.  So if you were to fail to testify

5    here today, for example, there may be serious

6    consequences; right?

7         A.    Yes.

8         Q.    Okay.  And as I understood your testimony

9    yesterday, you also said that you actually had never met

10   Paul Vaughn before the day of this event; right?

11        A.    Yes.

12        Q.    So all these planning meetings that you've

13   testified at some length about where they've talked about

14   roles and assignments and so on, he wasn't there; right?

15        A.    He may have been, I just didn't notice him.

16        Q.    And all you can testify to is your personal

17   knowledge.

18        A.    Yes.

19        Q.    You have no personal knowledge of that, do

20   you?

21        A.    I have no personal knowledge because either

22   I wasn't paying attention or he wasn't there.

23        Q.    For whatever reason.

24        A.    I can just tell you what I saw.

25        Q.    And, in fact, when you first saw him, you

1  didn't even think he was a pro-life guy; right?

2          A.    I wasn't sure who he was.  I thought he

3  might be with the police.

4          Q.    You thought he was police.  And you thought

5  he may have been a chaplain; yes?  Police chaplain?

6          A.    Yes.

7          Q.    And I presume that part of that was because

8  when you saw him he was down with the police more than he

9  was with the folks near the door, wasn't he?

10         A.    My recollection is he walked back and forth

11  quite a bit.

12         Q.    Yes, okay.  So it was unclear to you which

13  side he was on, so to speak; right?

14         A.    It was.

15         Q.    Okay.  And in that same vein, when you say

16  you later came to understand that maybe he was role of

17  police communicator, you remember that?

18         A.    Yes.

19         Q.    You never heard anybody assign him that

20  role, did you?

21         A.    It's possible I didn't pay attention, but I

22  didn't hear anyone assign him --

23         Q.    That's all I'm asking --

24         A.    -- that role.

25         Q.    -- what did you know.  Even the day of you

1    didn't hear anybody assign him that, did you?

2        A.    That is correct.

3        Q.    So you don't have any idea as we sit here

4    today how it came to be that he went to speak to the

5    police, do you?

6        A.    No, I don't know.

7        Q.    And likewise when you testified, well, in my

8    opinion I think he was -- he bought us a lot of time or

9    something to that effect.  Remember you said that?

10        A.    I know he bought us a lot of time.

11        Q.    Oh, you do, do you?

12        A.    Yes.

13        Q.    So you were present when he was talking with

14    the police; is that right?

15        A.    I was present when I watched all the videos

16    where that's talked about directly between Mr. Vaughn and

17    Mr. Chet Gallagher.

18        Q.    You hear Mr. Gallagher on the videos, is

19    that what you're saying?

20        A.    Gallagher and Vaughn had a conversation in

21    the stairwell, if you watch the videos, where he

22    specifically talks about him buying time by communicating

23    with the police.

24        Q.    And I would ask you and I'll ask the jury to

25    please review those videos very closely and see if

1        Mr. Vaughn says anything to that effect.

2                    Now, let's just be clear.  When you came

3        upstairs, you sat in front of that door, didn't you?

4               A.    Yes.

5               Q.    Which is at the far end of the hallway,

6        isn't it?

7               A.    Yes, it is.

8               Q.    And where were the police?  They were way

9        back at the other end, weren't they?

10              A.    They moved about, but they --

11              Q.    Yes.

12              A.    -- were gathered -- from my reviewing the

13       videos, I saw that they were by the elevator most of the

14       time, but they came over to us plenty of times.

15              Q.    Okay.  But the negotiations occurred back

16       there behind the elevators, didn't they?

17              A.    The negotiations occurred back by the

18       elevators.

19              Q.    You couldn't even see them, could you?

20              A.    No, I could not.

21              Q.    So you were unable to determine who

22       Mr. Vaughn was speaking to; right?

23              A.    I think he made that clear in the videos.

24              Q.    Excuse me, I'm just asking.  Could you see

25       who he was speaking to?

1      A.    I could not see who he was speaking to.

2      Q.    You couldn't see who spoke to him, could

3 you?

4      A.    I only saw when he was close up in the

5 hallway who he spoke to.

6      Q.    And so you couldn't see when he was around

7 the corner who was speaking to him; right?

8      A.    That is correct.

9      Q.    And clearly then you wouldn't know what they

10 said unless somebody came and related it to you; right?

11      A.    And the videos.

12      Q.    Yeah, okay.

13      And in all your experience in these rescues,

14 I don't recall you saying that you ever served in the

15 capacity of police communicator, as you call it, did you?

16      A.    I never did.

17      Q.    Never did.  Never were really present other

18 than, like, brief interactions like with Mr. Zastrow that

19 one moment where a police officer came up, were you?

20      A.    Are you talking about all the rescues I've

21 participated in?

22      Q.    Correct.

23      A.    Okay.  So the rescue where I participated

24 and blocked the doors in Sterling Heights --

25      Q.    Yeah.

```
 1         A.    -- I was literally sitting right there
 2    during all the police communications --
 3         Q.    Okay, fine.
 4         A.    -- because they came up and spoke to us at
 5    the door.
 6         Q.    Fine.  All right.  But you yourself never,
 7    again, played the role?
 8         A.    Yes.
 9         Q.    Never were close to Mr. Vaughn when he's
10    speaking with the police?
11         A.    Yes.
12              MR. CRAMPTON:  Okay.  That's all I have.
13    Thank you.
14              THE COURT:  All right.  Mr. Conway?
15              MR. CONWAY:  Ms. Beasley, has 3R been
16    admitted?  I think they all have.
17              THE COURT:  What's the number?
18              MR. CONWAY:  3R.
19              THE COURT:  Katheryn, has it been admitted?
20              COURTROOM DEPUTY:  Oh, oh, I see what you're
21    saying.  Yes, it's been admitted.
22              MR. CONWAY:  Just wanted to make sure.  I
23    will use the Elmo, and I think Ms. Bell is going to help
24    me with 3R and 4.
25              COURTROOM DEPUTY:  I have to change the
```

1  system between the two, so let me know.

2        MR. CONWAY:  I'm going to do 3R first and

3  then the video and then the Elmo picture of defense 2A.

4        COURTROOM DEPUTY:  So we're going to using

5  the computer first?

6        MR. CONWAY:  Yes, computer first.

7                    **CROSS-EXAMINATION**

8  BY MR. CONWAY:

9        Q.    Morning, Ms. Davis.  I represent Ms. Idoni.

10  I'm going to show you what's been previously marked as

11  Government's Exhibit 3R, but first I want to ask, would

12  you agree with me that persuading a pregnant woman to not

13  go through with an abortion would be the ultimate goal of

14  these sort of rescues or protests or whatever you want to

15  call them?

16        A.    No.

17        Q.    You don't?  If you can talk them out of an

18  abortion, that wouldn't be better than blocking a door?

19        A.    That's not the question that you asked.

20        Q.    Okay.  Well, that is what I'm asking.

21  Wouldn't you say if you can talk them out of an abortion,

22  it's better than just simply blocking a door?

23        A.    Yes.  I think that's much, much better,

24  especially given that's legal.

25        Q.    Okay.  Now, I'm going to show you -- like I

1  said, this is the Government's Exhibit 3R.  Do you

2  recognize this at all?

3       A.    Yes, I do.

4       Q.    Okay.  And the people that are talking to

5  the African American woman, do you recognize who those

6  people are?

7       A.    I can recognize from this angle Amanda

8  Place.

9       Q.    Okay.  And those would be people that are

10  there trying to counsel that person; correct?

11       A.    Yes.

12       Q.    Okay.  And if we can go to video 4 which has

13  been previously introduced.  And if we can start it with

14  the sound and then stop it right around 26 seconds.

15            (Playing video.)

16            Okay, we can stop it.  Do you know who that

17  was that was just talking?

18       A.    The lady who just said the children on the

19  phone thing?

20       Q.    Yes.

21       A.    I don't know that lady.

22       Q.    Okay.  She's also speaking to a woman at the

23  end of the hall talking about her children trying to talk

24  her out of an abortion; would you agree with that?

25       A.    Yes, I would agree with that.

1    Q.   And now if we can go to the Elmo for
2  Defense 2A.  This I may not need -- or maybe not.
3           Do you recognize what's going on in this
4  picture right here?
5    A.   That looks like the recording that we just
6  watched from a different perspective, a still image of
7  it.
8    Q.   Okay.  And would you agree that they're in a
9  capacity of trying to counsel this person to try to talk
10  them out of an abortion?
11    A.   I would agree that they're trying to talk
12  her out of her abortion, yes.
13    Q.   Just a second ago on cross-examination you'd
14  kind of talked about how you were on the ground in front
15  of the door and you were praying, and when you did that,
16  you had your hands up like this.  Is there some sort of
17  meaning behind this when you pray, your palms up in the
18  air?
19    A.   I guess, like, back then -- are you asking,
20  like, how I feel about praying now with my hands up --
21    Q.   No, then.
22    A.   -- or are you asking what I'm thinking then?
23    Q.   No, then.
24    A.   I think like a reverend thing to God, like
25  when I would pray, like, put my hands out like I'm giving

1  him reference, giving him my all kind of feeling.

2       Q.    Fairly common for everybody to do that;

3  right?

4       A.    I would say so.

5       Q.    I mean, you just did it, like not knowingly

6  on cross when you talked about praying; right?  Like five

7  minutes ago when Mr. Thornton was asking you questions?

8       A.    Sorry, I don't understand.  Could you ask

9  that one more time?

10       Q.    When Mr. Thornton just said -- he asked you

11  a question, he said, what do you mean when I was praying

12  and you did this?

13       A.    Yes.

14       Q.    Right there, like five minutes ago.

15       A.    Yes, I remember that.

16       Q.    Yeah, okay.  It's just fairly common to do

17  that when you're praying to give reference to God and so

18  on and so forth; right?

19       A.    I believe so, yes.

20       Q.    And you've seen the entirety of all of these

21  videos from all of the angles; correct?

22       A.    Yes, I have.

23       Q.    And I know we just kind of clipped out

24  the -- what's more or less important, but would you agree

25  with me that nearly the entire time, two and a half,

1    three hours, everybody is singing -- or most people are

2    singing and praying?

3          A.    Praying, I'm not sure, but singing, I can

4    say for sure.  A lot of people there were singing a lot

5    of the time.

6          Q.    Well, let me sparse it down to Ms. Idoni.

7    The whole time she was singing and praying in the videos;

8    correct?

9          A.    Praying, again, I can't say, I could

10   speculate.  But singing I heard her quite a bit.

11         Q.    She never actually spoke to anybody else

12   other than the group that you were with; right?

13         A.    I'm not sure.  I don't recall seeing her

14   speak with anyone else.

15         Q.    Okay.

16         A.    Other than our group.

17         Q.    And you've seen the videos ten times or so,

18   give or take?

19         A.    Yes, I have.

20         Q.    Now, I'm just going to close out with, the

21   defense attorney that you had up in Michigan was James

22   Waske?

23         A.    James Waske.

24         Q.    And that's the one that you work for?

25         A.    No.

1    Q.    Oh, who do you work for?

2    A.    I work for an attorney, Samuel Fenn Little.

3    Q.    But he does criminal defense; right?

4    A.    He does, among other things.

5    Q.    Okay.  And then in this particular case

6  you've got Ms. Heather Parker is your attorney?

7    A.    Yes.

8    Q.    Okay.  Is there anybody else that's been

9  helping you as a defense attorney in this case?

10    A.    I had --

11         MS. KLOPF:  Objection to this line of

12  questioning, Your Honor.

13         THE COURT:  Sustained.  I don't see any

14  relevance to that.

15  BY MR. CONWAY:

16    Q.    You have met with at least eight or nine

17  different defense attorneys or US attorneys prior to

18  testifying in these cases; correct?

19         MS. KLOPF:  Again, I'm going to object with

20  the meeting with defense attorneys.

21         THE COURT:  Sustained.

22         MR. CONWAY:  That's all I have, Judge.

23         THE COURT:  Any other cross?  I think we've

24  had everybody.  Okay.  Any redirect?

25         MS. KLOPF:  Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MS. KLOPF:

Q.    Good morning, Ms. Davis.

A.    Good morning.

Q.    Okay.  On cross you were asked a lot about your plea agreement in Michigan; correct?

A.    Yes.

Q.    You also have a plea agreement here in Nashville; correct?

A.    Yes.

Q.    You were offered that plea agreement prior to ever suggesting on your own that you would cooperate; correct?

A.    Yes.

Q.    What crimes have you pleaded guilty to committing here in Nashville on March 5, 2021?

A.    I pleaded guilty to conspiracy and I pleaded guilty -- I pleaded guilty to two misdemeanors, and one of them had to do with FACE and one of them had to do with conspiracy.

Q.    Okay.  On cross you said that you were initially surprised to be charged with conspiracy.  Are you a lawyer?

A.    Nope.

Q.    Have you come to learn what the elements of

1  a conspiracy are?

2          A.    Yes.

3          Q.    Now that you understand what a conspiracy

4  is, are you surprised?

5          A.    Not at all.

6          Q.    Let's talk about your change in perspective

7  that led you to your decision to plead guilty.  Who were

8  the friends who helped you with that decision?

9          A.    Well, my boss was one of those people.  A

10  conversation with Zach Lottenschlager, my boyfriend.  And

11  then a lot of family members.  My grandmother, a couple

12  conversations with a few of my uncles and aunts.  And

13  then conversations with my older brother.

14                Let's see.  I've had so many -- oh, my close

15  friend Laura and my close friend Alicia.  Trying to think

16  who else.  Oh, a couple pastors that I spoke to.  My

17  shepherding elder of the church that I was a member of.

18  A lot of people were just like trying to speak life into

19  me and help me realize and be wise.

20          Q.    Around that time were you frequently talking

21  to your codefendants?

22          A.    Around that time -- let's see.  There was

23  group chats that I was a part of.

24          Q.    I just want -- I guess let me circle back.

25  You had testified that there was a point in time where

1  you were communicating with some of your codefendants

2  very regularly?

3         A.    Yes.

4         Q.    So in the period when you decided to plead

5  guilty, were you communicating with them as frequently?

6         A.    No.

7         Q.    In the days after the Mt. Juliet blockade,

8  like a few days afterwards, were you communicating with

9  your codefendants?

10        A.    After the blockade, yes.

11        Q.    Did you reach out to defendant Coleman Boyd

12 after the blockade?

13        A.    Yes.

14        Q.    Did you thank him for working so hard to

15 help you?

16        A.    Yes.

17        Q.    Could you please flip in your binder to

18 what's been marked as Exhibit 18.

19        A.    Yes.

20              Okay, I'm there.

21        Q.    Very generally what is that?

22        A.    This is a text message -- no, it's not.

23 This looks like -- let's see.  This is a Facebook post,

24 it looks like, from a Facebook comment, I think.

25        Q.    Okay.  Did you write the comment?

```
 1        A.    Yes.
 2        Q.    Is it a true and accurate representation of
 3  that comment?
 4        A.    Yes.
 5              MS. KLOPF:  Move to admit, Your Honor.
 6              THE COURT:  Any objection?  Received.
 7              (Government Exhibit No. 18 was admitted.)
 8              MS. KLOPF:  Can we please publish
 9  Exhibit 18.
10              THE COURT:  Mr. Thornton?
11              MR. THORNTON:  Do you allow admission of
12  exhibits on redirect?  She did not admit it in her case
13  in chief.
14              THE COURT:  Yes, I do.
15              MR. THORNTON:  Okay, thank you.
16              MS. KLOPF:  Thank you, Your Honor.
17  BY MS. KLOPF:
18        Q.    Can we please publish Exhibit 18.
19              Can you please read the first line until the
20  black.
21        A.    (as read) Not risking arrest doesn't make
22  you a coward.  Not everyone is in a situation where they
23  fulfill the missions God has given them personally and
24  then also risk arrest.
25        Q.    Okay.  And can you read the next sentence
```

1  until the at symbol?

2      A.    Not to mention, as much as people are needed

3  to block the doors, people are needed --

4            MR. PARRIS:  I'm going to object to the

5  relevance of it.

6            THE COURT:  Overruled.

7            THE WITNESS:  Not to mention, as much as

8  people are needed to block the doors, people are needed

9  on the other side of things to help from the outside of

10 jail and the other parts of the rescue.  Coleman Boyd --

11 BY MS. KLOPF:

12     Q.    You can stop right there.

13     A.    Sorry.

14     Q.    Oh, I'm sorry -- yes, please stop right

15 there.  So this is just a few days after the blockade;

16 correct?

17     A.    Yes.

18     Q.    Before you start the cooperating with the

19 government?

20     A.    Yes.

21     Q.    Okay.  Let's talk about the actual blockade.

22 On cross you were asked about offering baby showers,

23 offering counseling.  Were you personally offering baby

24 showers?

25     A.    Yes.

1      Q.    Personally, you were offering those patients
2   baby showers?
3      A.    Not at that rescue, I didn't talk to any
4   patients, but that's something that I did do when I was
5   out on the sidewalks.
6      Q.    Oh, I'm sorry.  I'm talking specifically
7   about March 5, 2021.
8      A.    Then no.  Sorry.
9      Q.    Okay.  Were you personally offering
10  counseling?
11     A.    I would have been willing to that day, but I
12  didn't counsel anyone.
13     Q.    Okay.  What were you actually doing?
14     A.    I was actually blocking the doors of the
15  abortion clinic.
16     Q.    Why?
17     A.    Because I believed sincerely that it was the
18  holy and right thing to do at the time.
19     Q.    Okay.  And what was your purpose in terms of
20  the patients?
21     A.    To make sure none of them could get inside.
22     Q.    On cross you were asked about your
23  relationship with Gallagher and how well you knew him.
24  The day of the blockade he knew you by name; correct?
25     A.    Yes.

1     Q.     He handed his phone to you?

2     A.     Yes.

3     Q.     All right.  You were asked a lot on cross --

4  sorry, I'm jumping around to a lot of topics.  You were

5  asked a lot on cross about whether or not the blockade

6  was peaceful, nonviolent, orderly.  Would you agree with

7  me that a hallway full of people is intimidating?

8     A.     Yes.

9     Q.     You were asked whether the blockade was

10 well-ordered.  Can something be well-ordered and still be

11 intimidating?

12    A.     Yes.

13    Q.     What's the natural consequence of having a

14 big group in a blockade?

15    A.     Well, you're going to scare a lot of people

16 off.  I think that could be one.

17    Q.     Okay.  Tell us -- tell us another one.

18 Would it interfere with the police?

19    A.     Oh, yeah.  I mean, I think one of the

20 biggest consequences of that was drawing all those police

21 away from their actual jobs of protecting people like

22 they were pulled all away from that that day.

23          MR. THORNTON:  Your Honor, we object to the

24 degree she's speculating as to what others think.

25          THE COURT:  Sustained.

1  BY MS. KLOPF:

2      Q.   So in doing this, you testified a lot about

3  whether or not your intention was to harm people or

4  injure people.  Do you remember that?

5      A.   I remember that.

6      Q.   Do you remember being asked if your

7  intention was to intimidate people?

8      A.   Yes.

9      Q.   Were you aware of a high probability that

10  patients would be interfered with by your actions?

11      A.   I was very aware of that.

12      Q.   Were you aware that clinic staff would be

13  interfered with?

14      A.   Yes, I was very aware.

15      Q.   Were you aware of a high probability that

16  clinic workers would be intimidated?

17      A.   Yes.

18      Q.   Were you aware of the high probability that

19  patients would be intimidated by your group?

20      A.   Yes.

21      MR. THORNTON:  Your Honor, we object again

22  to the degree she's speculating as to what other people

23  think.

24      MS. KLOPF:  I'm asking what she was aware

25  of.

1          THE COURT:  She's asking what she was aware

2     of, not other people.

3     BY MS. KLOPF:

4          Q.   Who were you arrested with on March 5, 2021?

5          A.   I was arrested with Heather Idoni, Eva

6     Zastrow, Calvin Zastrow, Dennis Green.  Who else was

7     arrested, who else.  Paul Place.  Eva Edl.  That's off

8     the top of my head that I can remember.  And then I

9     watched four children get arrested, but they did not go

10    to jail with me.  But I saw them get arrested as well.

11         Q.   Moving on to a different topic.

12    Mr. Thornton was asking you a lot yesterday evening about

13    red rose rescue.  Do you remember that?

14         A.   Red rose rescue, yes.

15         Q.   Okay.  And he asked you if you're not asked

16    to leave, you're not breaking the law.  Do you remember

17    that?

18         A.   Yes.

19         Q.   Okay.  Again, are you a lawyer?

20         A.   No.

21         Q.   Okay.  So you had agreed with Mr. Thornton

22    yesterday evening that if you're not asked to leave,

23    you're not breaking the law.  Do you recall that?

24         A.   I recall that.

25         Q.   Okay.  Could there be other laws, other than

1  trespass, that you were violating even if you're not

2  asked to leave?

3           MR. THORNTON:  Object to the degree she's

4  offering a legal conclusion.

5           THE COURT:  Sustained.

6           MS. KLOPF:  Your Honor, this was what we

7  discussed yesterday evening that I could do some cleanup

8  on.

9           THE COURT:  Well, you can, but not that

10  particular question.

11           MS. KLOPF:  Okay.

12  BY MS. KLOPF:

13      Q.   Are you aware of all the laws that are in

14  the world?

15      A.   No.

16      Q.   Okay.  When you were asked that question,

17  were you thinking specifically about trespass?

18      A.   Yes.

19           THE COURT:  Do you know everything there is

20  about whether someone is violating the trespass law?

21           THE WITNESS:  No.

22           THE COURT:  You're not a lawyer, are you?

23           THE WITNESS:  I'm not a lawyer.

24  BY MS. KLOPF:

25      Q.   And so, in fact, in a situation based on

1  your understanding, the FACE Act does not require someone

2  to be asked to leave.  Is that a fair understanding?

3           MS. BELL:  I'm going to object, Your Honor.

4  She's not a lawyer.

5           THE COURT:  Sustained.

6  BY MS. KLOPF:

7      Q.   Are you aware that certain laws do not

8  require anyone to be asked whether or not to leave?

9           MS. BELL:  Objection.

10          MS. KLOPF:  Your Honor, given yesterday's

11  testimony, I just want to clean up the transcript.

12          THE COURT:  You're not a lawyer and you

13  don't know the law, do you?

14          THE WITNESS:  Yes, I don't know the law.

15          THE COURT:  Move on, Counsel.

16          MS. KLOPF:  Okay, Your Honor.

17  BY MS. KLOPF:

18     Q.   Mr. Thornton asked you a lot about your

19  agreement in DC and what you had agreed to.  When he was

20  asking you questions about what you agreed to, tell me

21  what you were testifying about.  Were you testifying

22  about yourself or the group?

23     A.   I was testifying about myself.

24     Q.   Okay.  In DC did you also testify that you

25  personally never made an agreement to block at the DC

1   abortion clinic, which is why you didn't see me in any of
2   those photos, but the others did, they raised their hands
3   boldly that they were going to do it for sure and they
4   showed up to do it for sure?
5           A.   Yes.
6           Q.   Okay.  So was the agreement that some people
7   would block and some people would not block?
8           A.   Yes.
9           Q.   Is it, in fact, correct to say that even in
10  that rescue you were aware that other people were
11  blocking doors?
12          A.   Yes.
13          Q.   Were you or were you not encouraging people
14  to block the doors?
15          A.   I was very much encouraging it.
16          Q.   Okay.  And were you or were you not
17  intending to help them commit that crime?
18          A.   I was intending to help them.
19          Q.   When Mr. Thornton was pushing you on what
20  the people in DC agreed to, would you or would you not
21  agree with me that all of the people at the planning
22  meeting understood it would be a blockade?
23          A.   Yes.
24               MR. THORNTON:  Object, Your Honor.
25               THE COURT:  Sustained.

1    BY MS. KLOPF:

2         Q.    Did you at that planning meeting understand

3    that it was going to be a blockade the next day?

4         A.    Yes, I did.

5         Q.    And were you encouraging other people to

6    block the doors?

7         A.    Yes.

8         Q.    And were you intending to help them block

9    the doors?

10        A.    Yes.  We're talking about -- sorry.

11        Q.    Sorry, DC.  I'm talking about DC.

12        A.    DC I was intending to help but not block.

13        Q.    Yes.  Thank you for that clarification.

14              And generally why did you want the doors

15   blocked that day?

16        A.    Because at the time I believed that my

17   personal and spiritual beliefs superseded the law.

18        Q.    I'm sorry, let me ask that more clearly.

19   What was the purpose -- what was your impression of the

20   purpose of blocking doors?

21        A.    To keep any of the patients from getting

22   inside.

23        Q.    You described your decision-making process

24   leading up to a blockade or a rescue?

25        A.    Yes.

 1       Q.    Okay.  And is it correct to say -- you still
 2  felt like maybe there was an out, that you might change
 3  your mind?
 4       A.    Yes.
 5       Q.    Okay.
 6             THE COURT:  Where are we now, are we DC?
 7             MS. KLOPF:  This is generally, but I will
 8  talk now specifically --
 9  BY MS. KLOPF:
10       Q.    Let's talk specifically about March 5, 2021.
11  It sounds like you were pretty certain in your decision
12  to block the doors?
13       A.    I was pretty certain in my decision to
14  block.
15       Q.    Okay.  If you had decided not to block,
16  would you still have been aware that other people were
17  blocking doors?
18       A.    Yes.  And I still would have helped.
19       Q.    Okay.  Thank you.  You got to my next
20  question.  Would you still be encouraging them to do
21  that?
22       A.    Yes.
23       Q.    Would you still be in agreement that that
24  was generally going to happen?
25       A.    Yes.

1          Q.    And generally what -- even if you had

2     stepped away from the door, what would have been the goal

3     of your agreement?

4          A.    The goal would have been -- even if I

5     decided not to get arrested, I would have hoped that no

6     patients would have been able to get inside.

7          Q.    So let's go back to DC, the time you chose

8     not to be arrested.  Did choosing not to be arrested mean

9     you hadn't agreed with the others about what would happen

10    that day?

11         A.    No.

12         Q.    Okay.  I'd like to move on to the

13    cross-examination about Mr. Vaughn.  I'd like -- do you

14    recall in the videos where Mr. Gallagher was talking

15    about Vaughn's role?

16         A.    Yes.

17         Q.    Okay.  Do you remember seeing Mr. Vaughn

18    nod?

19         A.    Yes.

20         Q.    I'd like to please play Exhibit 3C.  And I'd

21    like you to please narrate what Mr. Vaughn is doing while

22    Mr. Gallagher is talking.  But if you could try not to

23    talk over the video, that would probably be helpful.

24               (Playing video.)

25         A.    He's nodding and agreeing.

1    Q.   All right.  If we can please pause it there.
2  And can we please play 3K.
3           (Playing video.)
4    A.   There he smiled.
5    Q.   At any point do you see him, in all of the
6  videos you'd watched, disagree with any comments like
7  that?
8    A.   No.
9           MR. CRAMPTON:  Excuse me, Counsel.  Could
10 you just identify that exhibit for me again, please?
11          MS. KLOPF:  Sure.  That was 3K.
12          MR. CRAMPTON:  3 what?
13          THE COURT:  K.
14 BY MS. KLOPF:
15   Q.   All right.  So we've talked about a few
16 different patients, and you were asked a lot about the
17 women who were talking to the patients.
18   A.   Yes.
19   Q.   Why did those women have the opportunity to
20 even speak to those patients?
21   A.   Because the patient could not get inside the
22 clinic.  And so she was in the hallway, not able to get
23 inside and that was --
24          MR. HAYMAKER:  I'm going to object that she
25 knows what the -- why the woman did what she did.

1          THE COURT:  Sustained.  We can see the
2    video, we can see what was going on.
3          MS. KLOPF:  Sure.
4    BY MS. KLOPF:
5          Q.   If counseling didn't work, was the patient
6    going to be allowed to go into the clinic?
7          A.   No.
8          MS. KLOPF:  One moment, Your Honor.
9          (Pause in proceedings.)
10          MS. KLOPF:  No further questions.  Thank
11    you, Your Honor.
12          THE COURT:  Okay.  Any recross?
13          MS. BELL:  Yes, Your Honor.
14                    **RECROSS-EXAMINATION**
15    BY MS. BELL:
16          Q.   Good morning, Ms. Davis.
17          A.   Good morning.
18          Q.   Just have a couple of questions.  Ms. Klopf
19    was asking you about when you changed your perspective.
20    Do you remember that a few minutes ago?
21          THE COURT:  Ms. Bell, get the mic.
22          MS. BELL:  Thank you.
23    BY MS. BELL:
24          Q.   Can you hear me?
25          A.   Yes.

1      Q.   My allergies again.  I'll try to speak up.
2  Ms. Klopf was asking you about when you changed your
3  perspective.  Do you remember that?
4      A.   I remember that.
5      Q.   And you said it was based on talking to a
6  bunch of different people; is that fair to say?
7      A.   Yes.  I mentioned talking to lots of people.
8      Q.   Those conversations, however, to be clear,
9  occurred after you were indicted; correct?
10     A.   Yes, they did.
11     Q.   Okay.  After you were facing the FACE Act
12  violation; correct?
13     A.   Oh, yes.
14     Q.   And the conspiracy charge; correct?
15     A.   Yes.
16     Q.   Okay.
17          THE COURT:  Can we be clear, after she was
18  indicted where?
19  BY MS. BELL:
20     Q.   Well, you tell us.  When did those
21  conversations start?  After the Tennessee indictment or
22  after the Michigan?
23     A.   It was at Reform Con is the first
24  conversation that really started to push me, and I
25  believe we discovered that that was the month of

1  September, I think, yesterday if you recall.  I don't

2  remember the exact date, but it was after I was indicted,

3  I believe, in both Tennessee and Michigan, if I remember

4  correctly.

5       Q.   All right.  Now Ms. Klopf had asked you

6  about the plea agreement and the plea offer with the

7  government on the Tennessee case.  Do you remember that?

8       A.   I do.

9       Q.   And that that happened before you started

10  cooperating; correct?

11      A.   That a plea agreement was made before I

12  started cooperating?

13      Q.   In Tennessee.  That there was an offer --

14      A.   Oh.

15      Q.   -- in Tennessee before you started

16  cooperating; correct?

17      A.   Yes.  Everybody got an offer.

18           THE COURT:  Well, she's asking what happened

19  to you.

20           THE WITNESS:  Okay.  Yes.

21  BY MS. BELL:

22      Q.   But what I want to make clear is you pled

23  later, correct, in Tennessee?

24      A.   I'm sorry?

25      Q.   You pled -- let me go through the timeline

1    with you.  You got an offer in Tennessee prior to

2    agreeing or meeting with the government in Michigan about

3    cooperating.  We can agree on that; correct?

4         A.    Are you saying that I pled -- I'm sorry.

5         Q.    Listen to the question.  I'll see if I can

6    clear it up and I'll go slowly, okay.

7               Ms. Klopf, her office, makes you an offer in

8    early July of 2023; correct?

9         A.    I believe so.  I don't remember the exact

10   date, but yeah.

11        Q.    Okay.  July 14 you signed that proffer

12   agreement we looked at yesterday where you had approached

13   the government in Michigan about being a cooperator;

14   correct?

15        A.    Yes.

16        Q.    And then at the time of your Michigan plea,

17   you entered into a formal written cooperation agreement

18   that obligates you in many different ways; is that fair

19   to say?

20        A.    Yes.

21        Q.    Okay.  As to your actual plea agreement in

22   Tennessee -- and this is important -- that also contains

23   cooperation language; correct?

24        A.    Yes.

25        Q.    And so if you were to violate a cooperation

1    agreement in Tennessee or Michigan or even were called to

2    do some more things about Washington, say, testify at a

3    sentencing or something, that could violate your

4    cooperation agreement both in Tennessee and in Michigan?

5         A.    If I didn't go when I was called upon?

6         Q.    Correct.

7         A.    Correct.

8         Q.    Again, you were the one, when you were

9    facing two federal indictments, that approached the

10   government about cooperation?

11        A.    That is correct.

12             MS. KLOPF:  Objection, Your Honor.

13   BY MS. BELL:

14        Q.    The government in Michigan about

15   cooperation; correct?

16        A.    Yes.

17             MS. BELL:  Okay.  Those are all my

18   questions.

19             THE COURT:  Any further cross?  Mr. Parris?

20             MR. PARRIS:  No, Your Honor.

21             THE COURT:  Mr. Haymaker?

22             MR. HAYMAKER:  No, Your Honor.

23             THE COURT:  Mr. Crampton?

24             MR. CRAMPTON:  Yes, if I may briefly.

25

### RECROSS-EXAMINATION

BY MR. CRAMPTON:

    Q.   One moment, please, trying to set up a video.  Ms. Davis, let's go back to this video the government asked you about on redirect.  This is --

           THE COURT:  What is it, for the record?

           MR. CRAMPTON:  Exhibit 3C, Your Honor.

BY MR. CRAMPTON:

    Q.   And, Ms. Bell, if you would, just play just a few seconds and pause it.

           MS. BELL:  Sure.

BY MR. CRAMPTON:

    Q.   (Playing video.)  Stop.  Thank you.

           So at this point, I know it's a bit unclear, but would you agree with me, Ms. Davis, that Mr. Vaughn has just come into the scene with Mr. Gallagher?

    A.   It looks like it from the video.

    Q.   Fair enough.  Go ahead.  (Playing video.)

           Stop right there.  Did you see Mr. Vaughn as Mr. Gallagher's standing over here, Mr. Vaughn is near the doorway and he's glancing to his side.  Did you see that?

    A.   I didn't see him glance to the side.  Sorry.

    Q.   Can you back it up just a little bit. Thanks.  Watch this.  Watch this.  (Playing video.)

1          Right there.  Stop.  Did you see that?

2     A.    Yup.

3     Q.    He glances to his left, doesn't he?

4     A.    Yes.

5     Q.    Would you agree with me that he appears

6 somewhat distracted with that?  He's looking elsewhere.

7 He's not looking at the speaker, is he?

8     A.    He might be distracted.

9     Q.    Okay.  Go ahead, thanks.

10          (Playing video.)  Stop, thank you.

11          So he's nodding at the very end of

12 Mr. Gallagher's little narration, isn't he?

13     A.    Yes, he is nodding.

14     Q.    And then he walks right out the entryway,

15 the doorway there, doesn't he?

16     A.    Yes, he does.

17     Q.    As if, perhaps, he's going back about his

18 business of working with the police; correct?

19     A.    I don't know what his goals were, but I see

20 him walking out the door.

21     Q.    Fair enough.  Let me ask you this:  Have you

22 ever yourself nodded to someone when they were at the end

23 of a conversation as if to signal that, we're done here,

24 I got other things to do?

25     A.    Yes.  I think so.

1          Q.    So you don't know if that's what Mr. Vaughn

2    was nodding about there either, do you?

3          A.    All I can do is speculate, I suppose.

4          Q.    Fair enough.  The other clip I won't play

5    for you.  Thanks very much, Ms. Bell.

6                Is the end there where Mr. Gallagher appears

7    to be congratulating -- or does congratulate Mr. Vaughn?

8          A.    Yes.

9          Q.    What he says, if the transcript is accurate,

10   is, quote, of all the things you could have wanted to

11   witness today except this amazing worship going on, which

12   I was inspired by, is to hear how well Paul engaged the

13   police.  Does that sound right to you?

14         A.    Yes.

15         Q.    He doesn't say how well Paul delayed the

16   police, did he?

17         A.    No, he said engaged.

18         Q.    How well he engaged the police.

19               Thank you.  That's all I have.

20               THE COURT:  Mr. Russ?

21               MR. RUSS:  I have no recross, Your Honor.

22               THE COURT:  Mr. Conway?

23               MR. CONWAY:  No.

24               THE COURT:  Any redirect?

25               MS. KLOPF:  One final question.

1                **REDIRECT EXAMINATION**

2  BY MS. KLOPF:

3      Q.   You were asked again about both your plea

4  agreements.  What is the most important thing about your

5  plea agreements?

6      A.   That I tell the truth.

7      MS. KLOPF:  Thank you, Your Honor.

8             **\*\*\*\*\*WITNESS EXCUSED\*\*\*\*\***

9      THE COURT:  All right.  We're going to take

10  our morning break at this time.  The jury's excused.

11  We'll take a 20-minute break.

12      (Whereupon, at 10:30 a.m. the jury retired

13  from open court.)

14      THE COURT:  We're going to distribute to you

15  the first draft of the instructions.

16      All right.  We're in recess.

17      (Whereupon, a break was taken from

18  10:31 a.m. to 10:52 a.m.)

19      THE COURT:  Mr. Crampton, you have an issue

20  that you'd like to take up at sidebar?

21      MR. CRAMPTON:  Yes, Your Honor.

22      THE COURT:  If we don't need any other

23  defendants, why don't we just have two of you come up

24  here to the bench.

25

1          (Whereupon, the following proceedings were

2  had at the bench outside the hearing of the jury:)

3          MR. CRAMPTON:  In light of the testimony

4  that's come out, Ms. Davis testified that she said --

5  thought it was, quote, silly to try to block because the

6  women will just come back the next day and it's basically

7  senseless.  Second, the government has played the clip, I

8  think it's Exhibit 2L in which Mr. Zastrow is asking one

9  of the young ladies, did she say she was coming for an

10  abortion.  And the lady says, no, she said birth control.

11  And Mr. Zastrow kind of does a, oh, I don't think so,

12  something to that effect.

13          Third, Ms. Davis also testified that -- let

14  me see what this one is, this is -- that she would speak

15  to women even when they said they weren't coming for an

16  abortion and the implication again being that was a

17  senseless, maybe a harmless, rude thing to do.

18          THE COURT:  Wait.  Implication was that it

19  was a rude thing to do?

20          MR. CRAMPTON:  Yeah.  Well, I think it was

21  taken in a negative light or intended in a negative light

22  toward the defendants who would bother women, for

23  instance, harassing, whatever, as they come in,

24  regardless of whether they said they were there for an

25  abortion.  In fact, if I'm correct here, this next

1    witness, herself, changed her mind after --

2              MS. KLOPF:  Oh.

3              MR. CRAMPTON:  -- going back that morning,

4    came back that afternoon, told Ms. Forbis that she was

5    going to keep the baby and now has the baby.  I think the

6    government has opened a door.

7              REPORTER'S NOTE: (Redactions in this bench

8    conference made pursuant to the Court's ruling.)

9              MS. KLOPF:

10

11

12             MR. CRAMPTON:

13             MS. KLOPF:

14                                                      ?

15             MR. CRAMPTON:

16

17

18

19             MS. KLOPF:  Your Honor, we briefed this and

20   the Court has very clearly ruled we are not asking about

21   what services the patient was receiving that day.  I'm

22   asking her a leading question where I list off all the

23   reproductive health services, and then I ask her is that

24   what you were seeking this day.  What service she is

25   getting -- and frankly, it doesn't matter, reproductive

```
 1   health services covers a huge umbrella of services.
 2                THE COURT:  Right.
 3                MR. CRAMPTON:  Your Honor, there is no
 4   purpose for the video of Mr. Zastrow commenting on
 5   whether she was coming for an abortion other than to
 6   suggest that the defendants were basically engaged in bad
 7   faith and even --
 8                THE COURT:  No, absolutely not.
 9                MS. KLOPF:  It goes to the intent --
10                MR. CRAMPTON:  The testimony about it's
11   silly to stop women or talk -- to stop women because they
12   come back and do it anyway, it's directly contradicted by
13   the actual facts in this case.
14                THE COURT:  It's not a fact that it's silly.
15   It's her opinion.
16                MR. CRAMPTON:  I understand.
17                THE COURT:  She testified from the stand
18   that it was silly.
19                MR. CRAMPTON:  These are at least three and
20   I think there are other instances in the record here that
21   the government has introduced into evidence that are at
22   least in a relevance kind of analysis, pushed back
23   against, so to speak, by virtue of the actual fact here.
24                MS. KLOPF:  Reproductive healthcare covers
25   birth control, covers ultrasound, all of this.  All of us
```

said in opening, this isn't actually about abortion, it's
about a massive umbrella to subject this woman to one of
the hardest decisions of her life.

                    THE COURT:  It is not relevant.  You may not
go into it.

                    MR. CRAMPTON:  All right.

                    THE COURT:  That's the end of it.

                    MR. CRAMPTON:  We've made our record.

                    THE COURT:  Yes, you have.

                    MR. CRAMPTON:  Thank you.

1          (End of bench conference.  Whereupon, the

2     following proceedings were had in the hearing and

3     presence of the jury:)

4          THE COURT:  Folks, I want to pass out to you

5     an additional possible instruction.  There are really --

6     the *Handy* case talks about intimidate with regard to the

7     FACE Act.  But there are two definitions of intimidate

8     here, and we can't have them spilling over.

9          So I'm going to ask Ms. Beasley to pass out

10    to you -- my very clever law clerk has been listening and

11    has drafted something that I want you to consider when we

12    get around to instructions.  Which we're not there yet,

13    but you can add it to your pile.

14          All right.  Who's the next witness?

15          MS. KLOPF:  Melissa Ashby.

16          THE COURT:  Okay.  Let's let her wait right

17    there until we get the jury in here.

18          (Whereupon, at 10:58 a.m. the jury returned

19    to open court.)

20          THE COURT:  Okay.  Next witness.

21          MS. KLOPF:  Your Honor, the United States

22    calls Melissa Ashby.

23          THE COURT:  Melissa Ashby.

24

25

1          **MELISSA ASHBY**

2    called as a witness, after having been first duly sworn,

3    testified as follows:

4              **DIRECT EXAMINATION**

5    BY MS. KLOPF:

6          Q.    Good morning, Mrs. Ashby.  In March 5, 2021,

7    where were you living?

8          A.    Oak Grove, Kentucky.

9                THE COURT:  I'm sorry, where?

10                THE WITNESS:  Oak Grove, Kentucky.

11    BY MS. KLOPF:

12          Q.    And these microphones, you have to actually

13    really lean in.  I have the same problem.  So just do

14    your best to try and speak into it.

15                On March 5, 2021, did you have a reason to

16    come to Mt. Juliet, Tennessee?

17          A.    Yes, ma'am.

18          Q.    Are you familiar with a clinic called

19    carafem?

20          A.    Yes, ma'am.

21          Q.    Where is it?

22          A.    Mt. Juliet, Tennessee.

23          Q.    On March 5, 2021, did you have an

24    appointment scheduled at carafem?

25          A.    Yes, ma'am.

1          Q.    Okay.   The term reproductive health services

2    includes medical, surgical, counseling or referral

3    services relating to the human reproductive system,

4    including services related to pregnancy or the

5    termination of a pregnancy.

6                Was your appointment for reproductive health

7    services?

8          A.    Yes, ma'am.

9          Q.    What time was your appointment?

10         A.    Approximately 8:00 a.m.

11         Q.    What time did you arrive at carafem?

12         A.    Probably about 7:45.

13         Q.    How long was the drive to get there?

14         A.    Roughly an hour.

15         Q.    How did you get there?

16         A.    In a vehicle.

17         Q.    Was anyone else with you?

18         A.    Yes, ma'am.

19         Q.    Who was with you?

20         A.    My now husband, Nicko.

21         Q.    Is that Nicko Ashby?

22         A.    Yes, ma'am.

23         Q.    All right.  I'd like to show you what has

24    already been admitted as Exhibit 1F.  It should show up

25    on the screen in front of you in just a moment.

1           What is that?

2      A.    That's the building that the clinic is in.

3      Q.    When you and Mr. Ashby arrived at the

4 building, what did you first see when you were in the

5 parking lot?

6      A.    When we first pulled up to the building,

7 there was protestors outside on the sidewalk.

8      Q.    What was your understanding of why those

9 protestors were there?

10     A.    For abortion protesting.  Pro-life

11 protesting.

12     Q.    So today, if it's okay with you, I'd like to

13 talk about how you're feeling.

14     A.    Yes, ma'am.

15     Q.    Your anxiety.

16     A.    Yes, ma'am.

17     Q.    So I'm going to use a scale, zero to ten;

18 zero, absolutely no anxiety, ten just completely maxed

19 out.

20           THE COURT:  Are you talking about right now

21 or back in March?

22 BY MS. KLOPF:

23     Q.    I'd like to use that scale today to discuss

24 that date of March 5, 2021.

25     A.    All right.

1          Q.     When you first get to the parking lot, on a
2   scale of zero to 10, where is your anxiety?
3          A.     About a three.
4          Q.     Okay.  After you parked, where did you go
5   next?
6          A.     We walked inside the building.
7          Q.     When you walked inside the building, are you
8   on the first floor?
9          A.     Yes, ma'am.
10          Q.     What, if anything, did you see?
11          A.     There was a bench out there and then there
12   was also elevators.
13                THE COURT:  I'm sorry, a bench out there and
14   what?
15                THE WITNESS:  There was a bench inside the
16   building and there was elevators.
17                THE COURT:  Elevators?
18                THE WITNESS:  Yes, ma'am.
19   BY MS. KLOPF:
20          Q.     Ms. Ashby, I'm going to ask you to slow down
21   a little bit so that the court reporter can get
22   everything.  Where did you go from the lobby?
23          A.     We went into the elevator.
24          Q.     And can we please play Exhibit 1D and pause
25   at 17 seconds.  (Playing video.)

1          Okay.  Please tell the jury what we've seen
2     so far.
3          A.    The elevator is over there off to the left
4     side of the screen.  The doors opened and there's a
5     gentleman waiting right outside the elevator with a phone
6     videotaping.
7          Q.    Okay.  And who was the woman in the gray
8     sweatshirt?
9          A.    That was me.
10         Q.    Okay.  Did you see yourself turn and look
11    down this hallway?
12         A.    The one to my right?
13         Q.    The one on the right side of the screen.
14    Did you see yourself look down that hallway?
15         A.    Yes, ma'am.
16         Q.    What did you first see?
17         A.    A whole bunch of people.
18         Q.    How did that make you feel?
19         A.    Nervous.
20         Q.    Okay.  So we were talking about your anxiety
21    scale.  You had started at a 3.  Where are you now?
22         A.    A 7.
23         Q.    Can we please put Exhibit 4B on the other
24    screen, please.
25              Okay.  You said someone was filming.  Who is

1    the person in Exhibit 4B?

2           A.    The guy that was standing outside the

3    elevator.

4           Q.    Okay.  What, if anything, did he say to you?

5           A.    Just as you heard in the video, good

6    morning, and if we're here looking for the abortion mill.

7           Q.    How did that make you feel?

8           A.    Violated.

9                 THE COURT:  I'm sorry, how?

10                THE WITNESS:  Violated.

11   BY MS. KLOPF:

12          Q.    Initially what did you tell him?

13          A.    I was looking for a restroom.

14          Q.    Okay.  Why did you say you needed to find a

15   restroom?

16          A.    Because Nicko needed to go to the bathroom.

17          Q.    Where did you go -- if you're looking at

18   this video, where did you go when you went to the left

19   side of the screen?

20          A.    To look for a restroom because I came around

21   that corner and saw those people.  So I wanted to find

22   another one.  So there's a hallway on the left side.

23          Q.    Did you walk down that hallway?

24          A.    Yes.

25          Q.    What did you find?

 1          A.      Not a restroom.

 2          Q.      Okay.  So what did you do next?

 3          A.      Walked back out of that hallway and realized

 4     that the restroom was on the other side of the elevator.

 5          Q.      Can we take 4B down, please.

 6                  And let's go back to Exhibit 1D and start

 7     playing again at 17 seconds and please stop at 45

 8     seconds.

 9                  (Playing video.)

10                  Do you see the person in this image?

11          A.      Yes, ma'am.

12          Q.      Did this person try and talk to you?

13          A.      Yes, ma'am.

14          Q.      All right.  Let's start playing again and

15     please pause at minute -- I'm sorry, one and ten seconds.

16                  (Playing video.)

17                  Okay.  So what's happening here?

18          A.      We realized the bathroom was down that

19     hallway, so we made our way down the hallway so Nicko

20     could go to the restroom.

21          Q.      I think you had said you were at a 6 on your

22     anxiety scale.  Where are you now?

23          A.      At a 10.

24          Q.      Why?

25          A.      Because I just got closer to everything

1  that's happening at the end of the hallway.

2      Q.    And when you say what's happening at the end

3  of the hallway, what's happening at the end of the

4  hallway?

5      A.    The barricade at the end of the hallway.

6      Q.    Okay.  Given that those people were there --

7  oh, I'm sorry.  What did Mr. Ashby do next?

8      A.    He went into the restroom.

9      Q.    Okay.  Given that those people were there,

10 how did it make you feel to have him leave you?

11     A.    It was uncomfortable, but pretty confident

12 with myself that I would have been fine for the two

13 minutes he was in the restroom.  We just took an hour

14 drive, so.

15     Q.    Did he need to use the restroom?

16     A.    Yes, he did.

17     Q.    So at this moment seeing these people at the

18 end of the hallway, what are you thinking about your

19 ability to -- I'm sorry, let me stop there.

20           Do you know where the clinic is?

21     A.    I'm assuming it was the door at the end of

22 the hallway because there is a sign on the wall that

23 points -- there's an arrow that points down there.

24     Q.    So at this point in your head, what are you

25 thinking about your ability to get down that hallway?

1         A.    I won't get in.

2         Q.    Why?

3         A.    There was way too many people for me to get

4    into that door.  And they -- it was just impossible.

5    There was people blocking it.

6         Q.    All right.  Let's please start playing

7    again.

8               (Playing video.)

9               All right.  So where is Mr. Ashby at this

10   point?

11        A.    In the restroom.

12        Q.    What's happening here?

13        A.    Those two girls started bombarding me.

14        Q.    You use the word bombarding.  Why do you use

15   that word?

16        A.    Because they just -- they just approached me

17   and it was very unwelcoming.  I didn't want to speak to

18   anybody.

19        Q.    Did you express that you didn't want to talk

20   to them?

21        A.    No, but my body language told it all.  I was

22   not paying any mind to them because I didn't want to

23   speak to them.

24        Q.    Okay.  So at this point you said you were at

25   a 10.  How are you feeling?

1          A.     Way more than a 10.

2          Q.     Okay.  Now, at this point no one's being

3     violent with you; is that correct?

4          A.     No, ma'am.

5          Q.     Is anyone threatening you?

6          A.     No, ma'am.

7          Q.     But how are you feeling?

8          A.     Violated and very uncomfortable.

9          Q.     Okay.  Let's start playing again, and please

10    stop at two minutes, 25 seconds.

11                (Playing video.)

12                All right.  So how did -- I'm sorry.  What

13    just happened in this clip?

14         A.     The woman with the phone is a worker at the

15    clinic, and she came out and she told me to go

16    downstairs, to go to the lobby.  Nicko walked out of the

17    bathroom and he saw the people standing around me and

18    didn't take it very lightly and got protected --

19    protective and told them to leave me alone.

20                I motioned to him that, like, she was okay

21    and she's fine and she's telling us what to do and what

22    to -- like, to go downstairs.  So we went downstairs.  As

23    we're walking to the elevator, we're still being

24    harassed.

25         Q.     And why did you motion to Mr. Ashby to tell

1  him that she was okay?

2      A.    Because I didn't -- I didn't need him to get

3  enraged because he -- he saw that I was uncomfortable and

4  that people were bombarding me, and I didn't need him to

5  get angry, even more than he probably already was at the

6  point.

7      Q.    If that clinic worker hadn't come out and

8  told you to go to your car, would you have gone down the

9  hallway to the clinic?

10     A.    No, ma'am.

11     Q.    Why not?

12     A.    Because it was extremely intimidating and

13  there was -- there was no way we were going to get

14  through.  And I don't -- I don't think they would even

15  want us to try to get through.

16     Q.    Okay.  And, again, I think we've gone past

17  the end of the one through ten scale, but tell us how

18  you're feeling.

19     A.    Way up there.

20     Q.    All right.  Can we please play Exhibit 4

21  without sound.  And let's play it to just minute -- 1:17.

22            (Playing video.)

23            Can you please tell us what we're seeing

24  here?

25     A.    That's the view from the lady from the

clinic, I believe so.

Q.    This is the hallway?

A.    Yes.

Q.    Okay.  What's happening on the left side of the screen?

A.    Those are the two young women that are speaking to me.

Q.    Is that you?

A.    Yes, ma'am.

Q.    Why were you holding your phone?

A.    I was trying to distract myself from everything going on around me.

Q.    What's going on in your head?

A.    I just wanted to be left alone.

Q.    How are you feeling at this point?

A.    Overwhelmed.  Anxious.

Q.    Is that Mr. Ashby?

A.    Yes, ma'am.

Q.    Ultimately were you able to get to an appointment?

A.    Once everything was cleared out, yes.

Q.    Were there people in front of the door when you went to the appointment?

A.    Not in front of the door, but there was still some present out on the sidewalk.

1      Q.    But you were able to access the clinic?

2      A.    Yes.  Hours later.

3      Q.    How many hours would you estimate?

4      A.    I would -- I would say maybe -- it was

5  afternoon time, so probably about four hours later.

6      Q.    Once you went into the empty hall, tell us

7  on the anxiety scale, how were you feeling?

8      A.    I was fine because the hall was empty and I

9  was able to get to the doorway.

10            MS. KLOPF:  One moment, Your Honor.

11            No further questions.

12            THE COURT:  All right.  Cross?

13                    **CROSS-EXAMINATION**

14  BY MR. HAYMAKER:

15      Q.    Good morning, Ms. Ashby.  On March 5, that

16  day that you've been discussing, you stated you arrived

17  early for your appointment; is that right?

18      A.    Yes, sir.

19      Q.    You went up in the elevator; correct?

20      A.    Yes, sir.

21      Q.    You got off the elevator, there was a man

22  standing in the corner of the hallway; correct?

23      A.    Perhaps the corner was right in front of the

24  elevator.

25      Q.    To your left as you got out of the elevator;

1  correct?

2       A.    Yes, sir.

3       Q.    And at the end of that hallway, he was

4  standing up against the wall; correct?

5       A.    Yes.  He was just right in front of the

6  elevator.  I guess if you think -- yeah, in the corner.

7       Q.    He was not in the middle of the hallway;

8  correct?

9       A.    He was standing in front of the elevator.

10       Q.    Well, I want to be clear about that.  If

11  somebody's standing in front of the elevator, it would be

12  hard to get past that person, wouldn't it, if somebody

13  was standing directly in front of the elevator; correct?

14       A.    Well, I mean, considering the size of the

15  room that the elevator got off in, if there's plenty of

16  space.

17       Q.    That's what I'm trying to get to.  In other

18  words, he wasn't standing right in front of the elevator;

19  correct?

20       A.    I mean, not directly in front of the

21  elevator, but there was a phone in my face.

22       Q.    And there was plenty of room for you to come

23  out of the elevator, to go right, to go left, to go

24  wherever you wanted to on the floor; correct?

25       A.    Yeah.

1     Q.   Okay.  He asked you what you were looking
2  for; is that right?
3     A.   Yes.
4     Q.   Okay.  And you asked him where the bathroom
5  was; correct?
6     A.   I did not ask him where the bathroom was.
7     Q.   Okay.  Would you agree with me that it's
8  been a couple years; right?  Two or three years since
9  then; true?
10     A.   Uh-huh (affirmative).
11     Q.   Okay.  And would you agree with me that
12  whatever's on the videotape is probably the most accurate
13  version of what happened that day?
14     A.   Yeah, but I did not say do you know where a
15  bathroom is.  I stated that I was looking for a bathroom.
16     Q.   Okay.  He answered you and said he wasn't
17  sure where the bathroom is; correct?
18     A.   Yes, sir.
19     Q.   Okay.  And then he asked you if you were
20  going to the abortion mill.  You've testified to that;
21  correct?
22     A.   Yes, sir.
23     Q.   Then he asked you if he could talk to you;
24  correct?
25     A.   Yes, sir.

1          Q.    And you didn't respond to that, did you?

2          A.    No.

3          Q.    Okay.  Now, when you looked at him, you

4     didn't see any sort of weapon or -- of any kind; correct?

5          A.    No.

6          Q.    He didn't yell at you, did he?

7          A.    No.

8          Q.    He didn't scream at you?

9          A.    No.

10         Q.    He didn't raise his voice at you in any way,

11    did he?

12         A.    No.

13         Q.    He didn't threaten you, did he?

14         A.    No.

15         Q.    He didn't try to put his hands on you or

16    touch you in any way, did he?

17         A.    No.

18         Q.    Matter of fact, he was calm, wasn't he?

19         A.    For the most important, other than

20    overbearing.

21              THE COURT:  I'm sorry, what did you say?

22              THE WITNESS:  Other than being overbearing.

23    BY MR. HAYMAKER :

24         Q.    Well, was he overbearing because he was

25    speaking to you?

1      A.    He's overbearing because he was asking
2   questions that didn't need to be asked.
3      Q.    Okay.  So you didn't appreciate his
4   questions?
5      A.    Absolutely not.
6      Q.    Okay.  And he didn't get in your way in any
7   way, did he?
8      A.    He didn't.
9      Q.    He didn't get in front of you or anything
10  like that?
11     A.    He did not.
12     Q.    You had no difficulty passing him when you
13  went down the hall; correct?
14     A.    No.
15     Q.    Now, when you walked down the hall and you
16  saw -- strike that.
17           When you walked down the hall, he stayed
18  where he was, didn't he?
19     A.    I believe so, yes.
20     Q.    When you looked down the hall, you saw
21  people lining each side of the hallway, didn't you?
22     A.    Yes.
23     Q.    And that group of people included people of
24  all ages, didn't it?
25     A.    Yes.

```
 1          Q.     There were men down there; true?

 2          A.     Men?

 3          Q.     Men.

 4          A.     Yeah.

 5          Q.     There were women; true?

 6          A.     Yes.

 7          Q.     There were children; true?

 8          A.     Yup.

 9          Q.     Okay.  Talking about this group of people,

10    they weren't yelling at you, were they?

11          A.     No.

12          Q.     Okay.  They weren't screaming at you?

13          A.     No.

14          Q.     They weren't raising their voices in any

15    way, were they?

16          A.     No.

17          Q.     They weren't threatening you?

18          A.     No.

19          Q.     And as you looked at them, you didn't see

20    any weapons or anything like that, did you?

21          A.     Not that I could see.

22          Q.     Matter of fact, the only thing they had in

23    their hands were Bibles; true?

24          A.     Yes.

25          Q.     They were calm, weren't they?
```

1      A.    I guess.  I mean, not necessarily.  I don't

2   find harassment to be --

3      Q.    You don't believe -- well, but their

4   demeanor was calm.  They weren't making noise, they

5   weren't active.  They were just standing there being

6   quiet; true?

7      A.    Other than conversing with each other and

8   coming after me, yeah.

9      Q.    And you didn't see -- you said you saw the

10  door of carafem.  You didn't see the door chained or

11  anything like that, did you?

12     A.    No, but there was people standing directly

13  in front of it blocking it.

14     Q.    And so you got about two-thirds down the

15  hallway -- and it's a long hallway, isn't it?

16     A.    Uh-huh (affirmative).

17     Q.    And you got about two-thirds down the

18  hallway and there's a bathroom right to your left;

19  correct?

20     A.    Yes, sir.

21     Q.    And Mr. Ashby, your, I guess, then

22  boyfriend, now husband, was with you and as soon as you

23  got there -- now -- well, let me back up.

24           He was able to see the individuals at the

25  end of the hallway; correct?

1    A.    Yes.

2    Q.    Okay.  And as soon as you got to where the

3    bathroom was, he immediately went into the bathroom,

4    didn't he?

5    A.    I told him to go into the bathroom.

6    Q.    Okay.  And you viewed him as sort of your

7    protector; is that fair to say?

8    A.    Absolutely.

9    Q.    Okay.  And so you sent him in the bathroom,

10   you weren't concerned about your safety; true?

11   A.    I was.

12   Q.    Okay.  He's your protector.  If you were

13   concerned about your safety, wouldn't you want him with

14   you?

15   A.    I mean, absolutely, but if he had to use the

16   restroom after an hour-long drive up there...

17   Q.    Now, the people who were lining the hallway,

18   did you ever ask -- did you ever approach the door of

19   carafem?

20   A.    I wasn't able to.

21   Q.    Okay.  Well, you testified that people were

22   lining the wall.  So there was some space that you could

23   walk towards the door; true?

24   A.    I also said they were blocking the doorway,

25   so I was never able to access it.

1      Q.   That's not my question.  My question was:

2  You testified that there were some people standing in

3  front of the door; true?

4      A.   Yeah.

5      Q.   Okay.  But you also testified that they were

6  lining the walls; true?

7      A.   Yeah.

8      Q.   So there was space between where the people

9  started lining the walls and then where the people were

10  standing in front of the door; is that correct?

11      A.   I'm sorry, can you repeat that?

12      Q.   You testified there were people standing in

13  front of the door; true?

14      A.   Uh-huh (affirmative).

15      Q.   You also testified that there were people

16  lining the walls of the hallway; true?

17      A.   Yeah.

18      Q.   There was space between where the people

19  started lining the walls and where the people were

20  actually standing in front of the door; true?

21      A.   Yeah.

22      Q.   Okay.  And so you did not approach the

23  people who were standing in front of the door.  You

24  didn't approach that door; is that right?

25      A.   Absolutely not.

```
1        Q.    Okay.  That's all I'm trying to get to.
2              And you didn't say anything to anybody like,
3    excuse me or can I get by or anything like that?
4        A.    No.
5        Q.    Okay.  Now, while your -- while Mr. Ashby is
6    in the bathroom, you stepped down the hall two or three
7    steps; true?  Back towards the elevators; is that right?
8        A.    Yeah.
9        Q.    And you began looking at your phone.  I
10   think you testified to that; true?
11       A.    Uh-huh (affirmative).
12       Q.    Now, two young ladies came up to you and
13   started to speak with you; is that right?
14       A.    Uh-huh (affirmative).
15       Q.    And they were young women; is that fair to
16   say?
17       A.    Uh-huh (affirmative).
18       Q.    They were conversing with you; is that true?
19       A.    Trying to.
20       Q.    Okay.  They were making eye contact with you
21   or trying to make eye contact with you; is that right?
22       A.    Yeah.
23       Q.    And they actually were -- and maybe the
24   offer was unwelcome, but they were actually trying to
25   offer you help; true?
```

1          A.     There was no help involved in that.

2          Q.     Is your testimony that what they were saying

3    was not an offer of help?

4          A.     No, it was not an offer of help.

5          Q.     All right.  It was clear to you that they

6    were trying to persuade you regarding a termination of

7    pregnancy; correct?

8          A.     Persuade me away from it.

9          Q.     Okay.  They didn't threaten you in any way,

10   did they?

11         A.     No.

12         Q.     They didn't yell at you; true?

13         A.     No.

14         Q.     They didn't scream at you?

15         A.     No.

16         Q.     They didn't even raise their voice in any

17   way, did they?

18         A.     No.

19         Q.     They were calm, weren't they?

20         A.     For the most part, yeah.

21         Q.     They didn't appear to have any weapons or

22   anything like that, did they?

23         A.     No.

24         Q.     They didn't put their hands on you or touch

25   your arm or anything like that.  They didn't touch you at

all; correct?

    A.    Not that I can remember.

    Q.    Now, I think we saw in the video and you've testified that the worker from the clinic approached you while these two young ladies were speaking with you; correct?

    A.    Yes.

    Q.    And not long after that, Mr. Ashby came out of the bathroom; true?

    A.    Yes.

    Q.    And he knew about the people at the end of the hallway before he went into the bathroom; correct?

    A.    Uh-huh (affirmative).

    Q.    And so when he came out of the bathroom, the two young ladies were standing in close proximity to you; true?

    A.    Yes.

    Q.    And the worker was even in closer proximity to you, wasn't she?

    A.    Yes.

    Q.    And the worker told you-all to leave; correct?

    A.    She told us to go downstairs and that we would be called when we were able to get in to our appointment.

1      Q.    Okay.  Now, there were some -- in the video
2  that was shown, there were some comments made by the
3  person holding the camera.  Did you hear those comments
4  on the video?
5      A.    By the gentleman or the lady from the
6  clinic?
7      Q.    By the -- by the gentleman who's taking the
8  video.
9      A.    Did I hear those comments?  Yes.
10      Q.    Now, you've heard those comments now.  But
11  at the time you didn't hear those comments when you were
12  way down the hall, did you?
13      A.    No.
14      Q.    And so Mr. Ashby is fairly agitated.  I
15  guess that's a good way to characterize it; is that
16  right?
17      A.    Yes, sir.
18      Q.    And he kind of approaches the worker because
19  she's -- she's the closest one to you; correct?
20      A.    I don't think he approached the worker in
21  general.  I think he just approached the people
22  surrounding me.
23      Q.    Okay.  And you'd agreed with me that the
24  video is probably the best record of exactly what
25  happened that day; true?

1      A.    Yeah.

2      Q.    Okay.  And he's agitated, but the worker

3 very quickly says, I work here, I work here; right?

4      A.    Yes.

5      Q.    Or some words to that effect?

6      A.    Yes.

7      Q.    And then she told y'all to leave; correct?

8      A.    Yes, to go downstairs.

9      Q.    So you-all walked down the hallway; correct?

10     A.    Yes.

11     Q.    And you saw the gentleman in the same

12 position he was in when you-all got off the elevator;

13 correct?

14     A.    Yes.

15     Q.    Okay.  And you-all proceeded to go towards

16 the elevator and get on the elevator; is that right?

17     A.    Yes.

18     Q.    And this whole episode was no more -- from

19 the time you-all got off the elevator to the time you got

20 on the elevator, it was no more than three, four, five

21 minutes; is that true?

22     A.    Yeah.

23     Q.    Okay.  As you're getting on the elevator,

24 the man at the end of the hallway, he addresses

25 Mr. Ashby; is that correct?

1      A.     Yes.

2      Q.     Okay.  And do you remember him saying to

3  Mr. Ashby, that baby is a gift from God, a blessing from

4  God?

5      A.     Yup.

6      Q.     When he said that, was he yelling it or was

7  he just speaking to Mr. Ashby?

8      A.     He was just speaking to him.

9      Q.     Okay.  You testified earlier that this

10 whole -- the whole -- the whole experience of being on

11 that floor for those three, four, five minutes was -- you

12 said it was uncomfortable?

13     A.     Absolutely.

14     Q.     Okay.  Let me back up for a minute.  When

15 you were -- well, strike that.

16            Is it fair to say that the experience was

17 unpleasant?  Is that fair to say?

18     A.     Unpleasant and uncomfortable.

19     Q.     Okay.  Was it -- for you -- I imagine it

20 would be.  You would agree it's emotionally difficult; is

21 that true?

22     A.     Absolutely.

23            MR. HAYMAKER:  Thank you.  That's all I

24 have, Judge.

25            THE COURT:  All right.  Next?

1          MS. BELL:  Just a few questions.

2                      **CROSS-EXAMINATION**

3     BY MS. BELL:

4          Q.    Ms. Ashby, my name is Jodie Bell.  I just

5     need to ask you a few questions.  Okay?  It's fair to say

6     when you got up that morning you were just going to the

7     doctor, not expecting anything like this; correct?

8          A.    Yes.

9          Q.    Was completely unwelcome; right?

10         A.    Uh-huh (affirmative).

11         Q.    And kind of took you by surprise a little

12    bit --

13         A.    Absolutely.

14         Q.    -- is that fair to say?  When you got up on

15    the floor, you said your anxiety went up; right?

16         A.    Yes, ma'am.

17         Q.    And your husband had -- your now husband had

18    gone into the restroom and left you in the hallway;

19    correct?

20         A.    Yes, ma'am.

21         Q.    Now, while you were there, these two young

22    women approached you I think that you said; right?

23         A.    Uh-huh (affirmative).

24         Q.    Nobody else approached you; correct?  Other

25    than the clinic worker?

1      A.    Yeah, nobody else.

2      Q.    None of the other people in the hallway

3 tried to make any kind of contact with you; is that fair

4 to say?

5      A.    Yes.

6      Q.    Okay.  And...  I think that may be it.

7             The only people out of that group that did

8 talk to you were the two young women; right?

9      A.    And the gentleman in the --

10     Q.    At the end of the hall?

11     A.    Yes.

12     Q.    You never actually took any steps to go down

13 the hallway and get close to the other people; is that

14 fair to say?

15     A.    Not past the bathroom.

16          MS. BELL:  Okay.  Those are all my

17 questions.  Thank you.

18          THE COURT:  All right.  Any further cross by

19 anyone?

20          MR. CRAMPTON:  No, Your Honor.

21          MR. RUSS:  None for me, Your Honor.

22          MR. CONWAY:  None for Ms. Idoni.

23          THE COURT:  All right.  You may step down.

24          MS. KLOPF:  I just have a few redirect.

25          THE COURT:  Oh, redirect.  I'm so sorry.

1            **REDIRECT EXAMINATION**

2    BY MS. KLOPF:

3         Q.    How many times have you ever gone to a

4    doctor's appointment and found a hallway full of people

5    in front of your doctor's office door?

6         A.    Never.

7         Q.    How many times have you ever had people

8    approach you before a doctor's appointment and ask you

9    about your medical treatment?

10        A.    Never.

11        Q.    You were there for medical treatment?

12        A.    Yes.

13        Q.    Did being videotaped add to your anxiety?

14        A.    Absolutely.

15        Q.    Why?

16        A.    Because I'm in front of a medical office and

17   I believe that it's a violation of HIPAA for me to be

18   videotaped in front of a medical office.

19        Q.    How did the man -- Mr. Haymaker asked you a

20   lot of questions about that man right in front of the

21   elevator.

22        A.    Uh-huh (affirmative).

23        Q.    How did the fact that the man right in front

24   of the elevator was videotaping you, how did that impact

25   your feelings of intimidation?

1    A.    Very highly, because it was directly when we
2  got to the floor.  It just -- it just made it go up
3  because you already -- it gave you the feeling that
4  something was going to happen and is happening.
5    Q.    It was the first thing you saw?
6    A.    The first thing -- the first impression of
7  getting on that floor.
8    Q.    And he directed that young female to follow
9  you?
10    A.    Yes.
11    Q.    How did that young female following you down
12  the hallway made you feel?
13    A.    I did not like it.  Uncomfortable.
14    Q.    As you were leaving the floor, getting back
15  in the elevator, the man at the end of the hallway talked
16  to you again; right?
17    A.    Yes.
18    Q.    Mr. Haymaker asked you some questions about
19  that?
20    A.    Yes.
21    Q.    How did him talking to you again make you
22  feel?
23    A.    Bothered.
24    Q.    Did it add to your feelings of anxiety?
25    A.    Absolutely.

```
 1        Q.    Why?
 2        A.    I just wanted to be left alone.
 3        Q.    Okay.  So you got asked a lot of questions
 4   about your ability to walk down that hallway?
 5        A.    Yes, ma'am.
 6        Q.    Where were the people standing?
 7        A.    They were in front of the door and in the
 8   hallway.  I can't quite say if they were completely, you
 9   know, backs against the hall, but there was no way that I
10   would -- that I would even think about trying to get
11   through them.
12        Q.    Mr. Haymaker asked you if this was an
13   unpleasant experience.  Do you remember that?
14        A.    Yes.
15        Q.    Okay.  What other feelings were you feeling?
16        A.    Very -- scared.  Like, I -- I didn't come
17   there for that.  I came there to get medical treatment
18   and it wasn't able to happen at that time.
19        Q.    How did seeing that many people make you
20   feel?
21        A.    Uncomfortable.  Very anxiety ridden.
22        Q.    I'd like to show you Exhibit 4A.  Sorry to
23   put you on the spot.
24              Is that generally how the people looked --
25        A.    Yes.
```

1     Q.    -- when you were trying to go down to your

2  appointment?

3     A.    Yes, ma'am.

4     Q.    Was there space to walk through?

5     A.    To walk through the people like where it

6  curved?  Absolutely not.

7     Q.    Why didn't you ask them if you could go by?

8     A.    There was -- it was intimidating.  There was

9  so many of them.

10     Q.    Why didn't you push through?

11     A.    Because that's just not okay.  I'm not that

12  kind of person.

13          MS. KLOPF:  No further questions.

14          THE COURT:  Any additional cross?

15          MR. HAYMAKER:  No, Judge.

16          MS. BELL:  No, Your Honor.

17          THE COURT:  All right.  You may step down.

18                 **\*\*\*\*\*WITNESS EXCUSED\*\*\*\*\***

19          THE COURT:  Next witness.

20          MR. BOYNTON:  Your Honor, the next witness

21  implicates the pending government motion for

22  reconsideration.

23          THE COURT:  Okay.  We'll take an early lunch

24  hour today.  We'll be in recess for an hour.  The jury is

25  excused.

1          (Whereupon, at 11:36 a.m. the jury retired

2     from open court.)

3          THE COURT:  Yeah, that lunch break may be

4     longer than normal because their lunches may not be ready

5     yet.  So we'll see.  Sit down, please.

6          The renewed motion to admit Exhibit 15, I'll

7     hear whatever the defense wants to say in response to

8     this motion.

9          MS. BELL:  Your Honor, I'd rely on my

10    previous pleading, obviously.  But I think in -- let me

11    see if I can say this right.  In hearing Caroline Davis's

12    testimony, particularly about her saying if somebody had

13    come to the door, I wasn't going to get up, I was

14    blocking that door, that's the decision -- and kind of

15    her implication that everybody else shared the same

16    intent as her, if you put Ms. Idoni's statement in and we

17    can't cross-examine her, the other five of us who are

18    implicated through that statement, I think that is a

19    violation of confrontation, particularly given what

20    Ms. Davis said.

21         I think it's sort of a -- it bolsters

22    Ms. Davis's sort of opinion testimony that is kind of

23    what she testified as an expert on, rescues and blocking

24    and intent and those sort of things.  And I would want

25    the opportunity, if Ms. Idoni's statement about we

blocked the doors came in, on behalf of Mr. Gallagher to
pursue that that was -- you know, was that an individual
choice and would you have moved if someone got up to the
door, were you still praying, were you still
contemplating that.

And I think by putting this in it's sort of
just left there hanging in the air for the jury to see.
I think it's got a corroborative effect on Ms. Davis's
testimony and the things that she said.  And I think
because of the things that she said about her own state
of mind, it makes other people, such as Ms. Idoni's state
of mind, all the more relevant to my client.  And I would
submit to the other defendants sitting here.

THE COURT:  I am not convinced and I'm not
going to grant this motion.  It's denied.

I have another short criminal hearing at
noon.  You can certainly leave all your stuff and we will
just tell the parties it should be short, not to disturb
anything on the tables.  But at this time we'll stand in
recess.

(Whereupon, a break was taken from
11:39 a.m. to 12:21 p.m.)

THE COURT:  Someone had a preliminary
matter?

MR. BOYNTON:  Your Honor, I've raised this

1   with Mr. Haymaker already, but I wanted to bring it to

2   the Court's attention.  An attorney with Bass, Berry &

3   Sims contacted me and alerted me that a sign-in sheet was

4   being passed around the gallery with Mr. Boyd's name at

5   the top of it, asking people in attendance in the gallery

6   to be signing their names.

7            THE COURT:  What's the purpose of that?

8            MR. HAYMAKER:  Judge, I've discussed this

9   with my client.  I think what was happening is he had a

10  family member that was passing around a piece of paper

11  for the supporters of Mr. Boyd, people who are here in

12  support to put their names on a list so he could thank

13  them later for coming and supporting him.  I've explained

14  to him that that's not acceptable.  I've got the list, I

15  recovered the list, and my client apologizes.  I made it

16  clear that that's not appropriate.

17           THE COURT:  Thank you.  Anything else?

18           MR. BOYNTON:  No, Your Honor.

19           THE COURT:  All right.  We're ready for the

20  jury.  Who's the next witness?

21           MR. BEAYE:  The next witness is Ann Marie

22  Wood, Your Honor.

23           THE COURT:  Ann Marie Woods.

24           MS. KLOPF:  Wood singular; right?

25           THE COURT:  Wood singular.

1          MR. BEAYE:  Wood singular.

2          THE COURT:  Do you think we will finish the

3    government's proof this afternoon?

4          MS. KLOPF:  Absolutely, Your Honor.  There's

5    only one witness left after Ms. Wood.

6          THE COURT:  Defense better be ready to go,

7    then --

8          MR. PARRIS:  We are.

9          THE COURT:  -- so we don't waste any time.

10         So the government's instruction on the

11   Pinkerton instruction, unless you can give me some

12   authority that this ever has been used in a FACE Act

13   case, I'm not going to give it.  It will do nothing but

14   confuse the jury.

15         Okay.  We're ready.

16         (Whereupon, at 1:02 p.m. the jury returned

17   to open court.)

18         THE COURT:  Okay.  Next witness?

19         MR. BEAYE:  Your Honor, the government is

20   going to call Ann Marie Wood to the stand.

21         Before that, the two other stipulations that

22   the parties would agree to that I'd like to read into the

23   record.

24         THE COURT:  Why don't you come to the podium

25   and read them into the record.

1          MR. BEAYE:  Will do, Your Honor.  For

2   Your Honor's purposes, these are -- the first one is

3   Exhibit 21.

4               This is stipulation No. 3 of the parties.

5   The United States of America by and through undersigned

6   counsel and defendants Chester Gallagher, Heather Idoni,

7   Calvin Zastrow, Coleman Boyd, Paul Vaughn and Dennis

8   Green by and through undersigned counsel jointly agree

9   and stipulate to the following:

10              The parties agree that Government's

11  Exhibits 11, 12 and 15 are authentic copies of portions

12  of Coleman Boyd's Facebook account.

13              The parties agree that Government's

14  Exhibit 13 is an authentic copy of a portion of Chester

15  Gallagher's Facebook account.

16              Parties also agree that Defense Exhibits 10

17  through 13 are authentic copies of portions of Chester

18  Gallagher's Facebook account.

19              The parties reserve the right to object to

20  the admission of any exhibits or portions of exhibits on

21  other grounds, including but not limited to materiality,

22  relevancy and hearsay.

23              THE COURT:  That is Stipulation No. 3.  Do

24  you move it into evidence as Exhibit 21?

25              MR. BEAYE:  I do, Your Honor.

1           THE COURT:  Any objection?

2           MS. BELL:  No, Your Honor.

3           THE COURT:  Received.

4           (Government Exhibit No. 21 was admitted.)

5           MR. BEAYE:  Your Honor, this next one was in

6    the binder you have, Exhibit 23.  This is Stipulation

7    No. 5 of the parties.  The stipulation states:  The

8    United States of America by and through undersigned

9    counsel and defendants Chester Gallagher, Heather Idoni,

10   Calvin Zastrow, Coleman Boyd, Paul Vaughn and Dennis

11   Green, by and through undersigned counsel, jointly agree

12   and stipulate to the following:

13           The parties agree that Exhibits 7 and 9 are

14   copies of portions of the web history of a Google account

15   registered to Chester Gallagher.

16           The parties also agree that Exhibits 8 and

17   10 are authentic copies of portions of the search history

18   of the same Google account registered to Chester

19   Gallagher.

20           And I move to admit this in evidence as

21   Government's Exhibit 23.

22           THE COURT:  Any objection?

23           MS. BELL:  No objection.

24           THE COURT:  Received.

25

1          (Government Exhibit No. 23 was admitted.)

2          MR. BEAYE:  Your Honor, the government would

3   now call Ann Marie Wood to the stand.

4          THE COURT:  Ann Marie Wood.

5                    **ANN MARIE WOOD**

6   called as a witness, after having been first duly sworn,

7   testified as follows:

8                  **DIRECT EXAMINATION**

9   BY MR. BEAYE:

10         Q.    Good afternoon, Ms. Wood.

11         A.    Good afternoon.

12         Q.    Could you please state and spell your name

13  for the court reporter.

14         A.    My name is Ann Marie Wood.  It's spelled

15  A-n-n M-a-r-i-e, last name W-o-o-d.

16         Q.    Ms. Wood, what do you do for work?

17         A.    I work for the FBI.

18         Q.    What do you do there?

19         A.    I am what's called a staff operations

20  specialist.

21         Q.    What does that mean?  What does a staff

22  operation specialist do?

23         A.    I am a tactical analyst.  I provide support

24  to our agents in their investigations.

25         Q.    How long have you served with the FBI?

1      A.    I've been with the FBI since April of 2015.

2   So almost nine years.

3      Q.    And did you have law enforcement experience

4   before that?

5      A.    I did.  I worked for about a year as a

6   volunteer investigative analyst for a local law

7   enforcement agency.

8      Q.    What are your duties with the FBI, Ms. Wood?

9      A.    So as a staff operations specialist, I

10  assist agents with their cases, and that can take the

11  form of performing a number of analytical duties,

12  including looking at things like toll records, social

13  media, financial records, public information, open source

14  information.

15     Q.    As part of your duties with the FBI that you

16  just reviewed, did you review driver's license histories

17  of any of the defendants here today?

18     A.    I did.

19     Q.    Whose?

20     A.    I reviewed Dennis Green's and also Paul

21  Vaughn's.

22     Q.    Based on those histories that you reviewed,

23  could you identify where those defendants resided as of

24  March 5 of 2021?

25     A.    I could.

1       Q.    Where did Dennis Green reside?

2       A.    Dennis Green was residing in the state of

3  Virginia.

4       Q.    What about Paul Vaughn?

5       A.    Paul Vaughn was living in Tennessee at the

6  time.

7       Q.    Do you know what city?

8       A.    Centerville, Tennessee, I believe.

9       Q.    Approximately how far is Centerville,

10  Tennessee, from Mt. Juliet, Tennessee?

11       A.    It's about an hour and a half from

12  Nashville.

13       Q.    Is that driving?

14       A.    Or from Mt. Juliet.  Driving, yes.

15       Q.    As part of your duties with the FBI, did you

16  review materials for this case?

17       A.    I did.

18       Q.    What materials did you review?

19       A.    I reviewed several Facebook social media

20  returns.  And I also reviewed some Google returns.

21       Q.    Once you reviewed those materials, what, if

22  anything, did you do with them?

23       A.    I prepared a PowerPoint preparation that

24  highlighted various communications, as well as various

25  web searches and websites that were visited.

1      Q.    I'm going to show you what's been marked for
2  identification purposes as Government's Exhibit 7 through
3  10.  You can just -- should be in the binder in front of
4  you.  If you can just take a look.  And just let me know
5  once you've had a chance to review each of them.
6      A.    Okay.
7      Q.    What are these?
8      A.    These are extracted documents from search
9  warrant returns that were provided by Google.
10     Q.    Do you know whose Google account these
11 extractions came from?
12     A.    These were from Google user Chester
13 Gallagher.
14     Q.    Now, is this all of the materials that were
15 retrieved from the Google account?
16     A.    It is not.
17     Q.    Are these excerpts?
18     A.    These are excerpts, yes.
19     Q.    Are these excerpts you selected based on
20 your review of the search warrant returns?
21     A.    They are.
22     Q.    I also wanted you to take a look at
23 Government's Exhibit Exhibits 11 through 12.  Just take a
24 look at those and let me know when you have a chance.
25     A.    Okay.

1    Q.    What are these?

2    A.    These are a combination of Facebook messages

3  that were made through Coleman Boyd's Facebook account

4  and also a public post, it was a repost of someone else's

5  Facebook post.  Status update.

6    Q.    Is this everything you reviewed related to

7  Coleman Boyd's Facebook account from the search warrant?

8    A.    I reviewed quite a bit of the search warrant

9  return from Coleman Boyd, but these are what I reviewed.

10   Q.    Are these excerpts from that return?

11   A.    These are excerpts, yes.

12   Q.    Are these excerpts you selected based on

13 your review?

14   A.    They are.

15   Q.    I want you to also take a look at what's

16 been marked for identification purposes Government's

17 Exhibit 13.

18   A.    Yeah.

19   Q.    What is this?

20   A.    These are Facebook messages that are

21 excerpts from the Facebook return for Chester Gallagher's

22 Facebook account.

23   Q.    Are these excerpts you selected based on

24 your review of the Facebook account?

25   A.    They are.

1          MR. BEAYE:  Your Honor, we move to admit

2  Government's Exhibit 7 through 10 and Exhibits 11 through

3  13.

4          THE COURT:  Any objection to any of these

5  exhibits?

6          MS. BELL:  No, Your Honor.

7          THE COURT:  All right.  7, 8, 9, 10, 11, 12,

8  13 are received.

9          (Government Exhibits Nos. 7 through 13 were

10  admitted.)

11  BY MR. BEAYE:

12     Q.    Before we sort of turn to what you've done

13  with those exhibits, I want to ask you about Government's

14  Exhibits 1 and 3.  Are you familiar with those, what's

15  been admitted as Government's Exhibit 1 and 3?

16     A.    I am familiar.

17     Q.    How are you familiar with those exhibits?

18     A.    They're videos that I viewed as part of my

19  return, review of the Facebook returns for Coleman Boyd

20  and Chet Gallagher.

21     Q.    Based on your review of the Facebook search

22  warrant returns, what is Government's Exhibit 1?

23     A.    Government's Exhibit 1 is a video that was

24  posted to Coleman Boyd's Facebook account.

25     Q.    Do you know when this video was posted?

1    A.    It was posted on the 5th of March, 2021.

2    Q.    Do you know what time?

3    A.    It was at approximately 7:12 a.m. Central

4  Standard Time.

5    Q.    And based on your review of the Facebook

6  search warrant returns, what is Government's Exhibit 3?

7    A.    Government's Exhibit 3 is a video as well

8  that was posted to Chet Gallagher's Facebook account.

9    Q.    And do you know when that video was posted?

10    A.    That one was also posted on the 5th of

11  March, 2021.

12    Q.    Do you know approximately what time?

13    A.    It was posted at approximately 7:55 a.m.

14  Central Standard Time.

15    Q.    Now, just on the Gallagher video, do you

16  know when the recording was made?

17    A.    Given the length of the video that -- how

18  large the video is, how long the video is, and the time

19  that it was uploaded per the Facebook search warrant

20  returns, as well as some comments that were made

21  subsequent to that, it appears that that video was made

22  live.

23    Q.    What do you mean by live?

24    A.    So it was what's called a livestreaming

25  video.  Facebook provides users the ability to actually

1  start recording video and post it as it's happening live.

2      Q.    Is that true of the video by Coleman Boyd as

3  well?

4      A.    It's a little bit more difficult to tell

5  with that one.  But, again, the length of the video and

6  the time that it was uploaded suggests that it was live

7  as well.

8      Q.    Are you familiar with what's been admitted

9  as Government's Exhibits 16 and 17.  You can take a look

10 at that in your binder.

11     A.    I am.

12     Q.    What are these?

13     A.    These are clips of two videos that were put

14 into a Google Drive folder, the link for which was in a

15 Facebook message made by Coleman Boyd.

16     Q.    Do you know when the clips were -- the video

17 was created?

18     A.    They do appear to be on the 5th of March,

19 2021.

20     Q.    Now, Ms. Wood, I want to talk a little bit

21 about the presentation you referenced earlier.  I want to

22 show you what's been marked for identification purposes

23 as -- demonstrative purposes as Government's Exhibit 14B.

24 And if we could just put that up for the jury.

25         Are you able to see that, Ms. Wood?

1        A.    I am.

2        Q.    Is this the exhibit you prepared?

3        A.    It is.

4        Q.    Just to start, could you just walk us

5    through how you structured this exhibit?  How did you

6    break things up?

7        A.    Well, I looked to put together

8    communications that were relevant to the investigation.

9    I broke it up in a chronological fashion; in

10   communications that occurred prior to March 5, 2021, and

11   then communications that occurred after March 5, 2021.

12       Q.    Now, I want to walk through this exhibit a

13   little bit.  Let's just start with the section you've

14   identified as communications before March 5, 2021.  Could

15   we just look at slide 3.

16             Now, Ms. Wood, could you describe for the

17   jury what this sort of slide is depicting?

18       A.    Sure.  So this is Facebook Messenger

19   messages between a registered -- the registered Facebook

20   user Chester Gallagher and a Facebook user using the name

21   Heather Idoni occurs on the 9th of February, 2021.

22       Q.    I see that -- I see the date February 9,

23   2021, but at the opposite end of that, I see something

24   that states 8:45 p.m. CST and has sort of a symbol above

25   it.  What is that?

1      A.   That is actually not a Facebook message, but

2  a Facebook call, Facebook provides users with the ability

3  to make essentially a telephone call utilizing their

4  platform.  That emblem and the information below it

5  represent the call that occurred, according to the

6  Facebook search warrant returns.

7           MR. BEAYE:  Your Honor, before we move

8  forward I'd like to move to admit what's been

9  Government's Exhibit 14B.

10          THE COURT:  Any objection?

11          MS. BELL:  No objection.

12          THE COURT:  Received.

13          (Government Exhibit No. 14B was admitted.)

14          MR. BEAYE:  And permission to publish,

15  Your Honor.

16          THE COURT:  Yes.

17  BY MR. BEAYE:

18      Q.   Just going back to the cover page of this

19  exhibit, just for the jury's benefit, this is the exhibit

20  you prepared; right?

21      A.   It is.

22      Q.   And this is the exhibit you structured in --

23  based on the chronology of the communications you

24  reviewed?

25      A.   It is.

1     Q.   You have one section for communications

2 before March 5, 2021, and another section for

3 communications after March 5, 2021; correct?

4     A.   That is correct.

5     Q.   And now turning back to slide 3, so you

6 previously described this as Facebook messages between

7 Chester Gallagher and Heather Idoni on February 9, 2021?

8     A.   That's correct.

9     Q.   And I asked you about -- is that right?

10     A.   That is correct.

11     Q.   And I asked you about, what you're looking

12 at on this screen, at the end of this line towards the

13 right side of the exhibit itself I see 8:45 p.m. with a

14 symbol on top of it.  Could you just describe that again

15 for the jury's sake?

16     A.   Sure.  So this represents a Facebook call,

17 communication that was made between Chester Gallagher and

18 Heather Idoni's Facebook -- the Facebook platform.  It

19 was initiated -- this call was initiated from the

20 Facebook account of Heather Idoni to Gallagher.  The

21 start time of that call was 8:50:45 p.m. Central Standard

22 Time.

23     Q.   Do you know how long that call lasted?

24     A.   According to the records, 469 or maybe it

25 was 59, I think, seconds.

```
1        Q.    So how many minutes is that?

2        A.    I am not sure.  Somewhere -- somewhere

3   around 10 minutes.

4        Q.    More than a minute?

5        A.    It was more than a minute.

6        Q.    Okay.  Could you just -- just to talk a

7   little bit about the text that we see in the various

8   boxes on this screen, what are those?

9        A.    So each of those boxes represents

10  communications that was made by one of the two Facebook

11  message users.  It starts at around 7:47 p.m. Central

12  Standard Time and starts with communication by Chester

13  Gallagher, which is the boxes that you see on top in

14  blue.  And then replies that come from the account of

15  Heather Idoni in orange below.

16       Q.    Now, looking at these messages, are they

17  structured such that, I guess, the messages in blue are

18  Chester Gallagher?

19       A.    Correct.

20       Q.    And the message in this orange color are

21  Heather Idoni?

22       A.    Correct.

23       Q.    Does each box represent one message?

24       A.    Sometimes it is one message, but there are

25  times when I combined messages that occurred
```

1   concurrently.

2       Q.    When you say concurrently, what do you mean

3   by that?

4       A.    So as with texting on a phone, Facebook

5   allows you to send a message and you can send multiple

6   messages to the same person, kind of in rapid order.

7   Some of these were a grouping of those communications

8   that were made by one individual user.

9       Q.    What that means is that one user writes a

10  message and writes another message before the other user

11  has responded; is that right?

12      A.    That's correct.

13      Q.    Now, could you just tell us what they're

14  saying in these messages?

15      A.    Sure.  In the first message, the Facebook

16  message user registered to -- message user Chester

17  Gallagher asks:  What are your housing needs/plans and/or

18  arrangements when you do arrive.

19           The Facebook user Heather Idoni replies

20  that:  I have arranged housing for everyone.  Laughing

21  emoji.  The Hebbs, Belangers, Eva Edl, Michelle Eddy,

22  Caroline.  Kendra Petty, Eva Zastrow.  2415 McGavock

23  Pike, Nashville, Tennessee Wyndham Nashville.  Arriving

24  the evening of 3/3.  Do you need additional housing for

25  anyone?

          Chester replies back to that:  Waiting for
party responses.  You're amazing.

          Then the Facebook user Heather Idoni
replies:  Let me know if you hear from the Boyds.
Chester Gallagher replies back:  Yes.  Last I was told
they decided -- decide on an Airbnb.  What are the rates
at the Nashville Wyndham in case folks want to join the
group.

          Then Heather Idoni replies:  Well, I can
accommodate some rescuers bringing families but I am not
charging money.  Or I could put some single men together.

          Chester then replies:  I might ask you to
reach out to Dennis Green.  Would you do that?  And
Heather Idoni replies sure.  Last Chester Gallagher says:
Does the hotel have a small meeting room.

     Q.    And later on they have that call you
described earlier?

     A.    Correct.

     Q.    Can we turn to slide 4, please.  I just want
to ask you a few questions about that.

     A.    Uh-huh (affirmative).

     Q.    Can you describe what that slide depicts?

     A.    Sure.  These are communications between
multiple Facebook users, in this case an account with the
username Caroline Davis and an account that was

1  registered to Coleman Boyd and an account with the
2  username Andrew Belanger.
3      Q.    When is this occurring?
4      A.    It occurs on 11th of February, 2021.
5      Q.    What are they saying?
6      A.    In this particular case Belanger asks:  So
7  you are going the at symbol Caroline.  Caroline Davis
8  replies with a shrugging emoji.  Then Coleman Boyd asks:
9  We'll see if there is a nearby house with an open slot on
10 the floor if you really want to come.
11          And then Caroline Davis replies:  Sounds so
12 dot dot dot good.  I think I'll pass.  Ha ha ha.  I'll
13 see ya in Tennessee, though.  I don't mind putting up
14 with you since Jesus says love your enemies and it's for
15 the rescue.  Then Boyd asks:  Are you really not coming
16 here, why not?  Davis replies:  Well, that's just a lot
17 of travel for a poor sap like me.
18     Q.    Just to be clear, the messages in purple
19 are, I guess -- is Andrew Belanger and the message in
20 yellow are Caroline Davis?
21     A.    That's correct.
22     Q.    And the messages in green are Coleman
23 Boyd's?
24     A.    That's correct.
25     Q.    I want to ask you questions about the next

slide.  Now, what is this depicting?

    A.    So these are additional messages between the registered Facebook account for Chester Gallagher and an account with the username Heather Idoni.

    Q.    And when is this conversation happening?

    A.    It occurred on the 14th of February, 2021.

    Q.    And what are they saying to each other?

    A.    In this case, Heather asks the question or makes the comment, I have a two-bedroom deluxe condo for Cal.  Green family is confirmed.  Then it is followed with comments made by the account of Chester Gallagher: I have another request from someone in Wichita.  I don't know if it is a family or just the mom.  Her name is Claudine.  I'll call her today.  If alone she can join the ladies if Emily says no.

    Then Heather Idoni's account replies:  Would she be risking arrest?  I would also rather get to know her before a commitment.  I think Oma, Eva would rather room with those we already know.  Please just keep in touch when she responds.  We'll be sharing beds, but I know it would be okay with Emily.

    And then Chester Gallagher replies:  I will prequalify any I send your way.

    Q.    I want to ask you a few questions about the next slide, what is slide 6 in the binder you have.  Now,

1  can you describe what this slide depicts?

2       A.    Sure.  So this slide is specifically about

3  Google searches.  So this is based on Google returns that

4  were provided to us in response to a search warrant.

5  These are both what we call searched items, search terms

6  that the Google user made, as well as what pages, so a

7  web history that the Google user made from Google.

8       Q.    On what -- when are these searches and web

9  links being visited?

10       A.    This slide depicts those that are completed

11  on 18th of February, 2021.

12       Q.    Were you able to visit any of the web links

13  on this slide?

14       A.    I did, yes.

15       Q.    Which ones?

16       A.    I attempted to visit all three.

17       Q.    Which ones were you successful in visiting?

18       A.    I could visit the second and the third one,

19  but not the first.

20       Q.    And why aren't you able to visit the first?

21       A.    The first, the link is actually -- the page

22  could not be located.  It does bring you to the

23  Department of Justice's web page, but gives you an error

24  message indicating that the page is not -- could not be

25  located.

1       Q.    Focusing on that one specifically, I see

2   that the end of it there's the acronym -- three letters

3   CRT.  Do you know what that acronym stands for?

4       A.    I do.

5       Q.    What does it stand for?

6       A.    It stands for the Civil Rights Division at

7   the Department of Justice.

8       Q.    Now, just -- can you just walk me through

9   the timing and sort of each of the searches and websites

10  on this page?

11      A.    Sure.  So at approximately 10:02 p.m. on the

12  18th of February, 2021, this is Central Standard Time, a

13  search was conducted by Google user Chester Gallagher for

14  the term freedom of access to clinic entrances law.  Very

15  shortly thereafter the web page https:www.justice.gov

16  CRT-12 was visited.  A few minutes after that a website

17  https:www.law.cornell.edu/uscode/text/18/248 was visited.

18  That web page is specifically a --

19          MS. BELL:  I'm going to object to the

20  hearsay at this point.

21          MR. BEAYE:  And if I may respond,

22  Your Honor.  She testified earlier that she visited the

23  web page, and so she's describing what she viewed when

24  she got to the web page.  It's not the contents of the

25  page.  She's describing what the web page says.

1          THE COURT:  Just describing what she went

2    to.

3          MR. BEAYE:  Exactly.

4          THE COURT:  Okay.  Overruled.

5    BY MR. BEAYE:

6          Q.    You may continue your answer.

7          A.    So the web page contains text of federal

8    code in this case, 18 USC 248.

9          Q.    And what search was conducted next?

10         A.    So after that at approximately 11:32 on the

11   same evening, the search term TN medical license lookup

12   was searched.

13         Q.    And were you able to visit the resulting web

14   link?

15         A.    Shortly thereafter the website

16   https:www.healthguideusa.org/lookup/tennessemedical

17   license.htm was -- was visited.  Inputting that exact

18   address in -- it's a broken link essentially, but it

19   gives you an error message -- at least when I visited it,

20   it gave you an error message that said please visit

21   healthguideusa.org.  That website provides the user with

22   the ability to search any state's medical license

23   information.

24         Q.    Is that any -- is that any physician within

25   the state's medical license?

1          A.    I would assume.

2          Q.    I want to talk to you about the next slide,

3    slide 7, if we can just turn there.  Just let me know

4    when you're there.

5          A.    Yup.

6          Q.    Can you describe what this slide depicts?

7          A.    So this is continuing Facebook messages

8    between the registered user Chester Gallagher and the

9    Facebook user Heather Idoni.

10          Q.    And when is this conversation happening?

11          A.    It occurs on the 22nd of February, 2021.

12          Q.    What are they saying to each other?

13          A.    Chester asks the question:  When do you

14    arrive.  The account for Heather Idoni replies:  We'll

15    start the nine-hour drive early Wednesday morning.

16    Chester replies back --

17                MS. BELL:  Your Honor, I'm going to

18    objection to foundation.  I think that the appropriate

19    testimony would be the user of the account or somebody

20    using that account.  She doesn't know who's typing in the

21    account.

22                MR. BEAYE:  If I may briefly respond.

23                THE COURT:  Go ahead.

24                MR. BEAYE:  I believe -- Ms. Bell is correct

25    that she is the user Heather Idoni, but I believe other

1   evidence in this case has indicated that this user is,

2   indeed, Heather Idoni.

3                THE COURT:  She doesn't know that.  You're

4   just saying that from whoever was using Gallagher's

5   username and whoever was using Idoni's username?

6                THE WITNESS:  So, yeah.  In the case of

7   Chester Gallagher, the Facebook -- we have information

8   from the search warrant that says the account is

9   registered to Chester Gallagher.  Since we don't have

10  Heather Idoni's subscriber information, I'm referring to

11  it as the Facebook user, the name being Heather Idoni.

12               THE COURT:  Okay.  If you would refer to

13  them by their last names rather than their first names

14  too.

15               THE WITNESS:  I would be happy to.

16               THE COURT:  Go ahead.

17  BY MR. BEAYE:

18       Q.   Can you tell us what they're saying to each

19  other?

20       A.   Continue?  Picking up from the -- we'll

21  start the nine-hour drive, Idoni makes that comment.

22  Gallagher says:  So the folks you have arranged houses

23  for, who of them do you believe will also arrive when --

24  Wed afternoon or evening.  Idoni replies:  I'm not sure,

25  but they are able to check in without me.  I told all to

try to arrive early evening.  I believe.  I've talked to Belangers, Hebbs, Cal, the ladies I'm traveling with and the Greens.

Gallagher then replies:  I want to task the first arrivers and want to meet with them at the Wyndham at 7:00 p.m.  Can you call them and confirm who will attend.  Idoni replies:  Sure I will take care of that. And then Gallagher says:  I'll bring some extra folding chairs and we can meet in our room.

Q.    Can we now take a look at the next slide, just let me know when you're there.

Are you there?

A.    I am.

Q.    What does this slide depict?

A.    These are Facebook messages, again, between Gallagher and Idoni.

Q.    And when is the conversation happening?

A.    These -- this series of conversations occurs between the 23rd and the 24th of February, 2021.

Q.    And you said these were series of conversations.  This is not just one conversation; is that right?

A.    Yeah, it happens over a two-day period.

Q.    What are they saying to each other across these conversations?

1    A.    It starts with Idoni sending a link to the

2  Gallagher Facebook account that is -- that contains a 3D

3  viewer of a potential meeting room at the Wyndham

4  Nashville.  She then makes the comment after that:  I

5  will call to see if it's open for use.  Gallagher replies

6  okay.  Idoni follows with:  And I spoke to everyone.  We

7  can all be there in time for a 7:00 p.m. meeting.

8          Gallagher replies:  Great.  Good job.  And

9  Idoni then replies I think it's the next day:  The

10  meeting room will be set up for Wednesday night.

11    Q.    Now, let's look at the next slide.  Can you

12  tell us what this slide is depicting?  I see gray text up

13  at the top, purple below.

14    A.    Sure.  So this, again, is both searched

15  items that were made through the Google user Chester

16  Gallagher and then web pages that were also visited

17  through that user.

18    Q.    So is it right to say that the searches are

19  on top and the web pages are on the bottom of line that's

20  in the middle of the slide?

21    A.    That's correct.

22    Q.    Just focusing on the web pages at the bottom

23  of that page, were you able to visit any of those web

24  links?

25    A.    I was able to visit all three of those web

links.

Q.    And just starting with the first one, what does that web link show?

A.    That was a Tennessee government web page that can be used to search for Tennessee medical license information.

Q.    So is that similar to the web link you visited a few slides back?

A.    This one is the government site.  The one a while back I think is probably a private website that it permits you to do that.

Q.    What about the next web link?

A.    The next web link is for a similar purpose. It's Kentucky -- state of Kentucky's lookup system.

Q.    And what about the last one?

A.    The last one is a -- it's a search through website.  So it's fultonpolice.org.  It appears to be a private website, but you can look up police departments across the country from that website.

Q.    And just looking at the link itself, at the end of it, it has mount-juliet-police-department?

A.    Correct.

Q.    What does that reflect?

A.    So you -- when you follow this link exactly as it's written, it provides you with information on

Mt. Juliet's police department.

Q.    Now, can you just walk us through the timing
and sequence of the various searches and visits to web
pages?

A.    Sure.  So these searches and the web pages
were visited on the 25th of February, 2021, starting at
around 12 o'clock.  At about 12:10 p.m. the search for
medical license lookup Tennessee was made.  And then
again the web page below was visited.  Above you'll see
that on at about 12:12 p.m., freedom of access to clinic
entrances law was visited.

Shortly thereafter medical license lookup
Tennessee was again searched.  Very, very shortly
thereafter, about 20 seconds later, medical license
lookup Tennessee was also searched again.  And then at
about a minute later, less than a minute later, medical
license lookup Kentucky was searched.  And then
immediately following that the Kentucky website was
visited.

Slightly later in the day, a little bit
after 2 o'clock p.m. Central Standard Time, at about
2:16, the search term navigate to city jail Mt. Juliet,
Tennessee was searched.  And then within 30 seconds or so
later, directions to Mt. Juliet Police Department,
1019 Charles -- Charlie Daniels Parkway, Mt. Juliet,

1    Tennessee 37122 was searched.

2             After that --

3       Q.     Can I stop you there for one second?

4       A.     Of course.

5       Q.     This appears -- what you just read, the 1019

6    Charlie Daniels Parkway, Mt. Juliet, Tennessee, is that

7    an address?

8       A.     It is.

9       Q.     Where does that address lead?

10      A.     I believe it leads to the Mt. Juliet Police

11   Department.

12      Q.     You can continue, just on the next message,

13   the next search and what that consisted of.

14      A.     Yeah. So at about 2:20 there's the phrase,

15   does Mt. Juliet Tennessee have a local city jail was

16   searched. And then the fultonpolice.org website was

17   visited. And then following that at about 2:22 p.m.,

18   2425 North Mt. Juliet Boulevard, Mt. Juliet, Tennessee

19   was visited.

20      Q.     Is that also an address?

21      A.     It is.

22      Q.     Do you know where that address leads?

23      A.     I believe it's a -- one of the city

24   buildings, one of the Mt. Juliet city buildings.

25      Q.     As in a government building in Mt. Juliet?

1   A. Correct, government building.

2   Q. I want to talk to you about the next slide.

3 Just let me know when you're able to see that.  Sorry

4 about that.

5   A. Yup.

6   Q. Can you describe what that slide depicts?

7   A. These are messages between Facebook user

8 Chester Gallagher and Heather Idoni on the 26th of

9 February, 2021.

10   Q. And when is this conversation happening?

11   A. Again, on the 26th of February, 2021.  I'm

12 not sure of the time.

13   Q. Can you just -- what are they saying to each

14 other?

15   A. Gallagher writes:  Here's info to write

16 down.  There will be two evening rallies and are

17 scheduled in Mt. Juliet.  First meeting is at the

18 Nashville Club Wyndham in the game room.  That first

19 meeting to update those having arrived by Wednesday -- or

20 Wed afternoon or earlier on the week's plans will be at

21 7:00 p.m., Wednesday.

22    The address to the Wyndham and the two

23 rallies are as follows:  Club Wyndham, 2415 McGavock

24 Pike, Nashville, Tennessee, www.wyndham.  Music City

25 Baptist Church is 7104 -- I think it's Lebanon Road,

Mt. Juliet, Tennessee.  Meal location to be announced.

Q.    I see another address, 7104 Lebanon Road you described.  Do you know where that leads?

A.    I believe it's the Music City Baptist Church.

Q.    What's the next blue box and what's contained in that?

A.    So this particular message was also forwarded in its entirety to a Facebook user with the name Calvin Zastrow, as well as others.  And then after that the Gallagher asks, can you forward the message above to others for me.  Let me know who you sent it to.  Thanks.

And then Idoni replies:  I share the info with the Belangers, Hebbs, Greens, Cal, David and Laura Z and the ladies riding down with me.  I will share with Boyds as well.

Q.    Then -- I want to take a look at the next slide.  Just let me know when you can see that as well.

A.    Okay.

Q.    So this is now turning to the section containing communications after March 5, 2021?

A.    That's correct.

Q.    Can we take a look at the first slide within that section?  Can you describe what this depicts?

1          A.     So on the 8th of March, 2021, there was a
2    reply made to a status update on Coleman Boyd's Facebook
3    account.  In this case the reply was made by Caroline --
4    a Facebook user Caroline Renee Davis to a comment made by
5    another Facebook user to Coleman Boyd's status update.
6          Q.     And what is this message saying?
7          A.     The Facebook user Davis replies:  Not
8    risking arrest doesn't make you a coward.  Not everyone
9    is in a situation where they fulfill the missions God has
10   given them personally and then also risk arrest.  Not to
11   mention, as much as people are needed to block the doors,
12   people are needed on the other side of things to help
13   from the outside of jail and the other parts of rescue.
14               And then it's the at sign and then Coleman
15   Boyd's Facebook account did the bulk of the hard work
16   when we were on the inside.  He was slaving away on the
17   outside even in the middle of the night for us.  He
18   worked hard and sacrificed his time to do the
19   behind-the-scenes work.  So praise God for people like
20   Coleman.
21         Q.     Now I see in two instances in this message
22   an at sign followed by numbers and what appears to be a
23   name?
24         A.     Yeah.
25         Q.     What does that indicate?

 1      A.   That's Facebook's way of providing
 2 identification of a particular Facebook user.  The
 3 numbers preceding the name Coleman Boyd are Facebook --
 4 what we call user ID numbers.  And the same would be true
 5 for the at sign at the beginning of the message.
 6      Q.   I'm going to now take a look at the next
 7 slide.  And just let me know when you can see it.
 8      A.   I can.
 9      Q.   Can you describe what this slide is
10 depicting?
11      A.   So in this slide the Facebook user that was
12 registered to Coleman Boyd reposts a post that had been
13 made to a Facebook account with the name Dennis Green.
14 And so it is duplicated and posted to Coleman Boyd's
15 Facebook account.
16      Q.   You may have said this, but when is this
17 post?
18      A.   This one was on the 16th of June, 2021.
19      Q.   And what is being said?
20      A.   It's titled the Mt. Juliet rescue, which is
21 the original post from Dennis Green and says:  To explain
22 what happened in court today, I must give a little
23 background.  On March 5, 2021, a group of Jesus followers
24 went into a building in Mt. Juliet, TN that houses a baby
25 killing center.  We sat down in front of the door and

began to pray and worship.  Our intention was not to
protest but rather to interpose ourselves between the
baby and the person hired to kill them.  After about
three hours, which gave counselors time to share truth
and offer help to moms, we were arrested and taken to
jail.

      Q.   I want to just focus you back on slide 6, if
you can turn back to that.

      A.   Okay.

      Q.   I believe you testified that the link, the
second link that appears in the slide,
www.law.cornell.edu link, that it went to a place for --
that showed the language of 18 USC Section 248?

      A.   Correct.

      Q.   What is the title of that statute?

      A.   It is the FACE act.

      MR. BEAYE:  Thank you.  Nothing further.

      THE COURT:  Cross?

      MS. BELL:  Just have a few questions,
Your Honor.

**CROSS-EXAMINATION**

BY MS. BELL:

      Q.   Are you Agent Wood?

      A.   I am not.  Staff Operation Specialist Wood.

      Q.   You testified that you work for the FBI;

1    correct?

2          A.    That is correct.

3          Q.    And you just went through a bunch of

4    exhibits that I think you either pulled from Facebook or

5    helped develop as part of the demonstrative exhibit; is

6    that correct?

7          A.    They came from search warrant returns that

8    Facebook provided to us, yes.

9          Q.    Okay.  And I want to talk to you just

10   briefly about Exhibit 3.  Do you recall that exhibit?

11         A.    Yes.

12         Q.    And that would be the Facebook live video;

13   correct?

14         A.    Correct.

15         Q.    Posted to the account associated with

16   Mr. Gallagher; is that right?

17         A.    That's correct.

18         Q.    How long was that video?  Do you recall?

19         A.    It was almost two hours long.

20         Q.    So if it started at 7:55, it would have

21   turned off around 9:55; is that correct?

22         A.    I would assume.

23         Q.    You viewed the whole thing; is that fair to

24   say?

25         A.    I did not.

1      Q.    You did not view it?

2      A.    I didn't view the whole video, no.

3      Q.    Did you see how it ended?

4      A.    No.

5      Q.    Okay.  You just pulled it and gave it to the

6  government?  Is that what your job is?

7      A.    The video was provided to the government by

8  Facebook.

9      Q.    And you --

10     A.    I just viewed it, you know, parts of it and

11 highlighted it for the demonstrative or for our purposes

12 today.

13     Q.    Okay.  Let's talk about the demonstrative.

14 Did you make the demonstrative exhibit on your own?

15     A.    I did.

16     Q.    Did you have any input from the government

17 lawyers?

18     A.    There's always communication between the

19 investigative teams and the...

20     Q.    So is that a yes?

21     A.    Yes.

22     Q.    How many times were you adjusting the

23 exhibit over the last few weeks?

24     A.    I don't recall.

25     Q.    More than once?

1          A.     Yes.

2          Q.     Now, with respect to the messages that you

3     put regarding February 26, do you remember those?

4          A.     You'll have to give me a minute to find that

5     one.

6          Q.     Sure.  Do you have a copy of the

7     demonstrative exhibit up there?

8          A.     I do.

9          Q.     And there's a large message that says, okay,

10    here's the info to write down.  Do you see that?

11         A.     I do.

12         Q.     You did not put the entire message in that

13    demonstrative exhibit, did you?

14         A.     Probably not, no.

15         Q.     Do you know what part you left out?

16         A.     No.

17         Q.     Do you have Exhibit 13 in front of you?

18         A.     I do.

19         Q.     And can you go to the Chet Gallagher message

20    dated 2-26-2021 at 21:22:42 UTC time.

21         A.     Okay.

22         Q.     You see a large paragraph there; correct?

23         A.     I do.

24         Q.     Can you read the last sentence in that

25    paragraph out loud, please.

1      A.    Local folks will be joining us at the

2 rallies in the streets.

3      Q.    Now can you turn back to your demonstrative

4 exhibit and tell me if you included that in the excerpt

5 that you had on the February 26 conversation.

6      A.    I did not.

7      Q.    Why did you leave it out?

8      A.    I don't know.

9            MS. BELL:  Those are all my questions.

10            THE COURT:  Okay.  Next?  Mr. Parris.

11                    **CROSS-EXAMINATION**

12 BY MR. PARRIS:

13      Q.    Just one question.  I think inadvertently

14 you referred to a Facebook account for Calvin Zastrow?

15      A.    This message was shared with a Facebook user

16 by the name of Calvin Zastrow.

17      Q.    Which exhibit is that?

18      A.    It's not included in Exhibit 13.

19      Q.    Okay.  So you can't have -- strike that.

20 Tell me again how you characterized it.

21      A.    It was a message that was written by Chester

22 Gallagher that was forwarded or sent to other separate

23 Facebook users.

24      Q.    Okay.

25      A.    In addition to Heather Idoni.

1          Q.     What about Calvin Zastrow?

2          A.     It was sent to Calvin -- the Facebook user

3     named Calvin Zastrow.

4          Q.     Isn't it true you can't have -- you can't

5     send a message to someone that doesn't have a Facebook

6     user account; right?  You can't just come in cold and --

7          A.     The Facebook message returns for Chester

8     Gallagher indicate that a message utilizing the exact

9     same language as the one that I put in the demonstrative

10    was sent to a Facebook user by the name of Calvin

11    Zastrow.

12         Q.     And it's your testimony that you actually

13    have to be a member, I suppose, or a user to have -- you

14    have to have an account for that; correct?

15         A.     These -- these were Facebook messages sent

16    between two Facebook accounts, correct.

17         Q.     Are you familiar with maybe people opening

18    bogus accounts under anonymous names?  Is there a way

19    that they are checked?

20         A.     In the case of Chester Gallagher, we sent a

21    search warrant return to Facebook and they provided

22    subscriber information.  The name provided to us was

23    Chester Gallagher.  I do not know about the Facebook

24    account, but the username for Calvin Zastrow was as I

25    indicated.  I don't know who the user -- the subscriber

1   for that account is.

2        Q.   So it's possible it could be somebody else

3   that called themselves Calvin Zastrow?

4        A.   Certainly.

5        MR. PARRIS:  That's all I have.

6        THE COURT:  Mr. Haymaker.

7                **CROSS—EXAMINATION**

8   BY MR. HAYMAKER:

9        Q.   Good afternoon.  When you put these -- you

10  put the demonstrative exhibits together, these charts; is

11  that correct?

12       A.   I did.

13       Q.   And you didn't put on those charts all the

14  messages that are -- have been made exhibits, have you?

15  Just certain ones?

16       A.   No.

17       Q.   Okay.  I want to direct your attention --

18  and I'm sorry, I don't have the exhibit number, but it's

19  the -- it's the June 16, 2021, chart.

20       A.   Okay.

21       Q.   And that is a Coleman Boyd repost, you've

22  titled it a Coleman Boyd repost of Dennis Green's

23  Facebook post; correct?

24       A.   That's correct.

25       Q.   I think we all understand this, but I just

1   want to make it clear.  Assuming that's Coleman Boyd's

2   account, the Coleman Boyd here, he didn't write that, did

3   he?

4         A.    He didn't write the message, that's correct.

5         Q.    He reposted what somebody else had posted;

6   correct?

7         A.    That's correct.

8         Q.    And then I want you to look, if you could,

9   at Exhibit -- I believe it's Exhibit 18.  Did you testify

10  about that?

11        A.    I did not.

12        Q.    It may be on one of your charts, I'm sorry.

13  Do you have a chart for March the 8th, 2021?

14        A.    Oh, I apologize.  Yeah.

15        Q.    Okay.

16        A.    I apologize.

17        Q.    And that is a message just so we understand,

18  that is a message from somebody by the name of -- it

19  appears to be Iztok Uhmek?

20        A.    No, actually she's replying to his comment.

21        Q.    So this appears to be Caroline Davis

22  responding to this other individual?

23        A.    Correct.

24        Q.    Talking about Coleman Boyd; correct?

25        A.    This individual -- the Iztok Uhmek makes a

1   comment on a status update Coleman Boyd posts to his

2   Facebook account.

3        Q.    Okay.

4        A.    In reply to that comment, Caroline Davis

5   makes this statement.

6        Q.    Okay.  And in the statement, she says not to

7   mention, referring to Coleman Boyd -- or strike that.

8             She says:  Not to mention as much as people

9   are needed to block the doors, people are needed on the

10   other side of things to help from the outside of jail and

11   the other parts of rescue; is that right?

12        A.    Correct.

13        Q.    Then she refers to Coleman Boyd and she

14   says, using Coleman Boyd's moniker, Coleman Boyd did the

15   bulk of the hard work when we were on the inside.  He was

16   slaving away on the outside, even in the middle of the

17   night for us.  True?

18        A.    Yes.

19        Q.    Is that what it says?

20        A.    That's what it says.

21        Q.    Now, when it said he was doing the bulk of

22   the work while we are on the inside, you don't know what

23   that means, do you?

24        A.    I do not.

25        Q.    That could mean the inside of the building.

It could also mean when they were in jail after this was
all over; true?

A.     Yes.

Q.     Okay.  Now, lastly, I believe you referred
to Exhibit 1?

A.     Yes.

Q.     And Exhibit 1 I believe you testified was --
you said it was a little bit different, but basically you
said it was a livestream that appeared to be posted by
Coleman Boyd; is that true?

A.     Based on the length of the video, I believe
it was livestreamed.  But Facebook does not denote in
their search warrant returns whether a video is
livestreamed or something that was just posted after it
had been completed.  So there's no way for me to know.
But the length of time and the time that it was posted
suggests that it was a livestreamed video.

Q.     And you testified as to what time this
began; correct?

A.     That's correct.

Q.     What time did it begin?

A.     At approximately 7:12 a.m. Central Standard
Time.

Q.     So your testimony is that the livestream
that's Exhibit 1 started at 7:12 a.m. on March the 5th,

1  2021, Central Standard Time; is that right?

2      A.    My testimony is that the Facebook search

3  warrant returns indicate that video was uploaded to the

4  account of Coleman Boyd at 7:12 a.m. Central Standard

5  Time.

6      Q.    Okay.  So if the government has stipulated

7  that the recording took place starting at 7:47 a.m.

8  Central Standard Time and ended thereafter, then your

9  testimony and your analysis of this with respect to that

10  would be wrong; true?

11     A.    I'm not aware of that testimony, so I don't

12  know if the answer to that is correct or not.

13     Q.    Well, if that is correct, would that --

14     A.    I can't --

15     Q.    Okay.  That's what you're saying, at odds

16  with it?

17     A.    I can tell you that the Facebook message

18  returns indicate that the video was uploaded at 7 --

19  approximately 7:12 a.m.

20     Q.    And it couldn't be uploaded before it

21  happened, could it?

22     A.    Couldn't have been uploaded before it

23  happened, no.

24              MR. HAYMAKER:  Thank you.

25              THE COURT:  Mr. Crampton.

**CROSS-EXAMINATION**

BY MR. CRAMPTON:

 Q. Hello, Ms. Wood.  You didn't find in all your research of Facebook messages and so forth any mention of Paul Vaughn, did you?

 A. Not in the ones that I reviewed, no.

 Q. And you indicated that you had researched, I think, DMV records regarding his residence; is that right?

 A. That's correct.

 Q. When did you do that?

 A. The records for Paul Vaughn were pulled during the investigation phase of the case, which I was not here in Tennessee for.  I reviewed the DMV information that was obtained by others in my office this morning.

 Q. So you don't know when the original information was --

 A. It's posted -- the date the documents were obtained is serialized to the case file.

 Q. But you don't have that date for us today?

 A. It was after the 5th of March, 2021.

 Q. That's not really that helpful for us, with all due respect.

   MR. CRAMPTON:  Thank you very much.

1            THE COURT:  Mr. Russ?

2            MR. RUSS:  I have no questions, Your Honor.

3            THE COURT:  Mr. Conway?

4            MR. CONWAY:  No questions.

5            THE COURT:  Any redirect?

6            MR. BEAYE:  Brief redirect, Your Honor.

7            THE COURT:  Okay.

8                    **REDIRECT EXAMINATION**

9  BY MR. BEAYE:

10       Q.   Now, Ms. Wood, you were asked a number of

11  questions about the time in which the video in

12  Government's Exhibit 1 was uploaded.  Is this information

13  that you know or is it based on something you reviewed?

14       A.   It's based on the Facebook search warrant

15  returns that I reviewed.

16            MR. BEAYE:  Nothing further.

17            THE COURT:  All right.  You may step down.

18            **\*\*\*\*\*WITNESS EXCUSED\*\*\*\*\***

19            THE COURT:  Next witness?

20            MS. KLOPF:  Your Honor, the United States

21  calls Nicko Ashby.

22            THE COURT:  Nicholas Ashby.

23                    **NICHOLAS ASHBY**

24  called as a witness, after having been first duly sworn,

25  testified as follows:

1                        **DIRECT EXAMINATION**

2   BY MS. KLOPF:

3        Q.    Good afternoon.  Can you please introduce

4   yourself to the jury.

5        A.    How you doing.  My name is Nicholas Ashby.

6        Q.    Who do you work for?

7        A.    The United States Army.

8        Q.    How long have you been in the United States

9   Army?

10       A.    Roughly about 15 years now.

11       Q.    Have you ever been deployed?

12       A.    Twice.

13       Q.    Where?

14       A.    Both times Afghanistan.  RC East and RC

15  South.

16       Q.    What is your current title?

17       A.    Current title is a 92 Yankee supply

18  specialist.

19       Q.    What does that mean?

20       A.    Pretty much I handle and manage millions of

21  dollars of the Army's equipment and kind of distribute it

22  about.

23       Q.    How long have you held that title?

24       A.    For the past year now.

25       Q.    What other kinds of roles have you held?

1          A.    So before that I was a 13 Bravo cannon crew

2    member also as artillery, did that for last 14 years.

3          Q.    In March 2021 where were you stationed?

4          A.    Fort Campbell, Kentucky.

5          Q.    What was your title when you were at

6    Fort Campbell?

7          A.    I was a squad leader -- actually, I was a

8    platoon sergeant, as well as a 13 Bravo during that

9    timeframe.

10         Q.    Where were you living while you were

11   stationed in Fort Campbell?

12         A.    I've lived in Tennessee, in Clarksville, as

13   well as on the border of Oak Grove, Kentucky.

14         Q.    Are you familiar with a health clinic called

15   carafem?

16         A.    Yes, I am.

17         Q.    Generally where is that?

18         A.    Mt. Juliet, Tennessee.

19         Q.    How far is that from Clarksville?

20         A.    I want to say about an hour, hour and a

21   half.

22         Q.    Did you go to that clinic on or about

23   March 5, 2021?

24         A.    Yes.

25         Q.    How did you get there?

1       A.    I drove.

2       Q.    Was anyone with you?

3       A.    Yes.

4       Q.    Who was with you?

5       A.    At the time it was my girlfriend, now my

6  wife, Melissa Ashby.

7       Q.    Did Mrs. Ashby have an appointment for

8  reproductive health services that day?

9       A.    Yes, she did.

10      Q.    What time of day was the appointment?

11      A.    I want to say it was around zero eight in

12  the morning.

13      Q.    When you say zero eight, for those of us not

14  in the military, is that 8:00 a.m.?

15      A.    8:00 a.m., sorry.

16      Q.    What time did you arrive at carafem?

17      A.    I tend to like to be places early, so I want

18  to say it was 7:45 in the morning.

19      Q.    Okay.  When you got to the parking lot of

20  the facility to the building, did you see anything out of

21  the ordinary?

22      A.    We did see a number of individuals there,

23  some were holding signs out in the parking lot.  I kinda

24  observed it, but didn't pay too much mind to it.

25      Q.    Okay.  So after you parked, where did you go

1   first?

2       A.   After we parked we went into the building.

3   If I'm not mistaken, carafem is on the second or third

4   floor of the building.  And from that point on I went --

5   I had to use the bathroom.

6       Q.   You had to use the bathroom?

7       A.   Yes, ma'am.

8       Q.   How badly?

9       A.   Seeing how the drive's about, like I said,

10   hour, hour and a half, and I was probably on a second or

11   third energy drink, I'd say pretty bad.

12       Q.   Okay.  On the first floor of the building,

13   before you get into the elevator, do you see anything out

14   of the ordinary?

15       A.   No.  I seen two elderly women walking out of

16   the building.  That was about it.

17       Q.   So what did you do next?

18       A.   We proceeded to the elevator and go

19   upstairs.

20       Q.   When the elevator doors opened, what did you

21   first see?

22       A.   A gentleman standing in the left corner of

23   the elevator holding his phone.

24       Q.   I'd like to play for you what has already

25   been admitted as Exhibit 1D.

1              (Playing video.)

2              When that man said, good morning, what are

3    you looking for, who was he speaking to?

4         A.    He was speaking to myself and Melissa.

5         Q.    Okay.  I'd like to show you Exhibit 4B.  Who

6    is that?

7         A.    That's the individual that met us at the

8    elevator.

9         Q.    Okay.  Can we go back to 1D and play the

10   first 20 seconds, please.

11             (Playing video.)

12             Who was the woman that we just saw there?

13        A.    That is Melissa Ashby.

14        Q.    Where were you?

15        A.    Right behind her.

16        Q.    Where did you and Ms. Ashby go from here?

17        A.    We went down to the right looking for a

18   bathroom that way.  We didn't see the male's bathroom, so

19   we had to return and go down the other hallway.

20        Q.    Okay.  So let's keep playing Exhibit 1D and

21   let's pause at 1:11, please.

22             (Playing video.)

23             Okay.  So when you rounded that corner, what

24   did you see?

25        A.    We saw the number of individuals blocking --

1   or in the hallway.

2       Q.    Okay.  How did this make you feel?

3       A.    A little anxious, a little like I kind of

4   needed to be ready for anything and everything.

5       Q.    Why?

6       A.    Just due to my experience being overseas,

7   people are inpredictable.  I've done PSD, which is

8   personal security detail.  So kind of like having to

9   navigate through individuals or through crowded areas is

10   kind of one of the things I was trained on.

11       Q.    Okay.  Let's play to 1:13, please.

12           (Playing video.)

13           Okay.  So what are you doing here?

14       A.    At this point in time I'm going into the

15   bathroom.

16       Q.    So you just described that that crowd made

17   you uncomfortable; correct?

18       A.    Yes.

19       Q.    If that crowd was making you uncomfortable,

20   why did you still go into the bathroom?

21       A.    I didn't want to use the bathroom on myself.

22   That, and Melissa kind of assured me that she'd be okay

23   prior to when we -- when she first peered down the

24   hallway and seen the crowd.

25       Q.    Is it fair to say that going to the bathroom

at that point was an emergency?

     A.    Little bit, yes.

     Q.    When you're in the bathroom, what's going through your mind?

     A.    Just all possible outcomes of what could take place and what couldn't take place --

            MR. HAYMAKER:  Objection to the relevance.

            THE COURT:  Overruled.

BY MS. KLOPF:

     Q.    I'm sorry, could you start again, please. What was going through your mind?

     A.    Just all possible outcomes of what could and what could not take place and pretty much trying to game plan my -- how I was going to react to things.

     Q.    Do you like crowds?

     A.    No.

     Q.    Why not?

     A.    Like I said, human nature is highly impredictable.  If somebody believes in something strong enough, they will do anything and everything to stop it.

     Q.    Do you sometimes wear a firearm?

     A.    Absolutely.

     Q.    Were you armed this day?

     A.    That day I was not.

     Q.    How did that make you feel?

1      A.    Extremely uncomfortable.  I was already on

2  edge just because I didn't bring it with me that morning.

3      Q.    Okay.  All right.  Can we please play to

4  2:03.

5            (Playing video.)

6            So when you came out of the restroom, what

7  did you see?

8      A.    Immediately I saw Melissa surrounded by

9  three individuals, which sent me kind of like into

10 straight protective mode.

11     Q.    I'm sorry, into what?

12     A.    Protective mode.

13     Q.    Why?

14     A.    Just because she's surrounded, it's just

15 her, she's outnumbered and it's somebody I love and care

16 about.

17     Q.    What was your initial reaction to the woman

18 in the mask?

19     A.    Straight anger.  I know I kind of yelled at

20 her, and then it wasn't until Melissa said that she

21 worked for carafem that I kind of, like, mellowed out.

22     Q.    Okay.  Let's please play Exhibit 1D.

23            (Playing video.)

24            Okay.  Who was talking to you at the end of

25 that video?

1      A.    The same individual that we seen initially

2 when we came off the elevator.

3      Q.    What was in that individual's hands?

4      A.    He did have his cell phone in his hands.

5      Q.    What did it appear that he was doing?

6      A.    Seemed like he was recording.

7      Q.    How did that make you feel?

8      A.    Didn't phase me, really.  Just based off my

9 carnal knowledge, I am somewhat aware of individuals that

10 do do that.  And nowadays it seems like everybody wants

11 to record something.

12      Q.    Okay.  At this point when you get into the

13 elevator, where did you go?

14      A.    We went down to our vehicle.

15      Q.    Okay.  While these people were in the

16 hallway, did you go to the clinic?

17      A.    Later that afternoon we did, yes.

18      Q.    Were there any people in the hallway when

19 you did?

20      A.    No.

21      Q.    While the people were in the hallway, did

22 you go down -- did you go down that hallway?

23      A.    We did not.

24      Q.    Okay.  Why not?

25      A.    We were instructed by the lady with the mask

1    to pretty much just return to our car, and then when they

2    were ready, they would call us so we can come in.

3         Q.    Okay.  If she hadn't have told you that,

4    would you have tried to go down to the hallway?

5         A.    If Melissa wanted to, yes.

6         Q.    Could you have gone through that mass of

7    people?

8         A.    I could have.

9         Q.    What do you mean by that?

10         A.    I'm not so much the smallest individual.  So

11    if Melissa wanted to get there, I would have got her

12    there.

13         Q.    Would you have been able to do that without

14    being physical?

15         A.    More than likely not.

16         Q.    How did that make you feel?

17         A.    Me in particular, I was okay with it.  Just

18    as long as she was protective (sic).

19         Q.    How were you feeling about Ms. Ashby?

20         A.    Just that I needed to protect her.  Kind of

21    worry about what shit was going through her, because it's

22    already an experience alone.

23         Q.    Now I'd like to play Exhibit 4 without

24    sound, please.

25               (Playing video.)

1          Who's that on the left-hand side of the
2    screen?
3          A.     That is Melissa Ashby.
4          Q.     And where are you at this point?
5          A.     At this point I'm still in the restroom.
6          Q.     What are we seeing here?
7          A.     At this point you're seeing me yell at the
8    lady with the mask just because that was my first initial
9    reaction seeing Melissa cornered.
10         Q.     You used the word cornered?
11         A.     Her back is up against the wall and with her
12   being surrounded, that means she can only -- she has to
13   go through somebody else in order to get somewhere.
14         Q.     How does that make you feel seeing that?
15         A.     Extremely pissed off.
16         Q.     Any other feelings than pissed off?
17         A.     That I need to be protective.  I need to do
18   my job as a man, as a provider, as somebody that she saw
19   and confided in.
20         Q.     We can stop Exhibit 4 there.
21                Can we look at Exhibit 4A, please.  Okay.
22   Is this a still shot from what we just watched?
23         A.     It would seem so, yes.
24         Q.     Okay.  How would you have gone through these
25   people if you wanted to get to that clinic door?

```
1           A.    Physically.

2           Q.    What do you mean by physically?

3           A.    Based off my experience and things I've done

4     in my life, pretty much like a wrecking ball.

5           Q.    Like a wrecking ball.

6           A.    Just gone straight through anybody and

7     everybody.

8           Q.    Instead of using physical force to get

9     through these people, what did you do instead?

10          A.    Instead Melissa and I went to our vehicle.

11          Q.    During the course of this experience, did

12    any of the people in the hallway actually ask you why you

13    or Ms. Ashby were at this clinic?

14          A.    No, they did not.

15          Q.    Was anyone violent with you?

16          A.    No.

17          Q.    But you still had concerns?

18          A.    Absolutely.

19          Q.    Was this a negative experience for you?

20          A.    Yes.

21          Q.    Okay.  Did you have concerns for Ms. Ashby's

22    safety if you were to have gone down that hallway?

23          A.    Yes.

24          Q.    Why?

25          A.    Just due to the fact that it would -- I
```

1  would have to pull her behind me and I didn't want her to

2  either get hit or somebody put their hands on her in the

3  process of doing so.

4          MS. KLOPF:  No further questions.  Thank

5  you, Your Honor.

6          THE COURT:  All right.  Cross?

7                    **CROSS-EXAMINATION**

8  BY MR. HAYMAKER:

9      Q.   Good afternoon, sir.

10     A.   Afternoon, sir.

11     Q.   Thank you for your service.

12     A.   Thank you for your support.

13     Q.   When you arrived that day -- and I think --

14  well, let me just ask it.  On direct you were asked when

15  you got off the elevator, I believe you said, unless I

16  misheard, that there was a man standing in the corner of

17  the elevator.  The man you're talking about, where was he

18  standing when you got off the elevator?

19     A.   So as soon as we got off the elevator, he

20  was kind of like catty-corner from the elevator to the

21  left.

22     Q.   Okay.  So he wasn't standing in the

23  elevator, he was out in -- he was in the corner sort of

24  of the hallway, at the end of the hallway; is that right?

25     A.   Yes.

1          Q.    All right.  And he spoke to you and spoke to

2    Ms. Ashby; is that right?

3          A.    That is correct.

4          Q.    Okay.  Just to be clear, he didn't -- he

5    didn't yell at you or scream at you, anything like that,

6    did he?

7          A.    No, he did not.

8          Q.    Okay.  And pretty soon thereafter you-all

9    walked down the hallway; correct?

10         A.    Yes.

11         Q.    He didn't follow you or anything like that,

12   did he?

13         A.    He did not.

14         Q.    Okay.  And as soon as you-all got -- and

15   that's a long hallway; right?

16         A.    Decent size.

17         Q.    How far do you think it is, about 60 feet?

18         A.    I wouldn't necessarily say about 60 feet.

19   I'd say more about 30 or so.

20         Q.    Okay.  When you're walking down the hall,

21   you saw the people lining the walls; correct?

22         A.    Yes, sir.

23         Q.    Okay.  And there were a few people down by

24   the door standing in front of the door; true?

25         A.    True.

1          Q.    Okay.  And when you got down to the
2     bathroom, which was on the left; correct?
3          A.    Yes, sir.
4          Q.    Okay.  You immediately -- you saw the
5     people; true?
6          A.    Yes.
7          Q.    And then you immediately went in the
8     bathroom; true?
9          A.    Yes, sir.
10          Q.    Okay.  And so is it fair to say that you --
11     you were not afraid anything was going to happen to
12     Ms. Ashby at that point; true?
13          A.    There's always that level of fear.  But like
14     I stated earlier, Ms. Ashby did say that she would be
15     okay prior to.
16          Q.    But you felt comfortable going in the
17     bathroom leaving her there without you there; true?
18          A.    To some regard, yes, sir.
19          Q.    Okay.  And when you came out, you saw
20     Ms. Ashby maybe a few steps down towards the elevator
21     down in that direction from where you left her; right?
22          A.    Yes, sir.
23          Q.    Okay.  And you saw three women in close
24     proximity to her; is that true?
25          A.    Yes, sir.

1   Q. And as you're now walking back down the

2 hallway, so carafem is behind you, Ms. Ashby is -- is on

3 the left-hand side of the hallway; is that right?

4   A. Sure.

5   Q. Okay.

6   A. I'm not entirely hundred percent of where

7 her placement was, but yes, she was in front of me.

8   Q. And there was a young lady before her, but

9 closer to you by the wall as well; correct?

10   A. Are you referring to when I first came out

11 the bathroom, sir?

12   Q. When you first came out of the bathroom.

13   A. Yes.

14   Q. And then there was the worker, the person

15 you discovered later was the worker from carafem that was

16 essentially between you and Ms. Ashby; correct?

17   A. Yes, sir.

18   Q. And then the other young lady was across the

19 hall from Ms. Ashby; true?

20   A. True.

21   Q. Okay.  And it's fair to say that the worker

22 from carafem was closer in proximity to Ms. Ashby than

23 anybody else; correct?

24   A. It is.

25   Q. And understandably, that's why you

1    approached her at first?

2           A.    That is, yes.

3           Q.    Okay.  And at that point she told you and

4    Ms. Ashby to leave; correct?

5           A.    It was shortly after that, yes.

6           Q.    Okay.  And so you all proceed to leave.  And

7    the gentleman who spoke to you to begin with, he's still

8    standing in the same spot; is that correct?

9           A.    That is correct.

10          Q.    Okay.  Now, the worker from carafem, she had

11   her phone out videotaping too; correct?

12          A.    Yes, it is.

13          Q.    Okay.  And one of those videotapes you just

14   watched; correct?

15          A.    That is correct.

16          Q.    And as you got on the elevator, the man said

17   to you, sir, that baby is a gift from God, a blessing

18   from God.  That's what he said; correct?

19          A.    That is what he said, yes.

20          Q.    Okay.  Now, at some point -- I may have

21   asked this about before, but I'll ask it overall.  At no

22   point did anybody raise their voice at you, did they?

23          A.    No.

24          Q.    And you never saw any sort of weapons or

25   anything like that; true?

1          A.    We live in a conceal carry state.  So
2     anybody could -- nothing was --
3          Q.    Sir --
4          A.    -- distinguished out and visible, no.
5          Q.    With respect, listen to my question.  You
6     didn't see any sort of weapon; true?
7          A.    Physically, no.
8          Q.    Okay.  You can't see anything unless it's
9     physical; right?
10          A.    (No audible response.)
11               MR. HAYMAKER:  That's all I have.
12               THE COURT:  Okay.  Ms. Bell, do you have
13     anything?
14               MS. BELL:  Just a few, Your Honor.
15                        **CROSS-EXAMINATION**
16     BY MS. BELL:
17          Q.    Mr. Ashby, it sounds like you only
18     interacted with a few people when you were in that
19     hallway; is that fair to say?
20          A.    That is fair to say, yes.
21          Q.    And that would have been the man with the
22     camera that you saw when you got off the elevator;
23     correct?
24          A.    Yes, ma'am.
25          Q.    The clinic worker that you saw in the

1   hallway; right?

2          A.    Yes, ma'am.

3          Q.    The other people remained back from where

4   your wife was and where the clinic worker were; is that

5   fair to say?

6          A.    That is fair to say.

7          Q.    And you're a big man; is that fair as well?

8          A.    Yes, it is.

9          Q.    You don't know if you had gone down the

10  hallway whether or not those people would have moved, do

11  you?

12         A.    That I do not.  I can't say.

13         Q.    They could have if you had gone down the

14  hallway; correct?

15         A.    Potentially, yes.

16               MS. BELL:  Thank you, sir.

17               THE COURT:  Mr. Parris, do you have

18  anything?

19               MR. PARRIS:  No, Your Honor.

20               MR. CRAMPTON:  No questions.

21               MR. RUSS:  No questions.

22               MR. CONWAY:  No questions.

23               THE COURT:  Any redirect?

24               MS. KLOPF:  Just one moment, Your Honor.

25               No further questions.

1          THE COURT:  All right.  You may step down.

2          THE WITNESS:  Yes, ma'am.

3          **\*\*\*\*\*WITNESS EXCUSED\*\*\*\*\***

4          THE COURT:  Next witness?

5          MS. KLOPF:  The government rests.

6          THE COURT:  Government rests?

7          MS. KLOPF:  Yes, Your Honor.

8

9          (Government rests.)

10

11          THE COURT:  I think we'll take our afternoon

12  break at this time.  We'll be in recess for 20 minutes.

13          (Whereupon, at 2:27 p.m. the jury retired

14  from open court.)

15          THE COURT:  All right?  Are there any

16  motions by anybody?

17          MR. CRAMPTON:  Your Honor, we'd make a --

18          THE COURT:  Hearing none?  Maybe we'll take

19  a recess.

20          MR. CRAMPTON:  Rule 29 motion for acquittal

21  on behalf of Mr. Vaughn on both counts.

22          THE COURT:  That will be denied.

23          MR. PARRIS:  Same for Mr. Zastrow.

24          THE COURT:  Denied.

25          MS. BELL:  And for Mr. Gallagher,

1   Your Honor.

2              THE COURT:  Denied.

3              MR. HAYMAKER:  For purposes of the record,

4   for Mr. Boyd, Judge.

5              THE COURT:  Denied.

6              MR. RUSS:  Also make the same motion for

7   Mr. Green, Your Honor.

8              THE COURT:  Denied.

9              MR. CONWAY:  Same motion for Ms. Idoni,

10  Your Honor.

11             THE COURT:  Denied.  All right.  Let's get a

12  little sketch of what's to come next.  Ms. Bell, do you

13  have any witnesses?

14             MS. BELL:  I do not, Your Honor.

15             THE COURT:  Okay.  And your client does not

16  wish to testify?

17             MS. BELL:  He does not, Your Honor.  I

18  conferred with him at lunch.

19             THE COURT:  Mr. Parris?

20             MR. PARRIS:  No and no.

21             THE COURT:  Mr. Haymaker?

22             MR. HAYMAKER:  No witnesses.  I've

23  thoroughly discussed it with my client.  And he does not

24  wish to testify.  Thank you, Judge.

25             THE COURT:  Mr. Crampton?

1          MR. CRAMPTON:  Yes, Your Honor, we have one
2     witness.  Travis Watkins.
3          THE COURT:  Travis?
4          MR. CRAMPTON:  Watkins.
5          THE COURT:  Is he here?
6          MR. CRAMPTON:  Yes, ma'am.
7          THE COURT:  Good.  Any witnesses, Mr. Russ?
8          MR. RUSS:  Your Honor, I have no witnesses.
9     And I've discussed it with Mr. Green and he's elected not
10    to testify.
11         THE COURT:  Okay.  Mr. Conway?
12         MR. CONWAY:  No witnesses for Ms. Idoni.
13         THE COURT:  One witness and I think we'll
14    send the jury home and we'll have our jury conference --
15    I mean, our instruction conference.
16         MS. KLOPF:  Can we just put on the record
17    that Mr. Vaughn has elected not to testify and that he
18    has conferred with his attorney.
19         MR. CRAMPTON:  My apologies, that is
20    correct.
21         MS. KLOPF:  Sorry.
22         THE COURT:  Okay.  Based on who you know the
23    one witness will be, does the government anticipate any
24    rebuttal?
25         MS. KLOPF:  It's possible, Your Honor, we

1  have one witness that we would call on rebuttal.  But it

2  would be very brief.

3              THE COURT:  Is this a character witness or

4  fact witness?

5              MR. CRAMPTON:  Yeah, fact witness.  He's a

6  police negotiator.

7              THE COURT:  Oh, okay.

8              MS. KLOPF:  We may need to address -- we're

9  a little concerned that this could be a vehicle in which

10  to admit some inadmissible hearsay.  So we may ask for a

11  proffer of what they're expecting to elicit from

12  Mr. Watkins.

13             THE COURT:  Yeah, we can't have any

14  statements of your client through Mr. Watkins.  You know

15  that.

16             MR. CRAMPTON:  Of course.

17             THE COURT:  Okay.  We'll stand in recess.

18             (Whereupon, a break was taken from

19  2:30 p.m. to 2:54 p.m.)

20             THE COURT:  So we will have the witness,

21  then we'll send the jury home, unless there's any

22  rebuttal.  And then we'll have our instruction conference

23  and we'll come back Monday morning for closings.

24             MR. CRAMPTON:  We're not going to meet

25  Sunday?

1          THE COURT:  We could if you want.  At least
2    there's no snow.

3          We're ready.

4          (Whereupon, at 2:55 p.m. the jury returned
5    to open court.)

6          THE COURT:  All right.  The government has
7    rested.  And so now the defense can put on proof if they
8    wish to.  Ms. Bell, does Mr. Gallagher wish to put on any
9    proof?

10          MS. BELL:  No, Your Honor.

11          THE COURT:  Mr. Parris, does Mr. Zastrow
12    wish to put on any proof?

13          MR. PARRIS:  No, Your Honor.

14          THE COURT:  Mr. Haymaker, does Mr. Boyd wish
15    to put on any proof?

16          MR. HAYMAKER:  No, Judge.

17          THE COURT:  Mr. Crampton, you have one
18    witness; correct?

19          MR. CRAMPTON:  Yes, Your Honor.

20          THE COURT:  And let me just finish this.
21    Mr. Russ, does Mr. Green intend to put on any proof?

22          MR. RUSS:  None, Your Honor.

23          THE COURT:  And, Mr. Conway, does Ms. Idoni
24    intend to put on any proof?

25          MR. CONWAY:  No, Your Honor.

 1          THE COURT:  We're ready for your witness,

 2    Mr. Crampton.

 3          MR. CRAMPTON:  Thank you.  We call Travis

 4    Watkins.

 5          THE COURT:  Travis Watkins.

 6                    **TRAVIS WATKINS**

 7    called as a witness, after having been first duly sworn,

 8    testified as follows:

 9                    **DIRECT EXAMINATION**

10    BY MR. CRAMPTON:

11          Q.    Good afternoon, sir.  How you doing?

12          A.    Doing well, sir.  How are you?

13          Q.    Good, thank you.  Would you state your name

14    for the record, please.

15          A.    Travis Watkins.

16          Q.    Mr. Watkins, where are you from?

17          A.    I'm from right now the Lebanon area.

18          Q.    Okay.  What is your occupation, please?

19          A.    I am a pastor full-time, and I'm a reserve

20    officer with the City of Mt. Juliet.

21          Q.    Okay.  And have you worked for the City of

22    Mt. Juliet longer than the last year or two?

23          A.    Yes, sir.  I've been with the City of

24    Mt. Juliet since 2015.  About eight years.

25          Q.    And in what capacity?

1       A.    Both full-time and now reserve capacity.

2       Q.    With the police department?

3       A.    Yes, sir.

4       Q.    All right.  And what positions did you hold

5 in that department?

6       A.    I was a police officer, patrol officer,

7 field training officer.  The last several years I've

8 spent in investigations, served in a supplementary duty

9 as a crisis negotiations team member.

10      Q.    And currently you said you're still a

11 reserve officer --

12      A.    Yes, sir.

13      Q.    -- did I understand you correctly?

14           All right.  Are you still a negotiator --

15      A.    Yes, sir.

16      Q.    -- for Mt. Juliet Police Department?

17           All right.  Can you -- well, let's establish

18 in March of 2021 --

19      A.    Yes, sir.

20      Q.    -- were you employed by the Mt. Juliet

21 Police Department?

22      A.    Yes, sir.

23      Q.    And what was your title then?

24      A.    I was a detective assigned to the Criminal

25 Investigation Division, general investigations, as well

1    as a crisis negotiations team member.

2         Q.   Tell us a little bit about what is a crisis

3    negotiator.

4         A.   Sure.  Our -- we will respond to barricaded

5    subjects, subjects in crisis, suicidal subjects,

6    hostage -- hostages.  Anytime that there's a -- usually

7    anytime that our special response team or our SWAT team

8    would respond somewhere, the negotiators would go as well

9    with an attempt to deescalate or come out with an outcome

10   that is negotiated rather than somebody having to be made

11   to do something.

12        Q.   Okay.  And do you receive any kind of

13   special training for that?

14        A.   Yes, sir.  Went through -- initially went

15   through training in-house -- or applied to go through

16   training in-house.  Then was sent to a 40-hour course

17   through I think PATC was initially where I went.

18        Q.   Wait, what is that?

19        A.   PATC is a -- I think it's a national

20   training organization.  One of -- I guess it was the

21   standard that our -- we sent our negotiators through.  I

22   think it was a 40-hour course.  And then we do periodic

23   training in-house at the police department as well.

24        Q.   All right, sir.  So you've maintained that

25   kind of training?

1        A.    Yes, sir.

2        Q.    For several years?

3        A.    Yes, sir.

4        Q.    All right.  Now, let me direct your

5    attention back to March 2021, in particular March 5,

6    2021?

7        A.    Yes, sir.

8        Q.    Were you on duty on March 5?  Do you recall?

9        A.    That was a day that I was to be working,

10   yes, sir.

11       Q.    All right, sir.  Do you recall what time you

12   were supposed to start that day?

13       A.    I think it was 10:00 a.m.  I think I was on

14   the 10:00 a.m. to 8:00 p.m. shift during that time.

15       Q.    All right.  And did you end up receiving a

16   call that brought you in earlier?

17       A.    I did.  I did.

18       Q.    Tell us what you were -- what you remember

19   about that call.

20       A.    I was -- I was at my house and I believe I

21   got a phone call from my partner, one of my partners in

22   investigations.  And they -- they had told me that there

23   was a protest going on, that everybody was being called

24   in and that I needed to get there.  She was also a

25   negotiator.  And negotiation specifically was being

1  called in.  But I think at that point everybody was being

2  called and I needed to get to the carafem clinic in the

3  Providence/Mt. Juliet area.

4      Q.   All right, sir.  Do you recall any

5  additional information that you received at that point?

6  Were you told, like, where the protestors were or

7  anything?

8      A.   I think that they were in the clinic -- I

9  believe they were in the clinic or in the building at

10  least, and that's where I needed to go.  It was a pretty

11  short phone call conversation, more of just get here now

12  and less of the details.

13      Q.   So in your response do you drop everything,

14  so to speak, and rush over there or how did you respond?

15      A.   Yes, sir.  I only lived about probably five

16  minutes or so from that area.  I grabbed my vest and my

17  bag and I jumped in the car and then drove emergency

18  traffic to the clinic.

19      Q.   All right.  And did you have any

20  expectations about what you might encounter based on what

21  you'd already heard?

22      A.   Sure.  We have a CAD system or computer --

23  the dispatch system that we can access from our phone.

24  So I did pull that up to get the address, make sure the

25  address was correct.  And I think I skimmed over that.

1    Saw that there was protestors at the abortion clinic.
2    And as a negotiator, kind of just running through some of
3    those scenarios on the front end of where to start with
4    negotiations, how to -- how to successfully resolve this.
5              My only previous, I guess, understanding of
6    abortion protests would be more of your Westboro Baptist,
7    angry, hateful pickets, everybody is going to hell and
8    everybody is -- you're all bad guys essentially.  So that
9    was kind of my jump -- or my place that I wanted to start
10   was kind of how to deescalate some of that.
11        Q.    So would it be fair to say you were assuming
12   the worst?
13        A.    Yeah, absolutely.  Yeah, absolutely.
14        Q.    All right.  So you arrive at the pavilion,
15   Providence pavilion; correct?
16        A.    Yes, sir.
17        Q.    What did you find when you arrived?
18        A.    I was told not to come up the stairs, I do
19   remember that.  So I did go up the elevator.  Got there
20   pretty quickly.  When I got off the elevator, I saw that
21   there was a handful, maybe 10 to 15 police officers,
22   uniformed police officers off to my right.
23             As you kind of come out of the elevator,
24   there's the little alcove where an elevator space would
25   be.  Over to the right I kind of saw around the side of

1  the wall there was police officers there.  And when I --
2  you take a left off of the elevator, I believe, down this
3  hallway here, which is where, I guess, the clinic was, I
4  saw probably 10, 15, maybe 20 of the people that were
5  protesting there.  They were like praying and I think
6  some of them might have been worshiping.
7           And then on the far -- or kind of adjacent
8  from that hallway, I guess, was another hallway.  I saw
9  my chief of police and he was -- he was speaking with two
10 men there.  And I think I met my partner at that point in
11 that little alcove.
12      Q.   I may have asked you this, maybe you said it
13 and I missed it.  About what time was it that you think
14 that you got there?
15      A.   Right around the 8 o'clock hour, I believe.
16      Q.   Okay.  So what did you do when you saw all
17 of this?
18      A.   I had to completely reevaluate.  My
19 expectations weren't quite met when I got there.
20      Q.   Explain that.  What do you mean?
21      A.   Like I said, I guess in my -- in my
22 preparation I was -- I was expecting -- and I hate to use
23 a term -- just for lack of better terms, you know, that
24 Westboro Baptist, the pickets with everybody is angry and
25 everybody is yelling, very aggressive.  And I had to

1   completely kind of throw that out and reevaluate my plan

2   for a negotiation because I did not see any of that.  I

3   saw -- it was very quiet outside of singing, but it was

4   very quiet in personality, I guess, if I can say that.

5   It was not a charged atmosphere, if that's a better way

6   to put it.

7           Q.    Okay.

8           A.    So my next goal was to find -- try to figure

9   out who was in charge.  There was a lot of -- everybody

10  was there, I feel like.

11          Q.    Let me interject here, if I may.  You come

12  and you say -- you saw the chief himself?

13          A.    I did.

14          Q.    Meeting with some of -- presumably the

15  protestors?

16          A.    Yes, sir.

17          Q.    Well, would you not just naturally want to

18  stand down?  The chief is already there and taking

19  charge.

20          A.    Yeah, maybe.  That's not his job.

21          Q.    I see.

22          A.    Not that he's not qualified, my chief is an

23  incredible man.  That's not his job.  If anything, one,

24  that falls under where negotiators should be negotiating

25  per our policy.  But surely there was something more

1  important for him to be doing in -- that was my

2  assumption.

3       Q.    Okay.

4       A.    But I also didn't want to interject.  So I

5  was trying to figure out who was in charge --

6       Q.    Let me stop you there, if I may.

7       A.    Yes, sir.

8       Q.    There's the chief of police.  Doesn't that

9  end the inquiry as to who's in charge?  Why would there

10  be a question?

11       A.    Not always is the highest level officer in

12  charge.  We've got a large scale incident like that,

13  there will be an incident commander or there's supposed

14  to be per our policy.  And per your NIMS training, your

15  National Incident Management Systems training, what you

16  want to do there is you want to have one person that's in

17  charge so you don't have a bunch of people giving

18  instruction.  So that was my next thing was trying to

19  figure out who was in charge.

20       Q.    Okay.  Now, identify for us, who were the

21  candidates, so to speak, for who might be in charge?

22       A.    The on-duty supervisor, I think, was there.

23  Sergeant Schneider.  I saw the chief of police, Chief

24  Hambrick.  I saw the deputy chief of police, Deputy Chief

25  Mullins.  I believe I saw our captain there, Captain

1  Chandler.  I saw our SWAT commander, Sergeant Cook.  I

2  saw the tactical command director.  He was a sergeant at

3  the time, I think he's a lieutenant now, Sergeant

4  Cathron, who was also my direct report for

5  investigations.

6           Q.   I see.

7           A.   So there was a handful of candidates.

8           Q.   So who did you end up going to to clarify?

9           A.   I think I might have started with Sergeant

10  Cook.

11           Q.   Tell me again, what was his role?

12           A.   He's the SWAT commander.

13           Q.   SWAT commander, okay.

14           A.   I could see he was busy.  He didn't really

15  give me too much.  So I moved to I think Sergeant Cathron

16  who was my -- like I said, he was over my investigations

17  division.  And as the tactical command director, a good

18  person for me to -- from a negotiator standpoint to go

19  to.  And I believe I checked with him to see if he would

20  give me the okay to tap chief out and start negotiations.

21           Q.   And did he, in fact, give you that okay?

22           A.   He did.

23           Q.   So what did he do next?

24           A.   I got with my partner, Sarah Bancroft.  She

25  was a detective at the time.

1   Q. Also a negotiator?

2   A. She is, yes, sir.  And we kind of tried to

3 develop some sort of a plan.  Neither of us are -- were

4 in a commander role of the negotiations team.

5   Q. Okay.  Stop right there.  What does that

6 mean?

7   A. So our negotiations team has a commander.

8 Just as the SWAT team has a commander, our negotiations

9 team as a commander.  They were not on scene at that

10 time.

11   Q. Okay.

12   A. So we -- we just move into assuming that

13 command of that team.  Different scenarios or different

14 events would -- I may have strengths versus Sarah might

15 have strengths versus somebody else might have a

16 strength.  So we try to determine amongst ourselves or

17 the commander will say, hey, you're going to be the

18 primary negotiator.

19    In negotiations your negotiate -- the

20 negotiator can be fired by the subject, by the person

21 you're talking to.  So we like to have a primary

22 negotiator based on their strengths, and then a

23 secondary.

24    I assumed the role of primary negotiations

25 because there was religious undertones, religious

1    convictions involved, and my -- I guess my faith and that

2    was well-known by Sarah, she said, hey, probably better

3    that you take the primary, I'll take secondary.

4         Q.    Okay.  So do you now approach Chief Hambrick

5    and the protestors and negotiations?

6         A.    Yes.

7         Q.    Tell us what happens when you get there.

8         A.    I kind of eased my way into that

9    conversation.  Obviously it's my chief and you want to be

10   kind there.

11        Q.    Yes.

12        A.    And not -- in all humility just kind of step

13   into that.

14        Q.    Yeah.

15        A.    So I kind of listened for a little bit and I

16   don't remember exactly the phrasing, but eventually there

17   was kind of a tapping out where we began to chat more

18   with them.  I eventually had to interject in that

19   conversation.

20        Q.    Can you identify for us who the two

21   protestors were that were there?

22        A.    I believe it was Mr. Gallagher and then

23   Mr. Vaughn.

24        Q.    And did you know either of those gentlemen

25   before?

1       A.      No, sir.

2       Q.      All right.  So what did you learn about what

3  was going on here, what this was all about?

4       A.      That this was -- I believe that the

5  conversation was this was a rescue.  The goal was -- the

6  goal was, I guess, to bring people to anybody that would

7  want to --

8               MR. BOYNTON:  Objection, Your Honor.  I

9  think this answer is getting into hearsay.

10              THE COURT:  It is.  Sustained.

11 BY MR. CRAMPTON:

12      Q.      Fair enough.  It was a rescue, you say?

13      A.      Yes, sir.

14      Q.      All right.  And you -- as you approach a

15 negotiations session, do you, as a trained negotiator,

16 have some particular goal in mind?

17      A.      Sure, yeah.  The goal of that event was to

18 get everybody to leave.

19      Q.      All right.  Voluntarily?

20      A.      Voluntarily, yes.

21      Q.      Because you could just arrest everyone?

22      A.      Sure.

23      Q.      That would get them out of there; right?

24      A.      Sure, yes, sir.

25      Q.      All right.  And so how does that impact what

1    you did as a negotiator?  I mean, what do you do with

2    that goal?  How do you achieve it?

3         A.    I mean, each negotiation is different.  With

4    that one, obviously just dialoguing -- I think I was

5    dialoguing with Chet at the time of, you know, what is

6    the win.

7         Q.    Excuse me, that's Mr. Gallagher you're

8    talking about?

9         A.    Mr. Gallagher, yes, sir, sorry.  My goal

10   there was to see, hey, what is the win or what is the

11   perceived win here.  And then is there a -- is there a

12   place of compromise.  And if so, let's find a place of

13   compromise and -- so that was my goal.

14        Q.    All right.  At any point in your

15   negotiations, did that goal change for you?

16        A.    Yes, sir.  At some point it began or became

17   clear that several of the protestors had no intention on

18   leaving.  They were pretty -- pretty adamant with their

19   goal.  Some of them were planning on leaving, some of

20   them were not.  So what -- what -- my goal, I guess, as a

21   negotiator, hey, can we get as many of these people out

22   of here as possible, right.  That was the original goal,

23   that was the original win established.

24             And then I guess the secondary goal is,

25   let's get some of the kids out of here, and then any of

1   the parents that are going to be -- that have mom and dad

2   together, let's get one of those to leave so that kids

3   don't get separated from their parents and DCS gets

4   involved and it turns into a whole bigger mess.

5        Q.   Okay.  Can you explain to us why would

6   voluntary compliance and their leaving that way be a

7   preferred goal to, say, just arresting everyone?

8        A.   So we are -- mass arrests are difficult.

9   And honestly, like, sometimes they're necessary,

10  sometimes they're not.  I'm grateful for our department.

11  Our department is one I feel like really leads with, hey,

12  let's try to talk this through before we have to get

13  physical.  There's just so much more propensity for, you

14  know, things to go wrong in that.

15            And technically when we -- with that size of

16  a group, we had entered into kind of our policies and

17  procedures for crowd control, crowd management for

18  mass -- mass events.

19       Q.   Okay.

20       A.   And --

21       Q.   Let me stop you there if I may.

22       A.   Please.

23       Q.   I was going to ask, so there is some policy

24  that would govern this sort of thing?

25       A.   Yes.

1          Q.     What is that called?

2          A.     The name of it specifically is blanking.

3     It's like crowd control.  Crowd control --

4          Q.     Maybe civil disobedience or civil

5     disturbance?

6          A.     Something like that.  Civil unrest, civil

7     disobedience, something along those lines, yes.

8          Q.     In general, without going through piece by

9     piece of what this policy entails, can you just give us

10    an overall sort of view of what it calls for?

11         A.     Sure.  When there is a possibility for --

12    for a large scale arrest, simultaneous arrest or civil

13    disobedience or unrest of some sort, there is certain

14    things that we've got to follow.  If it is a -- the

15    policy is I think that if it's a planned thing,

16    obviously, we put an operations plan in place and the

17    chief or his designee is going to be the incident

18    commander for that event.

19              If it's a spontaneous event, which this one

20    is more -- kind of fell in line with, the supervisor on

21    scene, his job or his goal is to kind of make all of the

22    assessments necessary that we would have gotten done in

23    the operations plan, but, you know, some of those things

24    are getting the resources there, getting extra officers

25    there, getting, you know, mutual aid involved.

1    Q.    Let me stop you there.  What is mutual aid?
2  What does that mean?

3    A.    Mutual aid would be -- so anything, anybody
4  outside of Mt. Juliet.  So Tennessee Highway Patrol or
5  Lebanon Police Department, Wilson County Sheriff's
6  Office.  I think Wilson County Sheriff's Office ended up
7  coming and the highway patrol ended up coming as well.
8  Obviously large -- if -- if it's a huge event, you know,
9  we wouldn't be able to handle that on our own.  So we've
10  got mutual aid set up already.

11    Q.    And so there's been some testimony regarding
12  how long it took to resolve this matter that morning.
13  Was there at any point a delay entailed in getting these
14  other entities to come?

15    A.    I mean, yeah.  Yeah.  I mean, with our --
16  with our setup, we want to make sure -- we want to do
17  this as safely as possible.  So prior to us moving any
18  bodies, we want to make sure that we have officers ready
19  to make that transition take place.  If we're -- I know
20  that they used Wilson County's transport vans to take --
21  not to the hospital, to the jail.

22         EMS was called in case -- they were staged
23  in case something were to take place there.  There's --
24  there's a handful of things, if we have the time, we want
25  to take the time to make sure that it goes as well as we

1    can.

2          Q.    So with that kind of caveat, if I can call

3    it that, if there's time --

4          A.    Yes, sir.

5          Q.    -- was it your assessment that there was

6    time here?

7          A.    Sure.  Yeah.

8          Q.    And you mentioned also so many different --

9    these potential entities that could have been in charge

10   of this event?

11         A.    Sure.

12         Q.    Was there some clear resolution, as far as

13   you are aware, of who ultimately was in charge on this

14   day?

15         A.    I don't remember who ended up being in

16   charge.  I know there was some confusion -- that was one

17   of the things that we talked about, I think, afterwards.

18   There was some confusion on who exactly was in charge.  I

19   think there was a handful of people making calls.  All --

20   not necessarily contradicting each other, but all people

21   trying to help.  So it made it a little bit difficult.

22         Q.    Did that also contribute to a delay?

23         A.    Sure.

24         Q.    Okay.  Now, with the amount of resources

25   that then responded to this event, what would you say to

1  those who would suggest that this is a waste of

2  resources?  Why do we have to have so much of a response

3  here?

4  A.   We just don't know.  I mean, it's such a big

5  unknown.  And the policies are in place for a reason.

6  We've got to stick to the policies and procedures the

7  best that we can if we have the availability, but you

8  just -- you don't know.

9  Q.   Okay.

10  A.   You don't know.

11  Q.   Was there, in your assessment of the

12  situation, ever a question whether the police ultimately,

13  though, were in charge as opposed to, say, the

14  protestors?

15  A.   Ultimately if a decision has to be made in

16  that moment, we are going to make that decision.  Again,

17  this was because we had the ability for time.  Time was

18  on our side in that.

19  Q.   I see.  But to be clear, if someone at the

20  police department had wanted to just initiate mass

21  arrests, was there anything stopping them from doing

22  that?

23  A.   No, sir.

24  Q.   Okay.  So you've got all these kind of

25  factors at play.  Meanwhile, you are engaged in

1    negotiations?  Is that pretty much all you did at that --

2    once you --

3            A.    Yes, sir.

4            Q.    -- clarified that you were supposed to take

5    over?

6            A.    Once I got there, yeah, and got that

7    clarification, that was -- that was my -- my primary

8    role, yes, sir.

9            Q.    Okay.  And do you recall where you

10   positioned yourself physically in the layout of that

11   second floor?

12           A.    We were in the -- as I -- when I kind of

13   laid it out on the front end, to the right of the alcove

14   kind of across the hall from where the protestors were.

15   There was another hallway where Chief and I think

16   Mr. Gallagher and Mr. Vaughn were.  I spent a majority of

17   my time there.  I did make some trips back and forth

18   between the two, but I spent the majority of my time

19   there.

20           Q.    Were you, from your vantage point, able to

21   observe the folks down the hallway?

22           A.    Most of them, yes, sir.

23           Q.    And did you ever observe them, like, growing

24   aggressive?

25           A.    No, sir.

1    Q.    Hostile?

2    A.    Not even a little bit.

3    Q.    Threatening?

4    A.    No, sir.

5    Q.    Intimidating?

6    A.    No, sir.

7    Q.    Okay.  Let me see.  So let's return and just

8  focus for a moment on the negotiations themselves.  You

9  began with Mr. Gallagher and Mr. Vaughn involved;

10  correct?

11    A.    Yes, sir.

12    Q.    Did -- I think you indicated that that

13  changed.  Mr. Gallagher at some point left and it was

14  only Mr. Vaughn or can you explain that for us?

15    A.    I know that at one point my conversation

16  shifted more towards Mr. Vaughn.

17    Q.    And how would you describe in general the

18  conduct of those negotiations?  Was it tense, was it,

19  again, hostile or --

20    A.    No.

21    Q.    -- how would you describe that?

22    A.    As friendly as negotiations can be, as weird

23  as that is, it was -- it was not a charged environment.

24  We were having conversation.  You know, we -- I think

25  that there was an understanding.  I think there was an

understanding that -- and from a law enforcement
perspective, like, we don't want to be complacent, by any
means, that -- you know, we don't want to get to a place
and say that no violence could ever take place.  But we
were pretty -- pretty confident in this -- at this point
that this was a peaceful thing.  So the conversation had
kind of that same -- same tone.

Q.    Can you describe for the jury how Mr. Vaughn
conducted himself?

A.    He was very friendly, very pastoral, if you
will.  He was kind to me.  Kind to everybody that I saw
him interact with.

Q.    Would you say that --

A.    I would -- I'd say that his goal.  I
believe -- when I was speaking with him, there came a
point where we were -- we realized that there was going
to be some people that ended up getting arrested that
they wanted -- you know, hey, they wanted to be there and
this was -- this was what they were going to do.

The others there was some of that wiggle
room that we talked about in that negotiation, hey, let's
get some of them.  One of the things that we needed for a
logical understanding is how many people were going to be
transported.  And because there was already a
relationship there, I believe I asked Mr. Vaughn to find

1    those numbers out for me.  And let people know, hey,

2    like, if you're not -- you need to say your goodbyes and

3    head downstairs as -- you know, voluntarily.

4          Q.    Now, we've seen some video clips and it

5    appears, you correct me if I'm wrong, that Mr. Vaughn

6    makes maybe several trips down the hallway to where the

7    folks are?

8          A.    Yes, sir.

9          Q.    And back to you; is that correct?

10         A.    Yes, sir.

11         Q.    And so how did that come about?  You

12   mentioned one instance where you asked him to ascertain

13   how many are ultimately going to be arrested --

14         A.    Yes.

15         Q.    -- right?  Were there other things that you

16   were asking him to do?

17         A.    I think so.  I'm not a thousand percent, I

18   don't remember exactly.

19         Q.    Sure.

20         A.    I know that those two things, we had to get

21   final numbers, hey, give me -- give me a head count and

22   then, hey, we need final numbers.  And then instructions.

23   We were given -- I wanted him to give instructions to

24   them.  Again, if we can use -- if we can use somebody

25   that they are already familiar with and they're

1    comfortable with, then we would -- we would rather do

2    that.  And he was willing to help me out in that.  So I

3    utilized that.

4          Q.    Okay.  Did he ever disobey a request that

5    you made to him?

6          A.    No, sir.

7          Q.    Okay.  Now, I think there's also been a

8    suggestion that perhaps Mr. Vaughn was engaged in these

9    negotiations in some kind of an attempt to just delay the

10   process.  More or less a bad faith kind of undertaking.

11   Have you, in your capacity as a negotiator, received any

12   training to kind of identify who's really not negotiating

13   in good faith?

14         A.    Sure.  Yes, sir.

15         Q.    What does that look like?

16         A.    In our negotiations we have to -- the best

17   that we can to kind of psychoanalyze, if you will, the

18   person that we're speaking with to the best of our

19   ability.  Obviously usually that involves moving them

20   from that crisis thinking to logical thinking.  Again,

21   there are people with letters after their name that are

22   much better at that than us, for sure.  And I don't -- I

23   don't claim to be an expert in that.

24               But our goal is to -- if we -- we've got to

25   always be pushing back to incident command how our

1  negotiation's going.  Have we hit a rock wall, have we

2  started talking in circles, have we met resistance,

3  because obviously that is going to dictate from incident

4  command what their role is going to be.  So on all of our

5  negotiations that's our attempt.  And I don't -- I don't

6  think that I witnessed that in Mr. Vaughn.

7      Q.    Did you ever suspect he was negotiating in

8  bad faith?

9      A.    No, sir.

10     Q.    Let me just kind of jump ahead for a moment

11 and say, at the end of the day, would you describe

12 Mr. Vaughn's participation as a -- as a communicator with

13 you, as helpful or hurtful or what?

14     A.    Definitely -- definitely helpful.  Yeah.

15     Q.    Now, you asked him at one point there, like

16 I'm taking this toward the end of it, to get a final head

17 count or something?

18     A.    Yes, sir.

19     Q.    You don't happen to remember the numbers

20 that he came back with, do you?

21     A.    I don't remember.  I think -- I think if I

22 remember from my report, there might have been eight

23 adults and four kids.

24     Q.    That's very good.

25     A.    But I think that's more from just going over

1    my report --

2         Q.    Okay.

3         A.    -- if I may.

4         Q.    Very good.  And with regard to you -- you

5    made mention of it earlier.  There were children here,

6    women here?

7         A.    Uh-huh (affirmative).

8         Q.    And then there are adults; right?

9         A.    Yes, sir.

10        Q.    What kind of special circumstances, if any,

11   does that bring to bear on the circumstance?

12        A.    Well, mobility is a big thing.  We've got to

13   make sure that how -- how old are the kids, how old are

14   the adults.  You know, if they're too young to think on

15   their own, that is obviously an issue.  If they're too

16   old to move around on their own, that could play an

17   issue.

18             You know, I don't think that we had any kids

19   that were too, too young.  I think -- and then I think on

20   the other side of that spectrum there was an elderly

21   woman, I think she was in a wheelchair.  And so I think

22   everything from that elderly woman to young teens, so we

23   just -- logistically had to work through that, but.

24        Q.    And I think you made mention before to

25   Department of Human Services or something.  Are there

1  special accommodations that need to be made if you're

2  bringing children into custody?

3      A.   Yes.  I mean, if -- well, it's more of if

4  the parents are being -- if both sets of parents and

5  there's not somebody to take them, then obviously

6  Department of Children's Services would come in and

7  facilitate that.

8      Q.   Okay.

9      A.   When -- when children are arrested -- inside

10 of at least Wilson County, I can't speak to Davidson --

11 most often they are -- they're given a juvenile citation

12 and then released back into the custody of a parent, but

13 there just needs to be a parent there --

14     Q.   I see.

15     A.   -- to do that.

16     Q.   Okay.  Now, at some point, as you've

17 indicated, you reached the conclusion there's some that

18 are just not going to leave?

19     A.   Yes, sir.

20     Q.   Others that do?

21     A.   Yes, sir.

22     Q.   And somebody has to make, I think you called

23 it a final dispersement order; correct?

24     A.   Yes, sir.

25     Q.   Who made that?

1      A.     I believe I did.

2      Q.     And how did you come to do that?

3      A.     Don't remember who exactly gave me that

4  call, but I -- I remember I was the one that was -- at

5  that point leading that negotiation, so I was tapped to

6  do that.

7      Q.     Okay.  Now, it's called a final dispersement

8  order and, again, I think our video reveals there seems

9  to have been other dispersement orders made --

10     A.     Yes.

11     Q.     -- during the course of these negotiations.

12            Why do you need more than one?

13     A.     Per the policy we're supposed to give many

14  warnings.

15     Q.     Many?

16     A.     Many.

17     Q.     No specific number?

18     A.     I don't think there's a specific number.

19     Q.     Do you understand the reasons behind that?

20  Can you explain it?

21     A.     Again, if -- our goal in law enforcement in

22  every scenario, whether I get behind you with blue lights

23  and I want you to pull over your car, my goal is for this

24  to be a voluntary encounter, where you would voluntarily

25  pull over.  The same thing here as the job of us, as law

1  enforcement especially in that -- in that environment,

2  it's so much easier when we have people voluntarily

3  comply.

4       Q.   Okay.  And when you gave that dispersement

5  order, what was the response from the protestors, those

6  that were being arrested?

7       A.   I think there was -- they gave hugs to one

8  another.  I think that there was a couple that had -- had

9  prayed for one another.  And then I believe they went

10  down the stairwell and I think we had officers in -- in

11  the stairwell to escort them out.

12       Q.   Would you describe them as compliant?

13       A.   Oh, yes, sir.

14       Q.   Okay.  Now, you mentioned that you're a

15  pastor; right?

16       A.   Yes, sir.

17       Q.   This is an event that has a lot of professed

18  Christians in it?

19       A.   Yes, sir.

20       Q.   Did that cause concern for you?

21            MR. BOYNTON:  Objection, Your Honor.

22  Relevance.

23            THE COURT:  Sustained.

24  BY MR. CRAMPTON:

25       Q.   Let me ask it in another way.  Did it affect

1   your ability to do your job?

2          A.    Did not affect my ability.

3                MR. BOYNTON:  Objection, Your Honor.

4                THE COURT:  Overruled.

5   BY MR. CRAMPTON:

6          Q.    Now, it's also come out in the course of

7   these proceedings, Officer Watkins, that there were

8   actually some people still in the abortion clinic down

9   there.  Were you aware of that during the time of your

10  negotiations?

11         A.    I don't think that I did know that then.  I

12  think that would have -- that would have shifted my

13  negotiations.

14         Q.    In what way?

15         A.    Probably would have got them out of there.

16  I don't know who dropped that ball, but by the time I got

17  there, my assumption was that we were dealing with this.

18  I didn't -- I don't think that I knew that.

19         Q.    Okay.  So it would have been different had

20  you known?

21         A.    Sure.

22         Q.    In your own estimation at least?

23         A.    Sure.

24         Q.    One further question.  As a result of your

25  negotiating resolution here, did you receive any kind of

1    special notice or commendation?

2              MR. BOYNTON:  Objection, Your Honor.

3              THE WITNESS:  From my direct --

4              THE COURT:  Excuse me?

5              MR. BOYNTON:  Objection, relevance.

6              THE COURT:  Yeah, it's not relevant.

7    Sustained.

8              MR. CRAMPTON:  Fair enough.  Pass the

9    witness.

10                    **CROSS-EXAMINATION**

11   BY MR. BOYNTON:

12        Q.    Good afternoon, sir.

13        A.    How are you, sir?

14        Q.    Doing well, thank you.  Is your title still

15   detective with Mt. Juliet Police Department?  I know that

16   you're in a -- in a reserve officer status.

17        A.    No, sir.  When I moved to the reserve

18   status, I moved down to just patrol.

19        Q.    Is it all right if I call you Officer

20   Watkins?

21        A.    Call me whatever you need to, brother.

22        Q.    I appreciate it.

23              Walk through a little bit about the

24   questions that were posed to you on direct examination.

25   So you said you were -- you were called in to the scene

1 at the Providence pavilion on March 5, 2021; is that

2 correct?

3   A. Yes, sir.

4   Q. And I think you used a police term for it,

5 but you -- you responded running lights and sirens in

6 your vehicle; is that right?

7   A. Yes, sir.

8   Q. And you said it was about a five-minute

9 drive normally?

10   A. Yes, sir.

11   Q. Okay.  How quickly would you say you got

12 there with lights and sirens going?

13   A. I would say it was probably about four

14 minutes or so.  Four or five minutes with no traffic.

15 Providence is a little -- usually it's not that quick,

16 but I'd say somewhere between four minutes or so.

17   Q. Okay.  When you arrived on scene,

18 approximately how many officers from Mt. Juliet were

19 already there?

20   A. 15 to 20.

21   Q. Okay.  And at that time -- I know you were a

22 detective at the time so you weren't normally out on

23 patrol, but at that time approximately how many officers

24 would have been on a patrol shift for Mt. Juliet PD?

25   A. Somewhere between eight, maybe six and 10.

1    I would say eight is probably about the average that

2    you'd see.

3         Q.   Okay.  So this is -- this is the entire

4    patrol shift plus another entire patrol shift worth?

5         A.   Yes, sir.

6         Q.   Any command staff were there?

7         A.   Yes.

8         Q.   Other detectives, you said?

9         A.   Yes, sir.

10        Q.   Okay.  And you said, did you say that you

11   had to bring in the SWAT team for the department; is that

12   right?

13        A.   Yes.  Yes, special response team and the

14   negotiators, I think we got called in at the same time.

15        Q.   Okay.  And that's commonplace within a

16   police response, right, to bring in both your negotiation

17   response and your tactical response?

18        A.   Yes, sir.

19        Q.   And the tactical response isn't there

20   because there's a deadly threat.  They're there to aid in

21   arrest; is that right?

22        A.   Yes, sir, usually.

23        Q.   Okay.  They -- a SWAT team -- fair to say

24   that a typical SWAT kit, what the officer's wearing on

25   their body as a SWAT operator, they carry a few more sets

1  of handcuffs than your typical patrol officer?

2      A.    Sure.

3      Q.    So they've got more equipment to aid in

4  arresting a large group of people; right?

5      A.    Yes, sir.

6      Q.    Based on your experience as a negotiator,

7  approximately how long does it take to get -- not

8  necessarily the whole team assembled, but a couple

9  officers from the SWAT team out to the scene?

10     A.    They will trickle in for sure.  Because it's

11 a dual capacity, a lot of them -- we will have our SWAT

12 team and negotiators on all of our shifts.  Some of them,

13 I think, were on scene at the time because they were on

14 shift.  As they start coming in, we'll get a hasty team

15 together probably in 45 minutes.

16     Q.    Yeah.  So you said before you -- I think you

17 used the term collateral duty to refer to your

18 negotiation duties.

19     A.    Yes, sir.

20     Q.    And that's true of SWAT operators as well.

21 It's a collateral duty for them?

22     A.    Yes, sir.

23     Q.    Meaning it's not their primary task.

24 They're not spending their eight-hour shift working as a

25 member of the SWAT team.  You're not spending your

1   eight-hour shift working as a negotiator.  You've got

2   your primary duty as a detective; they might have their

3   primary duty as a patrol officer?

4          A.    Yes, sir.

5          Q.    You were asked a number of questions about

6   the atmosphere, whether it was a charged atmosphere there

7   when you got there?

8          A.    Yes, sir.

9          Q.    I just want to clarify.  Were you in the

10  hallway on the way to the clinic when Sergeant Schneider

11  attempted to go down that hallway escorting a female who

12  was trying to access the clinic?

13         A.    No, sir.

14         Q.    Okay.  Were you -- and you weren't in the

15  hallway when another patient arrived and was trying to

16  get access to her morning appointment at around

17  7:47 a.m.; right?

18         A.    No, sir.  That would have been just before I

19  arrived.

20         Q.    Okay.  And you said most of the negotiations

21  actually didn't take place in that hallway.  It was in a

22  different hallway; is that right?

23         A.    Yes, sir.

24         Q.    Okay.  So you weren't just standing there

25  monitoring everything that was going on at the doors into

1   the clinic?

2        A.   Well, from my position, I saw -- I could see

3   down the other hallway.  They were -- they were kind of,

4   I don't know if adjacent is the right term.  If here is

5   our -- the elevator shaft or the elevator lobby, over

6   here to the right was the hallway where we were.  And

7   then the other hallway was right about here.  So I

8   could -- I could see down that hallway.  I couldn't see

9   everything, but I could see a good portion of it.

10       Q.   Let's talk a little bit about what you saw.

11  Again, how many -- approximately people were in that

12  hallway?

13       A.   15, 20.

14       Q.   Okay.  And they were preventing people from

15  accessing that clinic; is that right?

16       A.   Yes, sir.

17       Q.   Okay.  And you understand that the -- you

18  understood at the time that the reason they were

19  preventing people from accessing that clinic is because

20  that clinic provided reproductive health services; is

21  that right?

22       A.   Yes, sir.

23       Q.   And you understood that because

24  Mr. Gallagher and Mr. Vaughn both conveyed to you that

25  that was the reason why they were there; is that right?

```
 1          A.    Yes, sir.
 2          Q.    All right.  You were asked a number of
 3   questions about your training and experience as a
 4   negotiator; is that right?
 5          A.    Yes, sir.
 6          Q.    I'd like to talk to you about some of those
 7   things that you discussed in your direct examination.
 8   You were asked kind of repeated questions about
 9   information that's important, information that impacts
10   your negotiation.
11          A.    Yes, sir.
12          Q.    As a negotiator, you're trying to take in as
13   much information as you can get; is that right?
14          A.    Yes, sir.
15          Q.    So that involves a lot of listening; is that
16   fair to say?
17          A.    Yes, sir.
18          Q.    Okay.  You also talked about your -- you
19   were asked about a question about whether -- whether you
20   felt that Mr. Vaughn was a good faith negotiator; is that
21   right?
22          A.    Operating in good faith, yes.
23          Q.    Operating in good faith, okay.
24          A.    Yes, sir.
25          Q.    And what you're talking about there is you
```

1 didn't know that you were being deceived by Mr. Vaughn or

2 Mr. Gallagher; is that right?

3     A.    Yeah, I had no -- no -- I guess I didn't --

4 I didn't receive that, no, sir.

5     Q.    Okay.  You -- at some point that day, you

6 became aware of a flyer or a handbill that was printed

7 up, typed on a computer and printed?

8     A.    Yes, sir.

9     Q.    Okay.  And that handbill announced that

10 people at that clinic in Mt. Juliet had been arrested; is

11 that right?

12     A.    Yes, sir.

13     Q.    And it's your recollection that that

14 handbill was distributed before arrests were even made;

15 is that right?

16     A.    It is, yes, sir.

17     Q.    Okay.  Did -- when you -- when you arrived

18 on scene that day and you first began to speak with

19 Mr. Vaughn and Mr. Gallagher, did they give you a copy of

20 that handbill?

21     A.    No, sir.

22     Q.    Did they tell you at that moment that people

23 were definitely going to be arrested because we had

24 preprinted a flyer announcing that people were going to

25 be arrested?

1    A.    They did not say that -- they didn't say it

2    like that, obviously.

3    Q.    Okay.

4    A.    They definitely -- I think that when I was

5    speaking with Mr. Gallagher, he was making it pretty

6    clear that they felt they were mandated by -- you know,

7    by the Lord to be doing what they were doing.

8    Q.    Okay.

9    A.    So that shift -- that's what I was speaking

10   of.  At some point we had to shift from, okay, there are

11   going to be people going to be arrested, how many can we

12   get out.

13   Q.    Yeah.  So you did become aware at some point

14   that there were definitely going to be people who needed

15   to be arrested; right?

16   A.    Sure.

17   Q.    But when you first got there, you weren't

18   told anything about that flyer?

19   A.    Not about the flyer, no, sir.

20   Q.    Okay.  And when you -- when you first got

21   there, were you told anything about blowfish?

22   A.    No, sir.

23   Q.    Your reaction, it's fair to say that that's

24   a word you're not familiar with in the context of a

25   clinic blockade; is that right?

1           A.      Sure.

2           Q.      So no one told you at any point that there

3    were a number of people in the hallway there who were --

4    the purpose of them being there was to trick the police

5    into thinking that more people would need to be arrested

6    than would actually need to be arrested?

7           A.      Nobody shared that with me, no, sir.

8           Q.      Okay.  And you -- you were asked questions

9    about Mr. Vaughn's trips back to the -- the blockaders in

10   the hallway blocking the doors.

11          A.      Yes, sir.

12          Q.      And he would go back there, talk to them,

13   he'd come back there and talk to you; is that right?

14          A.      Yes, sir.

15          Q.      Did you know -- or let me ask it this way.

16   Did -- did Mr. Vaughn tell you that when he was back

17   there, Mr. Gallagher was telling people in the hallway

18   and over -- over a video that he and Mr. Vaughn were

19   using the negotiations as a tactic to stall police

20   action?

21               MR. CRAMPTON:  Objection, Your Honor.

22   Mischaracterizes the evidence.

23               THE COURT:  Overruled.

24               THE WITNESS:  No, sir, I didn't hear that.

25

BY MR. BOYNTON:

Q.    Okay.  Is today the first time you're ever hearing that?

A.    Yes, sir.

Q.    All right.  Now, you were asked on your direct examination about whether you knew anyone was -- was in the clinic --

A.    Uh-huh (affirmative).

Q.    -- at the time that this was taking place. And can you just remind me of your answer why -- what your reaction is to finding that out?  I think the first time you found that out was when you and I met for the first time --

A.    Yes, sir.

Q.    -- a couple months ago; is that right?

A.    Yes, sir.  I didn't remember -- I don't remember anybody sharing that with me.  I think that the initial call came from the clinic.  And I think I shared that with you.  I think that would have been our original complainant.

So my understanding from patrol would have been that when I as a patrol officer got there, that probably would have been my first priority.  So I don't know who didn't get them out or why they didn't get them out or maybe -- I don't know.  I don't know why that

1    didn't happen.

2            Q.    Okay.  But Mr. Vaughn didn't share that with

3    you, that there were people inside the clinic; is that

4    right?

5            A.    No.

6            Q.    And Mr. Gallagher didn't?

7            A.    No.

8            Q.    I want to talk a little bit about kind of

9    the end of -- end of things.  You gave the final order to

10   disperse.  And I think your testimony before was that

11   your recollection sitting here today was that there were

12   eight adults and four juveniles that ultimately needed to

13   be arrested; is that right?

14           A.    I think so, based on -- based on my report,

15   yes, sir.

16           Q.    Would it surprise you if there were nine

17   adults?  Does that --

18           A.    No.

19           Q.    -- ring a bell?

20           A.    Yeah, like I said, I think I read that in my

21   report preparing for the trial.  I don't remember it that

22   day, I'm sorry.

23           Q.    All right.  I want to talk a little bit

24   about just kind of police procedures for arresting

25   somebody.

1      A.     Sure.

2      Q.     So would the juveniles that day -- I want to

3  set them aside first, because the juveniles that day,

4  they just received citations; right?

5      A.     I believe so.

6      Q.     So that's a summons to come to court?

7      A.     Yes, sir.

8      Q.     And then they were released to their

9  parents; is that right?

10     A.     I believe so, yes, sir.

11     Q.     Never put in handcuffs?

12     A.     I don't know.  I don't know who -- there

13 were several people that enacted that, so I don't -- I

14 can't speak that nobody got put in handcuffs, I'm not

15 sure.

16     Q.     To the best of your knowledge you didn't see

17 any kids -- I'm sorry, you did not see any kids in

18 handcuffs?

19     A.     No, sir.

20     Q.     And you didn't see any kids that had to be

21 transported to be processed to a jail or anything like

22 that?

23     A.     No, sir.

24     Q.     So let's talk about the nine adults.  The

25 typical patrol officer for Mt. Juliet PD, how many sets

1  of handcuffs do they carry on them?

2          A.    I carry three.

3          Q.    Okay.  Would you say that was kind of

4  typical among patrol officers?

5          A.    Two -- at least two.

6          Q.    At least two.  And then fair to say

7  officers, detectives might keep some zip ties or

8  something like that in their car?

9          A.    Sure.

10         Q.    And zip ties are kind of a -- they're a

11 fabric or a plastic cuff for lack of a better term?

12         A.    Yeah, I think we used the flex cuffs that

13 were -- they are zip ties, but they're made for that

14 handcuffing.

15         Q.    It's like as a one-time-use handcuff; right?

16         A.    Yes, sir.

17         Q.    You put it on and lock it up and then you'll

18 have to actually --

19         A.    Cut it, yes, sir.

20         Q.    -- clip it off; right?  Okay.

21               So two to three sets of handcuffs per patrol

22 officer and then the flex cuffs maybe in the car?

23         A.    Yes, sir.

24         Q.    So when you got there that day -- and I

25 think your testimony was you got there around 8 o'clock?

1          A.     I believe so, yes, sir.

2          Q.     And there are about 20 officers there at

3     that time, you said; is that right?

4          A.     Yes, sir.

5          Q.     Okay.

6          A.     Somewhere around there.

7          Q.     So we're talking about 40 sets of handcuffs

8     and maybe another 20 sets of flex cuffs in the car?

9          A.     Sure.

10         Q.     Okay.  Couple SWAT operators might be there

11    from patrol, and they'll have more cuffs; right?

12         A.     Yes, sir.

13         Q.     Okay.  Let's talk about transport for a

14    second.  Typically you'll transport one arrestee in a

15    patrol car; right?

16         A.     If they're nonviolent, we can transport two.

17         Q.     Okay.  And you testified that these folks

18    were nonviolent; right?

19         A.     Yes, sir.

20         Q.     And did you also have a patrol van or some

21    sort of transport van for Mt. Juliet?

22         A.     Mt. Juliet does not, no, sir.

23         Q.     All right.  But your neighboring

24    jurisdictions or Tennessee Highway Patrol has one?

25         A.     Yeah, the Wilson County Sheriff's Office, I

1    think, is who we reached out to to utilize theirs.

2          Q.    Okay.  And that's -- Wilson County is right

3    around you; right?

4          A.    Yes, sir.  We're in Wilson County, yes, sir.

5          Q.    Yeah.  So all right.  About -- have you used

6    that van before?  Are you familiar with that?

7          A.    I've not been a part of somewhere that we

8    needed that van before before that incident.

9          Q.    All right.  But you -- you talked about the

10   two -- two seats for nonviolent folks in the back of the

11   patrol cars.  So to fit nine people in there, you need

12   five patrol cars; is that right?

13         A.    Sure.  Yes, sir.

14         Q.    And you've got -- you've got approximately

15   20 officers on scene at that point?

16         A.    Yes, sir.

17         Q.    You were asked some questions about all of

18   the leaders and the command staff there.  You arrive on

19   scene and the chief of police was kind of taking the

20   lead; is that right?

21         A.    I saw him negotiating with Mr. Gallagher and

22   Mr. Vaughn.

23         Q.    Okay.  But you have a special skill?

24         A.    Yes, sir.

25         Q.    And so you -- you became the negotiator even

though there were all these other leaders who were there?

A.    Yes, sir.  After I was given permission to, yeah.

Q.    Okay.  But you're still part of the police department; right?

A.    Yes, sir.

Q.    Right.  Officer Watkins, I want to ask you about -- you were asked some questions about the folks out in the road.  Do you remember that?

A.    Uhm.

Q.    Or there were folks outside the clinic, not law enforcement officers; is that right?

A.    Yes, sir.

Q.    Okay.  And you understood them to be associated with folks on the inside?

A.    Yes, sir.

Q.    All right.  And do you recall having a conversation with any of them after the arrests had been made?

A.    Yes, sir.  There was -- there was a group that moved to one of the intersections.  I don't remember which one.  It's the one right in front of Chick-fil-A in Providence, South Mt. Juliet Road.  I'm blanking on that middle cross street there.  And I think that they were handing out pamphlets and -- and -- pamphlets, I think,

and a couple of them had signs on the other side of the
road.  Once we had cleared that area and we heard that
they were there, because I had kind of created that, I
guess, rapport with them, I moved over to speak with them
and asked if there was going to be any -- basically just
give me a heads-up if this is going to turn into another
thing that I need to let somebody know about.  And they
said that it wasn't.  And I said okay, as long as you
stay on the sidewalk or are not blocking traffic, you
guys are more than welcome to do what you're doing.

     Q.    Fair to say you were still in a negotiator
role at that point; correct?

     A.    Yes, sir.

     Q.    Trying to understand where things are going
from there?

     A.    Yes, sir.

     Q.    Now, as part of asking for that
communication, did you share any information about
yourself?

     A.    Oh, yeah.  I gave them I think my cell phone
number and said, hey, if there is going to be something,
can you give me a courtesy call and that way we can get
things in place.  We're here for the First Amendment, you
know, we want to protect your First Amendment rights.
Give me a heads-up if you can.  And I think they said

1   they would if that was going to be a thing, but they told

2   me they weren't going to do that.

3       Q.   Part of the reason that heads-up would be

4   superhelpful is because of the number of resources that

5   the department had to commit to the Providence pavilion

6   that day; right?

7       A.   Sure.  Depending on how large that was going

8   to be, yeah.  If you're going to be doing the -- you

9   know, handing out flyers and stuff, that's different, but

10  it was going to be a full scale thing, then we needed

11  to -- heads-up would be nice.

12      Q.   Yeah.  And I just want to be clear, no one

13  gave you a heads-up, to your knowledge, that this event

14  was going to happen this day; right?

15      A.   Correct.

16      Q.   All right.  You -- a couple weeks -- or is

17  it fair to say that around March 17 of 2021, you received

18  a package in the mail addressed to you at the police

19  department?

20      A.   Yes, sir.

21      Q.   Okay.  And do you recall --

22           MR. HAYMAKER:  Judge, I'm going to object to

23  the relevance.

24           THE COURT:  I guess we'll have to have a

25  conference.  I don't know what he's going to say.

1              (Whereupon, the following proceedings were

2    had at the bench outside the hearing of the jury:)

3              THE COURT:  Okay.  Can you hear me?

4              MS. BELL:  I'm sorry, Your Honor, mine

5    doesn't have signal.

6              THE COURT:  Why doesn't Mr. Boynton and

7    Mr. Haymaker come up here and we'll have a bench

8    conference up here.

9              MR. HAYMAKER:  Judge, I believe he is going

10   to elicit testimony that my client sent him a gift in the

11   mail.

12             MR. BOYNTON:  Yeah.

13             THE COURT:  What was it?

14             MR. BOYNTON:  It was a letter.  It was a DVD

15   about the Black Robed Regiment.  And it was a book called

16   "The Doctrine of the Lesser Magistrates," which is a

17   protestant doctrine about lower-level government

18   employees disobeying higher authorities.

19             THE COURT:  What's the -- this is a

20   relevance objection?

21             MR. HAYMAKER:  It's relevance and this is

22   after the -- it's after the conspiracy is over with.

23             THE COURT:  What's the relevance?

24             MR. BOYNTON:  I think the relevance,

25   Your Honor, is that it indicates because the detective

has -- only knows Coleman Boyd through that day and the
detective is going to testify that he understood that he
would be a witness in the case against anybody who was
arrested, he received this package from Coleman Boyd at
the police department and he was concerned about it.  He
put it into evidence as soon as he opened it because he
thought the contact was inappropriate given the
circumstances.

          THE COURT:  Sounds pretty relevant to me.

          MR. HAYMAKER:  I would say it's 404(b) too.

          THE COURT:  Might have a little 404(b)
problem here.

          MR. BOYNTON:  It's a little 404(b).

          THE COURT:  Yeah.

          MR. BOYNTON:  I think that it's evidence
of -- you know, his membership within the conspiracy is
relevant here, and so I think the purpose of the evidence
is not to show -- I'm not going to make any argument --
I'll be doing closing.  Amanda will be doing rebuttal.
No one is going to make an argument that there was an
attempt at witness tampering here.  And maybe we can cure
that by not eliciting any of the testimony about him as a
potential witness.

          MR. HAYMAKER:  Judge, I think that that may
be their intent, but the effect is going to be what it's

1  going to be.  And I think that the effect is going to be

2  exactly what he said they're not going to argue.  I don't

3  see how my client sending him a gift --

4          THE COURT:  What if he just testifies he

5  received something in the mail from Mr. Boyd, he opened

6  it and he put it in the evidence room.

7          MR. BOYNTON:  Without any details about what

8  it was?  I'm fine with that.

9          THE COURT:  Yeah, without any details.  I

10  mean, the -- there's been a lot of testimony about the

11  fact that this guy's a pastor and that -- I don't know --

12  I don't know, how does it hurt you?

13          MR. HAYMAKER:  Well, I think, first of all,

14  I think the jury will jump to -- I think there's a danger

15  that the jury jumps to a conclusion that he is trying to

16  tamper with a witness or something like that.  I don't

17  think that's what's going on, but I think the jury will

18  jump to that conclusion or may jump to that conclusion.

19  Beyond that, I just don't think it's relevant.  I think

20  it's after -- it's after the --

21          THE COURT:  Yeah, it's too problematic.

22          MR. BOYNTON:  Okay.

23          THE COURT:  I'm going to sustain the

24  objection.

25          MR. BOYNTON:  Thank you, Your Honor.

1              THE COURT:  Okay.

2              (End of bench conference.  Whereupon, the

3  following proceedings were had in the hearing and

4  presence of the jury:)

5  BY MR. BOYNTON:

6       Q.    Officer Watkins, you were asked on your --

7  Mr. Crampton's questioning of you about whether the

8  individuals who were in that hallway were compliant.  Do

9  you recall that?

10      A.    Yes, sir.

11      Q.    Okay.  And it's fair to say that they were

12 compliant with officers putting handcuffs onto them and

13 taking them out to the patrol car; is that right?

14      A.    Yes, sir.

15      Q.    But it's also fair to say that they were not

16 compliant with the first request by police for them to

17 leave the inside of the Providence pavilion?

18      A.    Yes, sir.

19      Q.    Fair to say they were not compliant with the

20 second request to leave?

21      A.    Yes, sir.

22      Q.    They were not compliant with repeated

23 requests by other officers and you to leave the second

24 floor of the Providence pavilion?

25      A.    Yes, sir.

1                   MR. BOYNTON:  All right.  Thank you,

2      Your Honor.  No more questions.

3                   THE COURT:  Okay.  Any additional cross by

4      any other defendants?

5                   MS. BELL:  Yes, Your Honor.

6                   THE COURT:  All right.  Ms. Bell.

7                   MS. BELL:  Thank you.

8                          **CROSS—EXAMINATION**

9      BY MS. BELL:

10          Q.    Good afternoon, Officer Watkins.

11          A.    Yes, ma'am.

12          Q.    You mentioned that you did not know that

13     there were any people inside the clinic; correct?

14          A.    Yeah, I don't think that I knew that.

15          Q.    And it's fair to say that when you got

16     there, there was nothing indicating to you that there was

17     someone inside the clinic; correct?

18          A.    That's correct.

19          Q.    And fair to say that there was nothing to

20     indicate to you that they knew somebody was inside the

21     clinic as well; correct?

22          A.    That's correct.

23          Q.    You said that you negotiated with Mr. Vaughn

24     and Mr. Gallagher.  Was it primarily with Mr. Vaughn?

25          A.    I don't -- I don't know.  I know that I

1    spoke with both of them.

2         Q.    Yes, sir.

3         A.    I think towards the beginning I think I

4    spoke more with Mr. Gallagher, and towards the back half

5    I think was more of Mr. Vaughn.

6         Q.    Was Mr. Vaughn going back and forth to

7    Mr. Gallagher and Mr. Gallagher then conveying to the

8    rest of the group, is that sort of how it worked?

9         A.    I'm not sure.

10        Q.    Okay.  With respect to the discussions you

11   were having and not going into sort of the substance of

12   that, were options other than arrest proposed to you or

13   by you to them as part of that negotiation?

14        A.    At that point we kind of had the two

15   options.  That was, hey, voluntary compliance, and

16   then -- and leaving the premises.  And then obviously the

17   alternative there is that those that don't would have to

18   be arrested.

19        Q.    And ultimately there came a point where you

20   did do the announcement that if you don't leave in five

21   minutes you'll be arrested --

22        A.    Yes, ma'am.

23        Q.    -- correct?  Now, prior to that, though, do

24   you recall that Ms. Bancroft, your partner, obtained

25   identification information from everyone?

1    A.    Yes, I believe -- I know somebody did.
2  Probably was her.
3    Q.    And there was nothing about obtaining that
4  information that was brought to your attention that
5  anyone was noncompliant about that or refusing?
6    A.    That's correct.  No, ma'am.
7    Q.    And, again, it's kind of interesting when
8  you watch the video.  The announcement is made and people
9  leave; correct?
10    A.    Yes, ma'am.
11    Q.    And then you say, okay, now it's time to be
12  arrested, and there's almost the same compliance except
13  people get handcuffed; is that right?
14    A.    Yes, ma'am.
15    Q.    They almost looked identical; correct?
16    A.    Yes, ma'am.
17    Q.    When you were going through the process of
18  actually physically arresting the people, nobody fell to
19  the ground, nobody resisted that arrest, nobody refused
20  to leave at that point; correct?
21    A.    That is correct.  Yes, ma'am.
22          MS. BELL:  I think those are all my
23  questions.  Thank you.
24          THE WITNESS:  Yes, ma'am.
25          THE COURT:  Mr. Parris, anything?

1          MR. PARRIS:  No questions.

2          MR. HAYMAKER:  No questions.

3          THE COURT:  Mr. Crampton -- well, let's get

4   additional questions.  Mr. Russ?

5          MR. RUSS:  None, Your Honor.

6          MR. CONWAY:  None, Your Honor.

7          THE COURT:  Any redirect?

8          MR. CRAMPTON:  None, Your Honor.

9          THE COURT:  All right.  You may step down.

10         THE WITNESS:  Thank you, ma'am.

11                **\*\*\*\*WITNESS EXCUSED\*\*\*\*\***

12         THE COURT:  All right.  Any other proof from

13  any defendant?

14         THE COURT:  Any rebuttal from the

15  government?

16         MR. BOYNTON:  No, Your Honor.

17         THE COURT:  Okay.  I guess I need to have

18  each defendant rest on the -- I'm going to have you rest

19  on the record.

20         MS. BELL:  Your Honor, on behalf of Chester

21  Gallagher, we rest.

22         MR. PARRIS:  On behalf of Calvin Zastrow, we

23  rest.

24         MR. HAYMAKER:  On behalf of Dr. Coleman

25  Boyd, we rest.

1          MR. CRAMPTON:  On behalf of Paul Vaughn, we

2    rest.

3          MR. RUSS:  Your Honor, on behalf of Dennis

4    Green, we rest.

5          MR. CONWAY:  On behalf of Heather Idoni, we

6    rest.

7

8          (Defense rests.)

9

10         THE COURT:  And there's no rebuttal from the

11   government?

12         MR. BOYNTON:  Correct, Your Honor.

13         THE COURT:  All right.  So the proof is

14   closed.  Members of the jury, we're going to let you have

15   an extra hour today.  We're going to send you home.  We

16   have some matters that we need to deal with out of your

17   presence.

18         So when you come back on Monday morning, we

19   will have closing arguments and instructions and you will

20   begin your deliberations hopefully by noon.  So it's very

21   important that you continue to follow my instructions to

22   not talk about this case with anyone or amongst

23   yourselves.  Ignore any news coverage on any media.  And

24   do not do any investigation about anything or anyone

25   connected to this case.  And have a nice weekend and

1    we'll see you back Monday at 9:00.  You're excused.

2                  (Whereupon, at 3:59 p.m. the jury retired

3    from open court.)

4                  **(Proceedings continued; transcription not**

5    **requested.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**REPORTER'S CERTIFICATE PAGE**

1

2

3          I, Roxann Harkins, Official Court Reporter for

4   the United States District Court for the Middle District

5   of Tennessee, in Nashville, do hereby certify:

6          That I reported on the stenotype shorthand

7   machine the proceedings held in open court on

8   January 26, 2024, in the matter of UNITED STATES OF

9   AMERICA v. CHESTER GALLAGHER, ET AL., Case No.

10  3:22-cr-327; that said proceedings were reduced to

11  typewritten form by me; and that the foregoing transcript

12  is a true and accurate transcript of said proceedings.

13

14          This is the 12th day of March, 2024.

15

16                    s/ Roxann Harkins_____
                      ROXANN HARKINS, RPR, CRR
17                    Official Court Reporter

18

19

20

21

22

23

24

25